1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10   UMG RECORDINGS, INC., a corporation;          )   CASE NO. CV 14-03466 MMM (JPRx)
     CAPITAL RECORDS, LLC, a limited              )
11   liability company; UNIVERSAL MUSIC           )
     CORP., a corporation; SONGS OF               )   ORDER DENYING DEFENDANTS'
12   UNIVERSAL, INC., a corporation;              )   MOTION TO DISMISS
     UNIVERSAL – POLYGRAM                          )
13   INTERNATIONAL PUBLISHING, INC., a            )
     corporation; UNIVERSAL – POLYGRAM            )
14   INTERNATIONAL TUNES, INC., a                 )
     corporation; UNIVERSAL MUSIC – MGA           )
15   NA, LLC, a limited liability company;        )
     UNIVERSAL MUSIC – Z TUNES LLC, a             )
16   limited liability company; RONDOR            )
     MUSIC INTERNATIONAL, INC., a                 )
17   corporation,                                  )
                                                   )
18             Plaintiffs,                         )
                                                   )
19        vs.                                      )
                                                   )
20   GLOBAL EAGLE ENTERTAINMENT,                   )
     INC., a corporation; INFLIGHT                 )
21   PRODUCTIONS, INFLIGHT                          )
     ENTERTAINMENT ALLIANCE, AND                   )
22   IFP; INFLIGHT PRODUCTIONS USA                 )
     INC. / AAEC INC., a corporation, for itself  )
23   and d/b/a INFLIGHT PRODUCTIONS,               )
     INFLIGHT ENTERTAINMENT                        )
24   ALLIANCE and IFP; INFLIGHT                    )
     PRODUCTIONS LTD., an entity of               )
25   unknown form; and DOES 1-20, inclusive,      )
                                                   )
26             Defendants.                         )
                                                   )
27

28        UMG Recordings, Inc., Capital Records, LLC, Universal Music Corp. (the "record company

plaintiffs"), Songs of Universal, Inc., Universal–Polygram International Publishing, Inc., Universal–Polygram International Tunes, Inc., Universal Music–MGA NA, LLC, Universal Music–Tunes, LLC, and Rondor Music International, Inc., (the "music composer plaintiffs") filed this action against Global Eagle Entertainment, Inc., Inflight Productions, Inflight Entertainment Alliance, and IFP, Inflight Productions USA Inc./AAEC Inc., for itself and d/b/a Inflight Productions, Inflight Entertainment Alliance, and IFP, Inflight Productions Ltd. ("defendants"), as well as certain fictitious defendants on May 5, 2014.[1]  The complaint pleads claims for infringement of sound recordings and musical compositions under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*.; state law copyright infringement under California Civil Code § 980(a)(2); violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200; and common law unfair competition.[2]

On June 16, 2014, defendants moved to dismiss plaintiffs' third and fourth claims for state law copyright infringement and unfair competition.[3]  Plaintiffs opposed the motion on September 8, 2014.[4]

## I.  FACTUAL BACKGROUND

Plaintiffs are various record companies and music publishers.[5]  They contend that defendants provide "various airlines" sound recordings and music videos that the airlines then publicly perform to their passengers.[6]  Defendants allegedly have no license or other authorization to perform the copyrighted sound records, music videos, and musical compositions publicly , but nonetheless reproduced, distributed, publicly performed, imported, and unlawfully advertised and promoted the

---

[1]Complaint, Docket No. 1 (May 5, 2014).

[2]*Id*. at 1.

[3]Motion to Dismiss("Motion"), Docket No. 15 (Jun. 16, 2014).  See also Reply in Support of Motion to Dismiss ("Reply"), Docket No. 32 (Sept. 15, 2014).

[4]Opposition to Motion to Dismiss ("Opposition"), Docket No. 31 (Sept. 8, 2014).

[5]Complaint, ¶¶ 12-21.

[6]*Id*., ¶ 1.

sound recordings, musical compositions, and music videos "for the entertainment of airline passengers."[7] In this way, plaintiffs assert, defendants have infringed and otherwise misused their property, which has had a material adverse impact on their revenues and profits.[8]

The record company plaintiffs allegedly hold copyrights in numerous sound records identified on a schedule attached to the complaint.[9]   The music publisher plaintiffs allegedly hold copyrights in certain musical compositions identified on a separate schedule attached to the complaint.[10]   Defendants purportedly have no license or other authorization to perform any of the copyrighted sound recordings, music videos, and musical compositions publicly.[11]   Plaintiffs assert that they have willfully reproduced, distributed, publicly performed, and imported these and "hundreds, if not thousands, of additional copyrighted sound recordings, as well as copyrighted music videos" that plaintiffs own in violation of 17 U.S.C. §§ 106 and 602.[12]   Alternatively, plaintiffs contend that, with actual or constructive

---

[7]*Id.*, ¶¶ 1-2, 26-28.  Plaintiffs attach an exemplar of defendants' allegedly unlawful advertising as Schedule A to the complaint.  (See *id.*, Schedule A.)

[8]*Id.*, ¶¶ 29-30.  Specifically, they contend defendants' unauthorized use of their musical compositions, sound recordings, and music videos conveys to the general public that their property is without value, and that it diminishes the value of the property for other purposes, including first use premiums and other exclusive uses.  (*Id.*, ¶ 30.)

[9]*Id.*, ¶ 33. See also *id.*, Schedule B (List of Copyrighted Sound Recordings).  Plaintiffs expressly reserve the right to amend the schedule to identify additional songs about which they learn through discovery or otherwise.  (*Id.*)

[10]*Id.*, ¶ 40.  See also *id.*, Schedule C (List of Copyrighted Musical Compositions).  Plaintiffs expressly reserve the right to amend the schedule to identify additional musical compositions about which they learn through discovery or otherwise.  (*Id.*)

[11]*Id.*, ¶ 2.

[12]*Id.*, ¶¶ 34, 37, 43, 45.  Under 17 U.S.C. § 106, "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the

knowledge of the infringing nature of the activity, defendants induced, caused, or materially contributed to the infringing conduct of others, and derived financial benefit from the infringement.[13]  They seek statutory damages under the Copyright Act, exemplary and punitive damages, injunctive relief, and attorneys' fees and costs.[14]

The record company plaintiffs also allege that they possess exclusive ownership interests in thousands of other sound recordings under California Civil Code § 980(a)(2).[15]  They assert, on information and belief, that defendants have reproduced, distributed, and publicly performed these recordings without permission, and seek injunctive relief and compensatory and punitive damages in an amount to be proved at trial.[16]  Finally, the record company plaintiffs assert an unfair competition claim against defendants under the UCL and common law.  They contend that defendants' unlawful appropriation of their property rights constitutes unfair competition, and ask that the court order defendants to account for all profits and compensation obtained through their unlawful conduct and

---

case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.  Under 17 U.S.C. § 602(a)(2), "[i]mportation into the United States or exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorecords, the making of which either constituted an infringement of copyright, . . . is an infringement of the exclusive right to distribute copies or phonorecords under section 106."

[13]*Id.*, ¶¶ 36, 44.

[14]*Id.*, ¶¶ 37-38, 45-46.

[15]*Id.*, ¶ 48. Defendants contend it is unclear whether plaintiffs are asserting infringement of pre-1972 sound recordings under § 980(a)(2).  (Motion at 3 n. 2.)  There is no ambiguity, however.  The complaint alleges that defendants infringed copyrights owned "pursuant to California Civil Code § 980(a)(2) and under the common law."  (Opposition at 4 n.2 (citing Complaint, ¶ 48).)  California Civil Code § 980(a)(2) provides: "The author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972, has an exclusive ownership therein until February 15, 2047, as against all persons except one who independently makes or duplicates another sound recording that does not directly or indirectly recapture the actual sounds fixed in such prior sound recording, but consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate the sounds contained in the prior sound recording." CAL. CIV. CODE § 980(a)(2).  The statute applies specifically to sound recordings fixed – i.e.,  recorded – prior to the effective date of the federal Copyright Act of 1976.  See *id.*; 17 U.S.C. § 301(c) (excluding pre-1972 recordings from preemption).

[16]*Id.*, ¶¶ 48-50.

permanently enjoin any further infringement of their exclusive rights in and to the music compositions, sound recordings, and music videos.[17]  The claim also seeks exemplary and punitive damages.[18]

## II.  DISCUSSION

### A.    Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory

---

[17]*Id.*, ¶¶ 55-56.

[18]*Id.*, ¶ 57.

1   'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a

2   claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

3   **B.      Legal Standard Governing Deregulation Act Preemption**

4          Defendants contend that the court should dismiss the record company plaintiffs' state law

5   copyright infringement and unfair competition claims because the claims are preempted by the

6   Deregulation Act.  Congress enacted the Deregulation Act in 1978 after "determining that maximum

7   reliance on competitive market forces would best further efficiency, innovation, and low prices as well

8   as variety [and] quality . . . of air transportation services. . . ." *Morales v. Trans World Airlines, Inc.*,

9   504 U.S. 374, 378 (1992) (internal quotation marks and citations omitted); see also *Rowe v. N.H. Motor*

10  *Trans. Assoc.*, 552 U.S. 364, 367-68 (2008).

11         To determine whether the Deregulation Act preempts a particular state law, the court must "start

12  with the assumption that the historic police powers of the States [are] not to be superseded by the

13  [Deregulation Act] unless that was the clear and manifest purpose of Congress." *Air Transport*

14  *Association of America v. City and County of San Francisco*, 266 F.3d 1064, 1070 (9th Cir. 2001).

15  Copyright and other intellectual property protections are historic police powers of the state.   See,

16  e.g., *Zachary v. W. Publ'g Co.*, 75 Cal.App.3d 911, 916-18 (1977) (holding that federal patent and

17  copyright law did not supersede "the general powers the states possess over their domestic affairs,"

18  and deciding that California common law copyright actions survived enactment of the federal

19  copyright statute); see also *International Tape Mfrs. Ass'n v. Gerstein*, 344 F.Supp. 38, 56 (S.D. Fla.

20  1972) ("if the Florida statute deals with prosecutions for violations of common law copyright, it in

21  no way affects the federal copyright scheme, and may be permissible as an exercise of the state's

22  police power"), vacated on other grounds, 494 F.2d 25 (5th Cir. 1974).   The Copyright Act

23  specifically carved out an exception for pre-1972 sound recordings, granting states the exclusive

24  right to determine the protection to be afforded such recordings.   This suggests that Congress

25  intended that the states would regulate pre-1972 sound recording. See 17 U.S.C. § 301(c); see also

26  *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1305 (9th Cir. 1998) (noting that

27  "Congress enacted Section 301(b)(4) of the Copyright Act to bring about '"a fundamental and

28  significant change' in existing copyright law by creating a new uniform federal copyright system

6

and preempting and abolishing 'rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law.' Congress carved out an exception to the general regime of uniform and exclusive federal copyright control by identifying '"areas of protection that preemption would not prevent the States from protecting"'). The court therefore begins its analysis on the assumption that Congress did not intend that the Deregulation Act would preempt § 980(a)(2).[19]

"Congress's 'clear and manifest purpose' in enacting the [Deregulation Act] was to achieve . . . the economic deregulation of the airline industry." *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc). The statute includes an express preemption provision, which states that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The *Charas* court held that the word "service" means "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail. In the context in which it was used in the Act, 'service' was not intended to include an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Charas*, 160 F.3d at 1261.

The Supreme Court has held that the framework that governs analysis of ERISA preemption should be used to analyze Deregulation Act preemption as well. *Morales*, 504 U.S. at 384. Thus, the "key phrase" in the Deregulation Act's preemption provision – related to – means having a connection with, or reference to, the prices, routes, or services of an air carrier. *Id*. "[S]tate enforcement actions [that have such a] connection with, or reference to, airline rates, routes, or services are [thus] pre-empted[.]" *Id*. at 384 (internal quotations and citations omitted).

A state law may "relate to" the subject matter of the Deregulation Act, and "run afoul of the

---

[19]As alleged, plaintiffs' unfair competition claim is derivative of their § 980(a)(2) claim. (See Complaint, ¶¶ 52-53.) Defendants contend it is unclear whether the unfair competition claim is based on a purported federal copyright violation, but plaintiffs confirmed that it is based solely on the § 980(a)(2) claim at the parties' pre-filing conference. (Motion at 3 n. 2.) In their opposition, plaintiffs similarly confirm that the unfair competition claim concerns only sound recordings owned "pursuant to state law." (Opposition at 4 n. 2 (citing Complaint, ¶ 53).) Whether the unfair competition claim should be dismissed, therefore, turns on whether the § 980(a)(2) claim is preempted. Defendants do not contend otherwise.

[Deregulation Act's] preemption clause, even though such law has only an indirect effect on the rates, routes, or services of an air carrier." *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1188 (9th Cir. 1998) (citing *Morales*, 504 U.S. at 385–86);[20] see also *Rowe*, 552 U.S. at 370–71 (holding that a state law may be preempted even if its effect on rates, routes, or services "is only indirect"). Some state action, however, affects an air carrier's fares in "too tenuous, remote, or peripheral a manner" to trigger preemption. *Mendonca*, 152 F.3d at 1188 (citing *Morales*, 504 U.S. at 390). Thus, where a state law has an indirect effect on the rates, routes, or services of an air carrier, it will be preempted only where that interference is acute. *Id*. at 1189.

## C.   Whether Record Company Plaintiffs' Civil Code § 980(a)(2) and Unfair Competition Claims Must Be Dismissed

The record company plaintiffs allege that defendants reproduced, distributed, and publicly performed certain sound recordings in which they have state law copyrights in violation of California Civil Code § 980(a)(2), California's UCL, and California common law.[21] Defendants do not contend these allegations lack facial plausibility; instead, they argue that the Deregulation Act preempts the claims.[22] In addressing this contention, the court must decide whether provision of in-flight entertainment is a "service" under the Deregulation Act and, if so, whether § 980(a)(2) relates to the provision of such a service. The court address each issue in turn.

### 1.   Whether In-Flight Music Constitutes a "Service" Under the Deregulation Act

Defendants cite decisions from other circuits concluding that the provision of in-flight amenities

---

[20]*Mendonca* concerned the Federal Aviation Administration Authorization Act ("FAAAA") rather than the Deregulation Act. See *Mendonca*, 152 F.3d at 1185. The FAAAA, however, contains a preemption provision that is "identical to an existing provision deregulating air carriers (the Airline Deregulation Act ("ADA"))." *Id.* at 1187.

[21]Complaint, ¶¶ 48-50, 55-56.

[22]Motion at 3-6.

8

1   is a "service" within the meaning of the Deregulation Act's preemption provision.[23]  They contend these

2   cases establish that providing in-flight amenities constitutes a service even if the claim would "only

3   indirectly or minimally affect the airline's provision of that service."[24]

4       The record company plaintiffs counter that these out-of-circuit cases are in direct conflict with

5   the Ninth Circuit's holding in *Charas*, and hence that the court should not apply them.[25]  The court must

6   therefore analyze *Charas*, the out-of-circuit decisions cited by defendants, and subsequent Supreme

7   Court precedent that arguably undermines the validity of *Charas*' holding.  In *Charas*, the Ninth Circuit

8   held that "service" means "the prices, schedules, origins and destinations of the point-to-point

9   transportation of passengers, cargo, or mail," and that it "was not intended to include an airline's

10  provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar

11  amenities" 160 F.3d at 1261.  The parties do not dispute that the provision of in-flight entertainment

12  is an amenity that, under *Charas*,  does not qualify as a "service" for Deregulation Act purposes.[26]

13  _____

14      [23]*Id.* at 4.

15      [24]*Id.* at 5.

16      [25]Opposition at 6-7.

17      [26]For the first time in reply, defendants assert the statement in *Charas* that service "was not

18  intended to include an airline's provision of in-flight beverages, personal assistance to passengers,
    the handling of luggage, and similar amenities" was dicta. 160 F.3d at 1261.  As the Ninth Circuit

19  explained in *Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004),

20          "A statement is dictum when it is made during the course of delivering a judicial
            opinion, but . . . is unnecessary to the decision in the case and [is] therefore not

21          precedential.  *Best Life Assur. Co. v. Comm'r,* 281 F.3d 828, 834 (9th Cir. 2002)
            (quoting *Black's Law Dictionary* 1100 (7th ed. 1999)). The line is not always easy

22          to draw, however, for where a panel confronts an issue germane to the eventual
            resolution of the case, and resolves it after reasoned consideration in a published

23          opinion, that ruling becomes the law of the circuit, regardless of whether doing so is
            necessary in some strict logical sense. *United States v. Johnson,* 256 F.3d 895, 914

24          (9th Cir.2001) (Kozinski, J., concurring)."  *Id.* at 1173 (internal quotation marks

25          omitted).

26  See also *Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (holding that court's
    interpretation of the term "incidental to" was not dicta and "became law of the circuit" where it was

27  "presented for review" and "decided in an opinion joined in relevant part by a majority of the
    panel"); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) ("We decline to dismiss our

28  precedent so lightly.  As we have noted before, where a panel confronts an issue germane to the

1  Defendants contend that *Charas*' holding is inconsistent with controlling Supreme Court precedent,

2  however.

3  In support of this argument, defendants rely primarily on the Second Circuit's decision in *Air*

4  *Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008). The *Cuomo* court observed that a

5  "majority of the circuits to have construed 'service' [as used in the Deregulation Act] have held that the

6  term refers to the provision or anticipated provision of labor from the airline to its passengers and

7  encompasses matters such as boarding procedures, baggage handling, and food and drink – matters

8  incidental to and distinct from the actual transportation of passengers." *Id.* at 223. It held that a New

9  York state law affirmatively "requiring airlines to provide food, water, electricity, and restrooms to

10  passengers during lengthy ground delays relate[d] to the service of an air carrier and therefore [fell]

11  within the express terms of the ADA's preemption provision." *Id.* In so doing, the *Cuomo* court

12  explicitly rejected *Charas*' definition of service, concluding that it was "inconsistent with the Supreme

13  Court's recent decision in *Rowe*." *Id.*

14  In *Rowe*, the Supreme Court held that a provision in the FAAAA – which preempts state

15  regulation of trucking – preempted a Maine law concerning the delivery of tobacco. 552 U.S. at

16  _____

17  eventual resolution of the case, and resolves it after reasoned consideration in a published opinion,
18  that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict
   logical sense" (citation omitted).

19  In *Charas*, the question the court was asked to resolve was the proper definition of service
20  as used in the Deregulation Act. It decided the issue in an en banc opinion; its definition of service
   thus became the law of the circuit, "regardless of whether doing so [was] necessary in some strict
21  logical sense." *Cetacean Community*, 386 F.3d at 1173. None of the authorities defendants cite
   refers to *Charas*'s holding as dicta. See *Cuomo*, 520 F.3d at 223 ("The Third and Ninth Circuits,
22  in contrast, have construed service to refer more narrowly to 'the prices, schedules, origins and
   destinations of the point-to-point transportation of passengers, cargo, or mail,' but not to 'include
23  an airline's provision of in-flight beverages, personal assistance to passengers, the handling of
   luggage, and similar amenities'"); *National Federation of the Blind v. United Airlines, Inc.*, No. C
24  10-04816 WHA, 2011 WL 1544524, *5 (N.D. Cal. Apr. 25, 2011) ("*Charas* held that 'service'
25  refers to such things as 'the frequency and scheduling of transportation, and [ ] the selection of
   markets to or from which transportation is provided' and does not include 'dispensing of food and
26  drinks, flight attendant assistance, or the like'"); *Rosen*, 430 N.J. Super. at 105 (noting that *Charas*
27  "defined" service as not including the "provision of in-flight beverages, personal assistance to
   passengers, the handling of luggage, and similar amenities"). Defendants' dicta argument therefore
28  lacks merit.

10

368.  The law required tobacco retailers to use a delivery service that provided recipient-verification service and prohibited any person from "knowingly" transporting a tobacco product unless the sender or recipient had a Maine tobacco license.  *Id*. at 369.  The Supreme Court held that the Maine law "related to" motor carrier "services" and was therefore preempted.  *Id.* at 368, 370-71.  This was so despite the fact that the law was directed at the tobacco industry as opposed to the trucking industry.  The Court concluded that it nonetheless had a "connection with" motor carrier services because it specifically referenced a "delivery service," and thus impermissibly regulated the "essential details of a motor carrier's system for picking-up, sorting, and carrying goods – essential details of the carriage itself."  *Id.* at 371-73.  The *Rowe* Court did not expressly define service.  See *Foley v. JetBlue Airways, Corp.*, No. C 10-3882 JCS, 2011 WL 3359730, *7 (N.D. Cal. Aug. 3, 2011) (observing that the "Court did not expressly define the term 'service'" in *Rowe*).

Following *Rowe* and *Cuomo*, several California district courts have held that *Rowe* "necessarily define[d] 'service' to extend beyond price, schedules, origins, and destinations."  See *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, No. CV 10-04816 WHA, 2011 WL 1544524, *5 (N.D. Cal. Apr. 25, 2011) (quoting *Hanni v. Am. Airlines, Inc.*, No. CV 08–00732 CW, 2008 WL 1885794, *6 (N.D. Cal. Apr. 25, 2008)).

In *Hanni*, the plaintiff asserted various personal injury claims against American Airlines, including false imprisonment, intentional infliction of emotional distress, negligence, breach of contract, and intentional misrepresentation.  The claims were premised on "several discrete actions or failures to act," specifically: "(1) [d]efendant's decision to allow [p]laintiff's flight from San Francisco to Dallas to depart in spite of the possibility of thunderstorms in Dallas; (2) after the flight was diverted to Austin, [d]efendant's refusal to permit passengers to leave the airplane while it was on the runway in Austin; (3) [d]efendant's failure 'to supply the parked aircraft with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at normal temperatures' while on the runway in Austin; (4) [d]efendant's decision not to unload checked baggage when it allowed the passengers off the airplane in Austin at 9:30 PM; (5) [d]efendant's failure to provide payment for lodging, meals, ground transportation and other expenses when the passengers were kept in Austin overnight; and (6) [d]efendant's failure to allow passengers to board their connecting flights in Dallas when they arrived

the following morning." *Hanni*, 2008 WL 1885794 at *1.

Relying on *Cuomo*, the court concluded that *Charas*' definition of services conflicted with the definition employed in *Rowe*. *Id.* at *6 ("As the Second Circuit recently noted, the Ninth Circuit's definition of 'service' in *Charas* does conflict with the Supreme Court's subsequent opinion in *Rowe,* which 'necessarily defined "service" to extend beyond prices, schedules, origins, and destinations'"). The court noted that "other circuits ha[d] allowed personal injury claims against airlines, . . . interpreting 'service' more broadly than the Ninth Circuit does." *Id.* (citing *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (holding that "[e]lements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself," but nonetheless concluding that "neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption")).

The court observed that the Ninth Circuit's decision in *Charas* was based on more than its definition of "service," in that the court there had noted broadly that "when Congress enacted federal economic deregulation of the airlines, it intended to insulate the industry from possible state economic regulation as well.  It intended to encourage the forces of competition.  It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct." *Charas*, 160 F.3d at 1266; see *Hanni*, 2008 WL 1885794 at *6.  "It was in this context," the *Hanni* court noted, that *Charas* held "'service' [did] not refer to the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions." *Id.*  The *Hanni* court therefore drew a distinction for preemption purposes between challenges to past tortious conduct and affirmative state regulations or requirements governing how an air carrier does business.  It held that, "to the extent they are not controlled by specific regulations, [p]laintiff's claims [were] not preempted." *Id.* at *7.  Because some of plaintiff's claims involved "issues about which the government ha[d] promulgated regulations," however, i.e., regulations governing compensation "for lodging, meals, substitute transportation and similar expenses" when a flight is delayed or cancelled, the court found claims related to such compensation preempted. *Id.* at *7.

The *National Federation* court reached a similar conclusion.  It noted that "[w]hile *Charas*

12

defined 'service' narrowly, *Rowe* put forth a more expansive view." *National Federation*, 2011 WL 1544524 at *5. Like the *Hanni* court, moreover, the *National Federation* court noted that "[e]ven if *Charas* [had] not [been] effectively overruled . . . ," it would not compel a finding that plaintiff's claims escaped preemption, because "*Charas* involved common law claims," not "a state statute [that was] interfer[ing] in a field traditionally regulated by Congress." *Id.*; see also *id.* at *3-4 (detailing Department of Transportation regulations regulating airport kiosks). It also noted that "airport kiosks assist passengers in accessing information about flights, checking in for flights, printing tickets and boarding passes, selecting seats, upgrading to business or first class cabins, checking baggage, and performing other transactions relevant to air travel plans," matters relevant to "service" as defined by the *Charas* court – i.e., to "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail." *Id.* at *5.

The *National Federation* court thus held that the provision of airport kiosks was a "service" as that term is used in the Deregulation Act, and that plaintiff's disability discrimination claim, which was premised on a failure to make airport kiosks accessible to the blind, was preempted. *Id.* at *8.

It does appear that the definition of "service" applied in *Rowe* calls into question the *Charas* court's limitation of the term to "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail," and suggests that the term could encompass, at least under some circumstances, "an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." See *Charas*, 160 F.3d at 1261. The *Rowe* Court's analysis examined the extent to which a state law might inhibit competitive market forces from determining the services carriers offered. It concluded that the state law in question might "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)," and/or that it "would freeze into place services that carriers might prefer to discontinue in the future." 552 U.S. at 372.

Record label plaintiffs do not dispute that the provision of in-flight entertainment, e.g., music, is an amenity. The question is whether the provision of this in-flight amenity can constitute a service under the analysis used by the Court in *Rowe*. There is no doubt that, under *Cuomo*, the provision of in-flight entertainment qualifies as a "service" because the term encompasses "matters such as boarding

13

procedures, baggage handling, and food and drink – *matters incidental to and distinct from the actual transportation of passengers*." 520 F.3d at 223 (emphasis added). Looking, moreover, as the *Rowe* Court did, at whether state regulation of in-flight entertainment would interfere with competitive market forces by requiring air carriers to provide a service they would otherwise choose not to provide or by increasing the cost of difficulty of providing the service, the court cannot say categorically that in-flight entertainment is not a "service" for purposes of assessing preemption under the Airline Deregulation Act. See 44 Fed. Reg. 9948, 9950-51 (1979) (Civil Aeronautics Board's Implementation of Preemption Provisions of the Airline Deregulation Act of 1978: "Section 105 forbids state regulation of a federally authorized carrier's routes, rates, or services. Clearly, states may not interfere with a federal carrier's decision on how much to charge or which markets to serve. . . . Similarly, a state may not interfere with the services that carriers offer in exchange for their rates. . . . Accordingly, we conclude that preemption extends to all of the economic factors that go into the provision of the *quid pro quo* for passenger's fare, including flight frequency and timing, liability limits, reservation and boarding practices, insurance, smoking rules, meal service, entertainment, bonding and corporate financing. . ."); cf. *Morales*, 504 U.S. at 384-85 ("Petitioner contends that § 1305(a)(1) only pre-empts the States from actually prescribing rates, routes, or services. This simply reads the words 'relating to' out of the statute. Had the statute been designed to pre-empt state law in such a limited fashion, it would have forbidden the States to 'regulate rates, routes, and services'").

## 2.    Whether Section 980(a)(2) "Relates To" Provision of a "Service" Under the Deregulation Act

Notwithstanding the fact that the provision of in-flight music amounts to a "service" under the Deregulation Act, defendants' preemption argument is unavailing. This is because even under *Rowe*'s more expansive definition of service, § 980(a)(2)'s relation to or connection with airline services is too tenuous to support a finding of preemption. *Rowe* is instructive on this point. The state law in that case was preempted because it had a "connection with" or "relation to" motor carrier services. It explicitly referenced a "delivery service," i.e., it affirmatively sought to regulate the "essential details of a motor carrier's system for picking-up, sorting, and carrying goods – *essential details of the carriage itself*." *Id.* at 371-73 (emphasis added). This was so despite the fact the law

14

1   was actually targeted at the tobacco industry.  Unlike the state law at issue in *Rowe*, § 980(a)(2) is

2   completely divorced from regulation of the airline industry.  The law has no direct connection to

3   airline services; it has no provisions that apply specifically to airlines, and it does not regulate –

4   directly or otherwise – the "essential details of a[n airline's] system for picking-up, sorting, and

5   carrying [passengers]."  Compare *Rowe*, 552 U.S. at 373.

6       Where, as here, the law at issue is "generally applicable," and "several steps removed from

7   prices, routes, or services," it is not preempted under the Deregulation Act.  See *Dilts v. Penske*

8   *Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014).  As the Ninth Circuit stated in *Dilts*:

9       "[E]ven if state laws increase or change [an air] carrier's operating costs, 'broad

10      law[s] applying to hundreds of different industries' with no other 'forbidden

11      connection with prices[, routes,] and services' – that is, those that do not directly or

12      indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services

13      – are not preempted by the [Deregulation Act]."  *Id.*

14  Section 980(a)(2) is precisely such a regulation.  It does not directly or indirectly target services

15  offered by airlines; rather, it is a generally applicable law that applies broadly to all persons and

16  industries.  While it may well increase the cost of airlines' in-flight services to some degree, its

17  impact on airline service is "too tenuous, remote, or peripheral . . . to have pre-emptive effect."

18  *Morales*, 504 U.S. at 390 ("Some state actions may affect [airline rates, routes or services] in too

19  tenuous, remote or peripheral a manner to have a pre-emptive effect" (citations and internal

20  quotation marks omitted)); see also *Rowe*, 552 U.S. at 375 (holding that a state law was not

21  preempted where it "prohibit[ed] certain forms of conduct and affect[ed], say, truckdrivers, only in

22  their capacity as members of the public"); *Dilts*, 679 F.3d at 647 ("Nor does a state law meet the

23  'related to' test for FAAAA preemption just because it shifts incentives and makes it more costly

24  for motor carriers to choose some routes or services *relative* to others, leading the carriers to

25  reallocate resources or make different business decisions"); *Mendonca*, 152 F.3d at 1189 (where a

26  state law has an indirect effect on rates, routes, or services, it is preempted only if that interference

27  is acute, even if it raises the overall cost of doing business, citing *Morales*, 504 U.S. at 390) ; accord

28  *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996) (a

state law "'relates to' airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them"). Accordingly, even if provision of in-flight music constitutes a service under the Deregulation Act, the record company plaintiffs' claims are not preempted because their § 980(a)(2) claim does not meet the "related to" test.[27]

*Cuomo* and *Rosen v. Cont'l Airlines, Inc.*, 430 N.J. Super. 97, 106 (App. Div. 2013), the only cases defendants cite concerning "the related to" requirement, are not to the contrary. In *Cuomo*, the relevant state law regulated the airlines even more clearly than the law in *Rowe* regulated the trucking industry. It directly regulated airline services because it "requir[ed] airlines to provide food, water, electricity, and restrooms to passengers." 520 F.3d at 222. Indeed, the law specifically referred to "service" in two of the three applicable subsections. See N.Y. GEN. BUS. LAW § 251-g(1).[28] Section 980(a)(2), by contrast, does not place any affirmative requirements on airlines, nor does it require airlines to do anything more or less than other entities and individuals. Accord *Hanni*, 2008 WL 1885794, at *7 ("Affirmative regulations restricting how a carrier does business will by definition result in a 'direct substitution of [the state's] governmental commands for competitive market forces.' In contrast, allowing individuals to recover for injuries suffered does not create any such regulation.

---

[27]Because defendants fail to establish that the record label plaintiffs' claims "relate to" the provision of airline services, the court need not address their argument that the Deregulation Act applies not only to claims against an air carrier, but also to claims against third party vendors. (Motion at 7.) Defendants appear to be correct on this point. See *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 287 n. 8 (5th Cir. 2002) ("ADA preemption is not limited to claims brought directly against air carriers"); *Marlow v. AMR Services Corp.*, 870 F.Supp. 295, 298 (D. Haw. 1994) ("The defendant need not be an air carrier so long as the state laws which prohibit defendant's alleged wrongdoing 'relate to' airline routes, rates or services"). But see *Alim v. Aircraft Service Intern., Inc.*, No. C 12–02133 WHA, 2012 WL 3647403, *3 (N.D. Cal. Aug. 23, 2012) ("The law is unclear as to whether the ADA should preempt California meal-and-rest break laws when the defendant is not *itself* an airline").

[28]N.Y. Gen. Bus. Law § 251-g(1), the law at issue in *Cuomo*, provides: "1. Whenever airline passengers have boarded an aircraft and are delayed more than three hours on the aircraft prior to takeoff, the carrier shall ensure that passengers are provided as needed with:

(a) electric generation service to provide temporary power for fresh air and lights;

(b) waste removal service in order to service the holding tanks for on-board restrooms; and

(c) adequate food and drinking water and other refreshments."

Further, while it is true that allowing such state claims might lead to individuals from different states recovering varying amounts depending on the particular states' decisional law, there is no danger that allowing such recovery could 'lead to a patchwork of state service-determining laws, rules, and regulations' that the *Rowe* court found to be 'inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace'").

In *Rosen*, the court held that claims for violation of the New Jersey Consumer Fraud Act, common law fraud and emotional distress were preempted because they arose out of an airline's advertising and its policy that it would not accept cash for the purchase of in-flight headsets.  See 430 N.J. Super. at 106.[29]  *Rosen* is distinguishable.  The conduct at issue here is that of a third party supplier of music to the airlines; the record label plaintiffs do not seek to impose liability on defendants based on any airline policy or procedure.  While the claims may impact the cost of providing in-flight amenities to passengers, Supreme Court and Ninth Circuit law is clear that this type of indirect impact is insufficient to justify preemption.  See *Rowe*, 552 U.S. at 375; *Morales*, 504 U.S. at 390; *Dilts*, 679 F.3d at 646-47; *Mendonca*, 152 F.3d at 1189.

In sum, even if in-flight entertainment qualifies as a service as that term is used in the Airline Deregulation Act, any connection between the service and § 980(a)(2) is too tenuous and remote to justify preemption.  Record label plaintiffs' § 980(a)(2), UCL and common law unfair competition claims are therefore not preempted by the Deregulation Act, and defendants' motion to dismiss must be denied.

### III.  CONCLUSION

For the reasons stated, the court denies defendants' motion to dismiss.

DATED: February 23, 2015

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[29]Further, because *Rosen* is a New Jersey state court opinion that interprets a federal statute, it is not binding on the court.