JEFFREY D. GOLDMAN (Bar No. 155589)
RYAN S. MAUCK (Bar No. 223173)
TALYA GOLDFINGER (Bar No. 294926)
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-4308
Telephone:   (310) 203-8080
Facsimile:    (310) 203-0567

Attorneys for Plaintiffs and Counter-Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC. et al., <br><br> Plaintiffs, <br><br> v. <br><br> GLOBAL EAGLE ENTERTAINMENT INC. et al., <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIMS. | CASE NO.   2:14-cv-03466-MMM-JPR <br><br> *Assigned to Hon. Margaret M. Morrow* <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR AN ORDER IDENTIFYING MATERIAL FACTS NOT GENUINELY IN DISPUTE RE:  (1) LIABILITY AND WILLFULNESS; AND (2) COUNTERCLAIMS OF DEFENDANTS INFLIGHT PRODUCTIONS LTD. AND INFLIGHT PRODUCTIONS (USA) INC.; AND MOTION TO STRIKE** <br><br> Date:          January 11, 2016 <br> Time:         10:00 a.m. <br> Ctrm:         780 <br> Judge:        Hon. Margaret M. Morrow <br><br> Complaint filed:      May 5, 2014 <br> Pretrial Conference:  February 8, 2016 <br> Trial Date:           March 1, 2016 |

JMBM | Jeffer Mangels Butler & Mitchell LLP

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, on Monday, January 11, 2016, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 780 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California 90012, the Honorable Margaret M. Morrow presiding, Plaintiffs and Counter-Defendants UMG Recordings, Inc. ("UMG"), Capitol Records, LLC ("EMI"), and Plaintiffs and Counter-Defendants Universal Music Corp., Songs of Universal, Inc., Universal – Polygram International Publishing, Inc., Universal – Polygram International Tunes, Inc., Universal Music – MGB NA LLC, Universal Music – Z Tunes LLC, Rondor Music International, Inc., and Universal Musica, Inc. (colloquially known collectively as the Universal Music Publishing Group, and referred to herein as "UMPG"; UMG, EMI and UMPG are collectively referred to herein as "Plaintiffs") will and hereby do move for an Order granting summary judgment to Plaintiffs on (1) the elements of liability and willfulness with respect to Plaintiffs' claims; (2) on the First, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Affirmative Defenses of defendants Global Eagle Entertainment Inc. ("GEE"), Inflight Productions Ltd. ("IFP Ltd."), and Inflight Productions (USA) Inc. ("IFP USA") (collectively "IFP"); and (3) on all Counterclaims of the Second Amended Counterclaims (the "SACC") of IFP.[1]

The grounds of this Motion are that there is no genuine issue as to any material fact on these claims, and that Plaintiffs are entitled to judgment as a matter of law for the following reasons:

**A.    <u>Liability and Willfulness</u>**

1.    The uncontroverted facts establish that Plaintiffs are the owners of the copyrights and state law rights at issue, and that IFP has reproduced, distributed, imported, and/or publicly performed (including by means of digital audio

---

[1] The SACC purports to assert claims against an additional counter-defendant, Universal Music Group International Ltd. ("UMGI"). However, UMGI has been dismissed for lack of personal jurisdiction.

PRINTED ON
RECYCLED PAPER
LA 12448367v1

transmissions) each of these works in the U.S., or alternatively, that the doctrines of contributory and vicarious infringement independently establish IFP's liability as to public performances (including digital audio transmissions) by airlines of such works in the U.S.

2.     The uncontroverted facts establish that IFP infringed Plaintiffs' copyrights and state law rights, and did so willfully.

**B.     <u>Affirmative Defenses</u>**

3.     IFP's First Affirmative Defense of failure to state a claim fails as a matter of law because Plaintiffs state cognizable claims for relief.

4.     IFP's Third and Seventh Affirmative Defenses of express and implied license fail as a matter of law because no factual basis exists for any license defense here.

5.     IFP's Fifth Affirmative Defense of waiver fails as a matter of law because Plaintiffs did not intentionally relinquish a known right with knowledge of its existence and the intent to relinquish it, as required to prove waiver.

6.     IFP's Sixth Affirmative Defense of consent fails as a matter of law because copyright law does not recognize a separate defense of "consent," and, in any event, no factual basis exists for such a defense here.

7.     IFP's Eighth Affirmative Defense of unclean hands fails as a matter of law because Plaintiffs do not seek equitable relief on this motion and, in any event, no factual basis exists for such a defense here.

8.     IFP's Ninth Affirmative Defense of laches fails as a matter of law because laches is not a defense to copyright infringement or to Plaintiffs' analogous state-law infringement claims, and regardless, no factual basis exists for such a defense here.

9.     IFP's Tenth Affirmative Defense of abandonment fails as a matter of law because there is no evidence of an intent by Plaintiffs to surrender rights in any work, or of an overt act evidencing such intent.

PRINTED ON
RECYCLED PAPER
LA 12448367v1

10.     IFP's Eleventh Affirmative Defense of preemption under the Airline Deregulation Act fails as a matter of law because, as the Court has already ruled, this statute is inapplicable to inflight entertainment, and, in any event, no factual basis exists for such a defense here.

## C.     Counterclaims

11.     IFP's First Counterclaim for Intentional Misrepresentation fails as a matter of law because (a) Plaintiffs did not make any misrepresentations to IFP; (b) IFP did not justifiably rely on any misrepresentations by Plaintiffs; (c) Plaintiffs did not make any promises to IFP with fraudulent intent; and (d) any alleged misrepresentation by Plaintiffs did not proximately cause IFP's alleged damages.

12.     The Second Counterclaim for Concealment fails as a matter of law because (a) IFP did not justifiably rely on any facts that Plaintiffs should have, but failed to, disclose; (b) Plaintiffs did not make any promises to IFP with fraudulent intent; and (c) any facts that Plaintiffs allegedly concealed did not proximately cause IFP's alleged damages.

13.     The Third Counterclaim for Negligent Misrepresentation fails as a matter of law because (a) Plaintiffs did not make any misrepresentations to IFP; (b) IFP did not justifiably rely on any misrepresentations by Plaintiffs; and (c) any alleged misrepresentation by Plaintiffs did not proximately cause IFP's alleged damages.

14.     The Fourth Counterclaim for Intentional Interference with Contractual Relations fails as a matter of law because (a) IFP's claims are barred by the litigation privilege and the *Noerr-Pennington* doctrine; (b) Plaintiffs did not disrupt or breach IFP's airline contracts; and (c) any alleged actions by Plaintiffs did not proximately cause IFP's alleged damages.

Alternatively, Plaintiffs request, pursuant to Fed. R. Civ. P. 56(g), that the Court enter an Order stating material facts that are not genuinely in dispute and treating such facts as established in the case.

Plaintiffs also move for an Order striking paragraph 129 of the SACC (from

PRINTED ON
RECYCLED PAPER
LA 12448367v1

Jeffer Mangels
Butler & Mitchell LLP

JMBM

page 41, line 20 through page 42 line 20) and all references to United Airlines in paragraphs 94, 95, 101, 127, 129 of the SACC on the grounds that those new allegations violate the Court's October 30, 2015 Order [Dkt. 362] because they are new allegations not directed to cure the specific defects the Court identified in that Order.

This motion is based upon this Notice; the accompanying Memorandum of Points and Authorities ("Memorandum"); the Separate Statement of Uncontroverted Facts and Conclusions of Law ("Separate Statement") filed herewith; the accompanying Declaration of Jeffrey D. Goldman ("Goldman Decl.") and exhibits thereto; the court file; any matters of which this Court may properly take judicial notice or may otherwise consider (including the matters identified in the concurrently filed Request for Judicial Notice); any reply Plaintiffs may make; and any further evidence and argument that may be presented to the Court prior to or at the hearing on this Motion or as otherwise permitted.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on various dates, including but not limited to November 2, 4, 9 and 13, 2015.

In the Memorandum, Plaintiffs cite the uncontroverted facts from the Separate Statement in superscript text with a "UF" prefix (*e.g.*, "UF–"). Footnotes in the Memorandum are in superscript text and italicized.


DATED:  November 30, 2015     JEFFREY D. GOLDMAN
                              RYAN MAUCK
                              TALYA  GOLDFINGER
                              JEFFER MANGELS BUTLER & MITCHELL LLP

                              By: /s/ Jeffrey D. Goldman
                                      JEFFREY D. GOLDMAN
                              Attorneys for Plaintiffs and Counter-Defendants

PRINTED ON
RECYCLED PAPER
LA 12448367v1

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................1

Summary of Uncontroverted Facts re Plaintiffs' Claims ............................2

Argument...................................................................................................20

I.   DEFENDANTS ARE LIABLE FOR COPYRIGHT AND STATE-
     LAW INFRINGEMENT.................................................................20

II.  DEFENDANTS' AFFIRMATIVE DEFENSES ARE MERITLESS...............24

III. IFP'S INFRINGEMENTS WERE WILLFUL. ...............................27

IV.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
     IFP'S COUNTERCLAIMS. ...........................................................30

     A.   The Fraud-Based Counterclaims are Meritless.......................31

          1.   Additional Facts Relevant to the Fraud-Based
               Counterclaims...............................................................32

          2.   There is No Evidence Plaintiffs Made Any
               Misrepresentations.......................................................37

          3.   IFP Did Not Justifiably Rely on Any Representation or
               Omission.......................................................................38

          4.   There is No Evidence of Fraudulent Intent..................39

          5.   The Negligent Misrepresentation Claim Fails Because It
               Is Not Premised on Actionable Misrepresentations......40

     B.   The Intentional Interference Claim is Meritless. ..................41

          1.   The *Noerr-Pennington* Doctrine and the Litigation
               Privilege Still Bar This Claim.....................................42

          2.   There is No Evidence of any Breach or Disruption of
               IFP's Airline Contracts. .............................................42

     C.   There is No Evidence of Legally Cognizable Damages
          Proximately Caused By Plaintiffs on Any of the Counterclaims. ..........43

          1.   Plaintiffs Did Not Cause IFP to Move Overseas. .......44

          2.   Plaintiffs Did Not Cause IFP to Dispute Its Indemnity
               Obligations. .................................................................45

Conclusion.................................................................................................45

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON

RECYCLED PAPER
LA 12448367v1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Abdallah*,
   948 F. Supp. 1449 (C.D. Cal. 1996)................................................................28

*A&M Records, Inc. v. Heilman*,
   75 Cal. App. 3d 554 (1977)........................................................................20

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001).........................................20, 23, 24, 25

*Am. Viking Contractors, Inc. v. Scribner Equip. Co., Inc.*,
   745 F.2d 1365 (11th Cir. 1984).................................................................39

*Avocados Plus Inc. v. Freska Produce Int'l LLC*,
   No. CV06-896-RGK, 2007 WL 5091680 (C.D. Cal. Jan. 26, 2007).....................43

*Banner Entertainment, Inc. v. Superior Court*,
   62 Cal. App. 4th 348 (1998).....................................................................25

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
   758 F. Supp. 1522 (S.D.N.Y. 1991).........................................................28

*Bean v. Pearson Educ., Inc.*,
   949 F. Supp. 2d 941 (D. Ariz. 2013).......................................................25

*Beckner v. Sears, Roebuck & Co.*,
   4 Cal. App. 3d 504 (1970)........................................................................44

*Big Tree Enters., Ltd. v. Mabrey*,
   No. 93-4024-SAC, 1994 WL 191996 (D. Kan. Apr. 15, 1994) .............................39

*Brakke v. Econ. Concepts, Inc.*,
   213 Cal. App. 4th 761 (2013)....................................................................40

*Broadcast Music, Inc. v. TTJ's Inc.*,
   No. 3:09-CV-460-BLW, 2010 WL 2867814 (D. Idaho July 20, 2010)................28

*Bustamante v. Intuit, Inc.*,
   141 Cal. App. 4th 199 (2006)....................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................24, 31

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 12448367v1

## TABLE OF AUTHORITIES (CONT.)

Page(s)

*Champagne v. City and County of San Francisco*,
   No. C 06-05425 JSW, 2008 WL 1990889 (N.D. Cal. May 5, 2008) ................... 44

*Cherry River Music Co. v. Simitar Entertainment, Inc.*,
   38 F. Supp. 2d 310 (S.D.N.Y. 1999) .................................................................. 26

*Coleman v. ESPN, Inc.*,
   764 F. Supp. 290 (S.D.N.Y. 1991) .............................................................. 22, 26

*Conroy v. Regents of Univ. of Cal.*,
   45 Cal. 4th 1244 (2009) .................................................................................... 32

*County of San Luis Obispo v. Abalone Alliance*,
   178 Cal. App. 3d 848 (1986)............................................................................. 43

*David v. Showtime/The Movie Channel, Inc.*,
   697 F. Supp. 752 (S.D.N.Y. 1988) .............................................................. 22, 23

*Davis v. Nadrich*,
   174 Cal. App. 4th 1 (2009)................................................................................ 43

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.*,
   30 Cal. App. 4th 54 (1994)................................................................................ 25

*Elektra Entertainment Group, Inc. v. Barker*,
   551 F. Supp. 2d 234 (S.D.N.Y. 2008) ............................................................... 22

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004)........................................................................... 24

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
   344 U.S. 228 (1952).......................................................................................... 27

*Fairbank v. Wunderman Cato Johnson*,
   212 F.3d 528 (9th Cir. 2000)............................................................................. 24

*Farmers Ins Exch. v. State of California*,
   175 Cal. App. 3d 494 (1986)............................................................................. 43

*First v. Allstate Ins. Co.*,
   222 F. Supp. 2d 1165 (C.D. Cal. 2002) ....................................................... 11, 37

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*,
   807 F.2d 1110 (2d Cir. 1986)............................................................................ 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jeffer Mangels
Butler & Mitchell LLP

JMBM

PRINTED ON
RECYCLED PAPER
LA 12448367v1

## <u>TABLE OF AUTHORITIES (CONT.)</u>

<u>Page(s)</u>

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
  80 F. Supp. 3d 535 (S.D.N.Y. 2015) ....................................................25

*Fonovisa v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996).......................................................... 23, 24

*Ford Motor Co. v. Summit Motor Products, Inc.*,
  930 F.2d 277 (3d Cir. 1991)..............................................................21

*Franceschi v. Harrah's Entertainment, Inc.*,
  No. 2:10-cv-00205-RLH-RJJ, 2011 WL 9305 (D. Nev. Jan. 3, 2011)..................37

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
  772 F.2d 505 (9th Cir. 1985)..............................................................27

*Goehring v. Chapman Univ.*,
  121 Cal. App. 4th 353 (2004)..............................................................44

*Hampton v. Paramount Pictures Corp.*,
  279 F.2d 100 (9th Cir. 1960)..............................................................27

*Heartland Payment Systems, Inc. v. Mercury Payment Systems, LLC*,
  No. C 14-0437 CW, 2014 WL 5812294 (N.D. Cal. Nov. 7, 2014) .......................42

*Heller Financial, Inc. v. Midwhey Powder Co., Inc.*,
  883 F.2d 1286 (7th Cir. 1989)..............................................................26

*Hoffman v. 162 N. Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014)..................................................... 32, 38, 39

*Ice Nine Publishing Co. Inc. v. Barnes*,
  No. 89-3227, 1990 WL 236055 (C.D. Ill. Sept. 14, 1990)....................................29

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003)......................................................... 23, 28

*Int'l Korwin Corp. v. Kowalczyk*,
  665 F. Supp. 652 (N.D. Ill. 1987)....................................................... 27, 28

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
  740 F.2d 718 (9th Cir. 1984)..............................................................20

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
  591 F. Supp. 2d 1098 (N.D. Cal. 2008)..................................................23

Jeffer Mangels
Butler & Mitchell LLP

JMBM

- viii -

## <u>TABLE OF AUTHORITIES (CONT.)</u>

<u>Page(s)</u>

*Magnuson v. Video Yesteryear*,
　85 F.3d 1424 (9th Cir. 1996).............................................................................27

*Magpali v. Farmers Group, Inc.*,
　47 Cal. App. 4th 471 (1996)..............................................................................39

*MAI Systems Corp. v. Peak Computer, Inc.*,
　991 F.2d 511 (9th Cir. 1993).............................................................................21

*Meadowgreen Music Co. v. Voice in the Wilderness Broadcasting, Inc.*,
　789 F. Supp. 823 (E.D. Tex. 1992) ...................................................................28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
　518 F. Supp. 2d 1197 (C.D. Cal. 2007)............................................................25

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
　545 U.S. 913 (2005)...............................................................................23, 24

*Microsoft Corp. v. Compusource Distributors, Inc.*,
　115 F. Supp. 2d 800 (E.D. Mich. 2000) ...........................................................28

*Microsoft Corp. v. Grey Computer*,
　910 F. Supp. 1077 (D. Md. 1995) ...............................................................22, 28

*Microsoft Corp. v. Harmony Computers & Electronics, Inc.*,
　846 F. Supp. 208 (E.D.N.Y. 1994)....................................................................21

*Microsoft Corp. v. Logical Choice Computers, Inc.*,
　No. 99 C 1300, 2001 WL 58950 (N.D. Ill. Jan. 22, 2001)....................................28

*Microsoft Corp. v. V3 Solutions, Inc.*,
　No. 01 C 4693, 2003 WL 22038593 (N.D. Ill. Aug. 28, 2003)............................28

*Moore v. Apple Inc.*,
　309 F.R.D. 532 (N.D. Cal. 2015) .......................................................................44

*N.A.S. Import, Corp. v. Chenson Enters., Inc.*,
　968 F.2d 250 (2d Cir. 1992)...............................................................................28

*Oracle Corp. v. SAP AG*,
　734 F. Supp. 2d 956 (N.D. Cal. 2010)..............................................................23

*Paramount Pictures Corp. v. Carol Publishing Group*,
　11 F. Supp. 2d 329 (S.D.N.Y. 1998) .................................................................26

PRINTED ON
RECYCLED PAPER
LA 12448367v1

## **TABLE OF AUTHORITIES (CONT.)**

**Page(s)**

*Peer Int'l Corp. v. Latin American Music Corp.*,
  161 F. Supp. 2d 38 (D.P.R. 2001) ...................................................................29

*Peer Int'l Corp. v. Pausa Records, Inc.*,
  909 F.2d 1332 (9th Cir. 1990)...................................................................27, 28, 29

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ..........................................................30

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  134 S. Ct. 1962 (2014)....................................................................................26

*Playboy Enterprises, Inc. v. Frena*,
  839 F. Supp. 1552 (M.D. Fla. 1993) ..............................................................21

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*,
  982 F. Supp. 503 (N.D. Ohio 1997) ...............................................................30

*Purzel Video GmbH v. St. Pierre*,
  11 F. Supp. 3d 1020, 1030 (D. Colo. 2014)....................................................26

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) ......................................................................................41

*Reprosystem, B.V. v. SCM Corp.*,
  727 F.2d 257 (2d Cir. 1984).............................................................................38

*S.O.S., Inc. v. Payday, Inc.*,
  886 F.2d 1081 (9th Cir. 1989) .........................................................................20

*Sega Enterprises Ltd. v. Maphia*,
  948 F. Supp. 923 (N.D. Cal. 1996)..................................................................28

*Serv. by Medallion, Inc. v. Clorox Co.*,
  44 Cal. App. 4th 1807 (1996)..........................................................................43

*Shewry v. Begil*,
  128 Cal. App. 4th 639 (2005)..........................................................................26

*Sosa v. DirecTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006)...........................................................................42

*Spectravest, Inc. v. Fleet Street, Ltd.*,
  No. C–88–4539 RFP, 1989 WL 135386 (N.D. Cal. Aug. 23, 1989)....................30

PRINTED ON
RECYCLED PAPER
LA 12448367v1

## **TABLE OF AUTHORITIES (CONT.)**

**Page(s)**

*Stratton v. Upper Playground Enters., Inc.*,
  No. CV 09-8796 PSG, 2010 WL 5313317 (C.D. Cal. Dec. 16, 2010) ..................28

*Tarmann v. State Farm Mut. Auto Ins. Co.*,
  2 Cal. App. 4th 153 (1991)..................................................................................40

*Tenzer v. Superscope, Inc.*,
  39 Cal. 3d 18 (1985) ............................................................................................39

*Theme Promotions, Inc. v. News Am. Marketing FSI*,
  546 F.3d 991 (9th Cir. 2008)................................................................................42

*U.S. v. King Features Entm't, Inc.*,
  843 F.2d 394 (9th Cir. 1988)................................................................................25

*U.S. v. Moghadam*,
  175 F.3d 1269 (11th Cir. 1999).............................................................................20

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................................21

*Wall Mountain Co., Inc. v. Edwards*,
  No. C 08-2579 PVT, 2010 WL 4940778 (N.D. Cal. Nov. 30, 2010).....................28

*Webloyalty.com, Inc. v. Consumer Innovations, LLC*,
  388 F. Supp. 2d 435 (D. Del. 2005) ......................................................................29

*WGN Continental Broadcasting Co. v. United Video, Inc.*,
  693 F.2d 622 (7th Cir. 1982)..........................................................................7, 23

*Wiechmann Engineers v. State of Cal. ex rel. Dep't Pub. Works*,
  31 Cal. App. 3d 741 (1973)..................................................................................37

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994).............................................................................27, 30

*Williams v. Scribd, Inc.*,
  No. 09cv1836–LAB, 2010 WL 10090006 (S.D. Cal. June 23, 2010)....................23

*Wow & Flutter Music v. Len's Tom Jones Tavern, Inc.*,
  606 F. Supp. 554 (W.D.N.Y. 1985)................................................................28, 29

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001)..................................................................................28

PRINTED ON
RECYCLED PAPER
LA 12448367v1

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-03466-MMM-JPR

## TABLE OF AUTHORITIES (CONT.)

Page(s)

**STATUTES**

17 U.S.C.
  § 101 .................................................................................................................22
  § 102 .................................................................................................................20
  § 103 .................................................................................................................20
  § 106 ....................................................................................................20, 21, 22
  § 109(d) .............................................................................................................21
  § 301(c) .............................................................................................................20
  § 501(a) .............................................................................................................20
  § 504(b) .............................................................................................................27
  § 504(c) .............................................................................................................27
  § 602(a) .............................................................................................................21
  § 602(a)(1) .........................................................................................................20
  § 602(b) .............................................................................................................20

Cal. Civ. Code
  § 980(2) .............................................................................................................20
  § 3333 ...............................................................................................................43

**OTHER AUTHORITIES**

Digital Performance Right in Sound Recordings Act of 1995, Senate
  Report No. 104–128, 104th Cong., 1st Sess. 1995, 1995 WL 472241,
  1995 U.S.C.C.A.N. 356 (1995) .......................................................................22

Fed. R. Civ. P. 12(f) .............................................................................................41

Fed. R. Civ. P. 30(b)(6) ............................................................................14, 16, 34

Fed. R. Civ. P. 56 .................................................................................................31

H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 62, 1976 WL 14045 (1976) .............21

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON

RECYCLED PAPER
LA 12448367v1

**Preliminary Statement**

Plaintiffs are among the leading record companies and music publishing companies in the U.S.  This action concerns the blatantly willful infringements of thousands of their copyrighted and state-law-protected sound recordings, and copyrighted musical compositions, by defendants Global Eagle Entertainment Inc. ("GEE"), Inflight Productions Ltd. ("IFP Ltd."), and Inflight Productions (USA) Inc. ("IFP USA") (collectively "IFP"), for inflight airline passenger entertainment.  IFP's own internal documents and damning deposition admissions demonstrate that since 2008, IFP has executed a multiyear scheme to reproduce, distribute, import, and publicly perform Plaintiffs' music on commercial aircraft in the U.S. while knowing it needed licenses to do so, and did not have them.  IFP went to great lengths to cover up its infringements, knowingly misrepresenting to airlines that it had the necessary licenses, and to Plaintiffs that all of its current music reproductions were made outside the U.S.  Internal documents show that IFP knew it was "infringing," was in a "real mess," legal claims were "bound to happen," and it needed to "tread carefully" because disclosure of its infringements could open a "can of worms."  The head of IFP's U.S. Audio Department testified he was deeply troubled by the lack of licenses, and that only a "dumb-ass" wouldn't have been.  Meanwhile, IFP was even charging airlines "copyright fees" for Plaintiffs' music, while keeping the money for itself.  If IFP's infringements were not willful, no infringements could ever be.

In 2008, IFP hired a U.K.-based music licensing "expert," Mark Isherwood, to assess the legality of IFP's admittedly "under the radar" uses of copyrighted music in the U.S.  He advised IFP in writing, over and over from 2008 to 2013, that it was engaged in copyright infringement, and was "exposed" to lawsuits from U.S. rightsholders like Plaintiffs with uncertain damages and penalties.  He told IFP there was an "urgent need" to resolve its U.S. infringements, and the only remedy was to obtain written license agreements that covered IFP's specific activities.  And he told IFP "the complexity of doing this does not negate the requirement to do so" and there

PRINTED ON
RECYCLED PAPER
LA 12448367v1

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1   were "no guarantees that this could be achieved."

2       In the face of this repeated "expert" advice, IFP made the conscious decision, at

3   the highest levels of its international management, to continue its infringing U.S.

4   operations, "right or wrong," because it did "not wish to see the L.A. office precluded

5   from providing services purely due to onerous licensing costs.  This will impact the

6   growth of the L.A. office which should not be."  IFP USA's then-CEO admits this

7   decision may have been "wrong," but claims "it was out of [his] hands."

8       Beginning in 2009, Isherwood began gingerly and sporadically seeking licenses

9   from U.S. rightsholders, including Plaintiffs, while carefully obscuring the massive

10  scope and territory of IFP's ongoing infringements.  His efforts to obtain licenses were

11  unsuccessful, as he repeatedly advised IFP, but IFP's appetite for Plaintiffs' music was

12  insatiable.  Hoping against hope that Isherwood could somehow, someday obtain

13  retroactive licenses at the meager rates IFP was willing to pay, but knowing full well

14  the legal consequences if he couldn't, IFP continued to infringe Plaintiffs' music and

15  pitch that infringing music to U.S. airlines.  Even when one Plaintiff told Isherwood

16  that under no circumstances would it *ever* be able to license its Beatles recordings

17  (among others) for airline use, IFP went on using the Beatles' music.  A 2013 lawsuit

18  against IFP by another record company, Sony Music, alerted Plaintiffs to IFP's

19  ongoing U.S. infringements, and this action followed.

20       The Court should find, as a matter of law, that IFP infringed Plaintiffs'

21  copyrights and state law rights, and did so willfully, in the 5,494 works identified in

22  Exhibit X to the Goldman Declaration.  *See* [Proposed] Order.  For similar reasons,

23  IFP's SACC, predicated entirely on certain preliminary, inconclusive meetings

24  between Isherwood and certain Plaintiffs, and on Plaintiffs' efforts to protect their

25  rights in connection with this action, are also meritless as a matter of law.

26           **Summary of Uncontroverted Facts re Plaintiffs' Claims**

27      **The Defendants.**  IFP Ltd. wholly owns IFP USA, formed in the 1990s and

28  located in Southern California.[UF3]  GEE, the successor-in-interest to Advanced Inflight

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   Alliance AG ("AIA"), a German company, bought IFP Ltd. and IFP USA in or about

2   2006-2008,[UF4] has wholly owned both IFP Ltd. and IFP USA from 2008 to the

3   present, and "in effect … has control of the IFP group of companies."[UF5]

4       **IFP's Music Operations.**  IFP contracts with commercial airlines to provide

5   them with popular music for inflight passenger entertainment.  IFP Ltd. established

6   IFP USA "to have a presence in the U.S., to have an ability to service the needs of

7   American [air] carriers" and "produce shows locally [so] that our international

8   customers could have the flavor of … U.S.-produced music" for inflight

9   entertainment.[UF6]  IFP USA's Audio Department began to create both "radio"-type

10  programs accessed through airplane armrests ("Broadcast") and, more recently,

11  programs with interactivity (*e.g.*, the ability to pause, fast forward, rewind, rearrange,

12  and otherwise manipulate music tracks) using seatback touchscreen panels (Audio-on-

13  Demand or "AOD").[UF16]  To make these programs, IFP USA first made lists of

14  popular (and invariably copyrighted) music ("playlists") of various genres and styles –

15  much of this music owned by Plaintiffs.[UF17]  As IFP concedes, "[t]his case is not a

16  dispute about whether Defendants reproduced Plaintiffs' works.  Defendants did so

17  and have never contended otherwise."[UF24]

18      IFP USA then acquired this popular, copyrighted music by obtaining physical

19  CDs or individual digital music tracks (including by purchasing them at physical and

20  online retail stores),[UF17] which IFP USA then copied onto its internal hard drives.[UF18]

21  For both Broadcast and AOD programs, IFP USA first made an individual copy (or

22  ".wav" file) for each song on the playlist it had made.[UF19]  IFP USA then combined

23  tracks together on its hard drives (sometimes interspersing interviews and commentary

24  for Broadcast programs),[UF20] then made another .wav copy of the mixed program.[UF21]

25  IFP USA made these .wav copies for virtually all of the Broadcast programs for at

26  least twelve[2] airlines,[UF22] and for at least five[3] airlines' AOD programs.[UF23]  After

27  _____

28  [2] Continental/Copa, Aircalin, EVA, Air New Zealand, Qatar, Cathay Pacific, North

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   creating yet another copy of each program (a physical DVD or digital file), IFP would
2   send this copy to be encoded to each individual airline's technical specifications by
3   either a U.S.-based third-party "integrator" or one of IFP's overseas offices.[UF25]  Even
4   where this encoding took place overseas, this additional encoded copy was eventually
5   imported back to the U.S., either directly to a U.S. airline hub to be loaded on aircraft,
6   or to a third-party "integrator" in California to be distributed to U.S. airlines.[UF26]  In
7   some cases, IFP's copying was entirely done overseas; for example, after Sony
8   Music's 2013 lawsuit, IFP still made *playlists* in Los Angeles, but would send them to
9   an overseas office for mixing and encoding,[UF28-29] in an attempt to circumvent U.S.
10  copyright law.  However, in an interrogatory response, IFP admitted that "***all*** of the
11  Broadcast Programs and AOD Playlists [in this case] that were duplicated or encoded
12  abroad were transported into the United States" after IFP's overseas copying
13  occurred.[UF27]

14       There are 5,494 works at issue in this case, determined as follows.  Pursuant to
15  a discovery Order,[UF30] amended by stipulation, IFP produced playlists for U.S.-based
16  airlines, and for international airlines "but only where Defendants engaged in any
17  aspect of the reproduction process … at least once in the United States."[UF31-32]  Also
18  pursuant to a discovery Order,[UF33] IFP produced a list of sound recordings it copied
19  onto its U.S. hard drives (the "Metadata"), but which were not necessarily on any
20  playlist IFP produced.[UF34]  From the playlists and Metadata, and based on IFP's
21  interrogatory responses describing the manner and location of IFP's activities on an
22  airline-by-airline basis, Plaintiffs identified 5,494 works which Plaintiffs own or
23  control and that Plaintiffs contend IFP used without Plaintiffs' authorization.[UF35]  Of
24  these works, IFP's interrogatory responses reveal 3,437 "playlist" works reproduced

26  American-World, National, Singapore, Thomas Cook, American, and Atlas Air.  The
    only exception was nine mostly foreign-music programs.[UF22]

27  [3] Continental, United, Qatar (2012-13), American (2013), and Air Transat.[UF23]

1  by IFP in the U.S., and another 970 Metadata works copied onto IFP's U.S. hard

2  drives.[UF36]   The remaining 1,087 works appeared on playlists for U.S.-based airlines

3  (841) or appeared on playlists for which IFP did not provide sufficient data for

4  Plaintiffs to determine where the copying took place (246),[UF36] but, even if those

5  works were copied abroad, they were eventually transported back into the U.S.[UF26-27]

6  **IFP's Hiring of a Music Licensing Expert.**  In late 2008, Ian Defibaugh joined

7  IFP USA as Director of Operations.[UF7]  Jeff Borgeson, who ran IFP USA's Audio

8  Department,[UF13] alerted Defibaugh about IFP USA "not having [music] licenses,"

9  telling Defibaugh "there wasn't anything formalized within the U.S. to address a

10  production that was being done in the L.A. office" and "nothing was in place to

11  address the issue."[UF37]  Borgeson expressed concern about these "under the radar" uses

12  – by which he meant "undetected," "not widely known" and "[n]ot accounted for" –

13  which he recognized was "a problem, a potential problem."[UF38]  Defibaugh testified

14  that "the discussion was there wasn't a signed agreement of any kind," and "based on

15  my experience at [his prior employer] United Airlines it was always ingrained in me to

16  have a written agreement, you know, through our legal team, and so when I went to

17  work at [IFP] it was just a very different world."[UF39]

18  IFP's top international management was already well aware of the issue.

19  Earlier in 2008, the head of IFP Ltd., Tony Taverner,[UF9] its CFO, Jayne

20  Gething,[UF10] had commissioned a U.K.-based licensing "expert," Mark Isherwood, to

21  "look into any sort of exposure that the company may have with regards to audio

22  licensing."[UF40]  In March 2008, Isherwood was charged with providing "███████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ███████████" around the world, including the U.S.[UF41-44]

26  In June 2008, Isherwood reported to IFP that its "licensing arrangements were

27  not sophisticated enough to meet its business requirements"[UF45]; that in *each* country,

28  including the U.S., it needed licenses for both the sound recordings and musical

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   compositions it "dubbed, duplicated or any way copied" and *also* separate licenses to

2   *distribute* the copies it made[UF46]; and that even where it made an initial copy in the

3   U.S. but did further copying or "encoding" abroad, U.S. licenses were still

4   required.[UF47]

5       He told IFP it was "infringing" copyrights not only where it did not have a

6   license at all, but also where a license did not cover the particular uses in which IFP

7   was engaging.[UF48]  He told IFP that in the U.S., it had no licenses at all, and was

8   "exposed" to legal action and legal claims, including lawsuits for copyright

9   infringement in which the amount of damages was uncertain and hard to predict.[UF50,]

10  [146]  He told IFP: "███████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████" such as hiring lawyers.[UF51]  Isherwood knew

> there's always the risk that the rights owners you speak to
> will seek some sort of penalty for what you have been doing
> in the past … [and he had] no knowledge of what that
> penalty might be…. [I]f you poke a sleeping lion, you never
> know how it's going to react…. [But] eventually rights
> owners will find these things out … and you could be in
> considerable problems from a legal point of view…. As to
> what those penalties would be, that would depend on the …
> relevant jurisdiction at the time.[UF52]

20      IFP understood it was "quite exposed in the USA[.]"[UF53-54]  Could IFP at least

21  keep using copyrighted music until it received a cease-and-desist letter?  No, that

22  would be legally and morally wrong, Isherwood testified, [4] and IFP USA's Borgeson

---

[4] In May 2009, Isherwood met with Borgeson and Defibaugh at IFP USA's Los Angeles office for an "intro into licensing" to give them an "understanding as to how licensing happens."[UF112]  Isherwood reminded them that "IFP appears to have no licenses in place"[UF114] and disabused Borgeson of the "Myth[]" that when record companies sent promotional copies of CDs to IFP, it meant IFP could reproduce and distribute the content without a license.[UF114]  He told IFP it was "quite exposed" in the U.S. even when using such promotional copies.[UF115]

PRINTED ON

RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels | Butler & Mitchell LLP

admits, "I have never heard that before."[UF57-59]  Over and over, Isherwood told IFP that it was its ***own*** responsibility to survey its ***own*** activities, determine what licenses it needed, and obtain them.[UF55]  He told IFP that it needed "proper licensing arrangements"[UF60-61] that would cover the ***specific activities*** in which IFP was engaged,[UF48] including detailed accounting requirements.[UF49, 62]  This could not have come as a surprise to IFP – its own policies required written licenses, setting forth all of the material terms of the deal, ***before*** IFP used any copyrighted ***video*** content.[UF73-76]  And for "big omnibus deals" involving large amounts of video content, IFP ***always*** had a ***formal*** written agreement, often involving multiple written drafts exchanged back and forth, and "documented procedures … to approve those deals" requiring an internal approval memorandum (stating the basic terms of the deal), "legal read-through," approval by U.S. lawyers (for a U.S. license), and express IFP Board of Directors approval.[UF63-66]

In a third report in July 2008, Isherwood reminded IFP of its "urgent need" to resolve its U.S. music infringement issues,[UF77] explaining that "the U.S. office had been operating under the … wrong information that the agreements with [U.K. music rights societies] PPL and MCPS [for sound recordings and musical compositions, respectively] would cover the reproductions they were making in the U.S. office," but "the jurisdiction of MCPS and PPL would not go to reproductions that take place in the U.S.,"[UF78-79] where no analogous organizations exist.[UF80]

**IFP's Knowledge of Obstacles to U.S. Licensing.**  IFP next commissioned Isherwood to seek and obtain ***formal written*** licenses from U.S. record companies and music publishers,[UF81] as well as licenses in other territories.  For the U.K. territory, Isherwood fairly quickly negotiated written licenses with U.K. music rights societies PPL and MCPS on IFP's behalf.[UF82]  But he warned IFP that, for the U.S., it would be more complicated,[UF83] ***"the complexity of doing this does not negate the requirement to do so,"***[UF56] and "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆,"[UF83] For sound recordings, the U.S. had no PPL equivalent, so IFP needed separate licenses

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1  from *each* individual U.S. record company, including the four major labels – UMG,

2  EMI, Sony, and Warner (UMG's indirect parent acquired EMI, including Plaintiff

3  Capitol Records, LLC, in or about 2011).[UF84-85, 109]

4      For U.S. musical compositions, a company called the Harry Fox Agency

5  ("HFA") sometimes acted as an agent for some music publishers, but Isherwood told

6  IFP that HFA's "mandate can vary more" than the MCPS, as "some publishers would

7  choose, for certain types of exploitation of their rights, to license directly with the

8  licensee, rather than through [HFA]."[UF86]  It "was always a very fluid set of

9  arrangements" and "never cut and dried, one way or the other."[UF86]  It was "never

10  clear" whether and to what extent HFA could act on behalf of any particular music

11  publisher, such as UMPG, and "[y]ou don't get a quick answer.  That's – that's

12  clear."[UF87]  He told IFP that even if he successfully negotiated a license with HFA, any

13  publisher could "opt out" of it, and major ones (such as UMPG) probably would,[UF88-89, 108]

14  forcing IFP to seek and obtain licenses directly from these publishers.[UF110]  IFP

15  also understood that U.S. music licensing fees were likely to be *more expensive* than

16  in the U.K.[UF94-95]  Isherwood told IFP that *if* he was able to negotiate the general

17  parameters of U.S. license agreements to IFP's requirements, an "*essential aspect*" of

18  the process would be obtaining "full-size draft contracts" from the rightsholders, then

19  engaging a "qualified law firm" in the U.S. to review, negotiate the "exact wording"

20  of, and approve them.[UF90, 113]

21      None of this ever came close to occurring.

22      **IFP's Decision to Continue Infringing.**  "[I]t will take a while to conclude any

23  arrangements" in the U.S., Isherwood warned IFP.[UF92]  In the meantime, IFP had a

24  critical choice to make.  Its current activities were plainly, knowingly infringing.[UF93]

25  The obvious, riskless, and legal alternative would be to shut down the U.S. operations

26  (as well as unlicensed importations and distributions, and authorizations to airlines for

27  U.S. public performances) until and unless IFP obtained the licenses it needed to

28  engage in those activities.[UF99]  IFP understood that continuing to infringe "was an

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

unknown factor" because "there was no agreement in place[.]"[UF96]  Isherwood told IFP "there's a risk that they're running"[UF97] by continuing to infringe, and admits IFP understood that

> *there is always a risk in carrying on an infringement whilst you are exposed without licenses. That's – that's there*. You take [*sic*] a business decision, based on past experience, as to whether or not *it's a risk worth taking*.[UF98]

And IFP *really wanted* to keep its U.S. office operating, illegally or not.[UF100-104] Moving production to the U.K. to service U.S. airlines "wouldn't have been a good thing" for IFP's "ability to service the customer," as "it felt like we could improve the service if … we were able to do more of the U.S.-based servicing work locally."[UF105] IFP USA's then-CEO Gerard Shadrick[UF8] wanted "to grow the business" in the L.A. office,[UF106] and IFP USA Director of Operations Defibaugh advised the head of IFP Ltd., Taverner, that "logistically it was better for us to do it in the U.S. because we were basically producing it in the U.S., putting it together in the U.S., and to send it overseas to be done overseas and then sent back to the integrator which is in Orange County it really didn't make sense[.]"[UF107]  Infringing was far more convenient.

IFP dithered for nearly a year after Isherwood's 2008 reports, all the while continuing to infringe.  Finally, in May 2009, Defibaugh emailed Taverner:

> After our very informative meeting with Mark Isherwood last week and learning of the complexities surrounding U.S. mechanical royalties which IFP would be held in responsibility, what direction would you like us to pursue in regards to new and existing business? Should we continue "as is" for now and assume all existing and possibly new IFP USA audio work will remain within the LA office until further direction?[UF116]

"Continue on," Taverner responded.[UF117]  Shadrick – a music composer himself[UF67] who understood copyright and knew that formal, written licenses were obligatory in business,[UF68-69, 72] and that major record companies would require them[UF70-71] told his

Jeffer Mangels Butler & Mitchell LLP

employee Borgeson:  "For now (*right or wrong*) we are maintaining the current status quo."[UF118]  Shadrick testified:

> It was out of my hands…. It was going to just keep happening the way it was until … I was directed by [IFP Ltd.]…. I didn't know if it was right or wrong [but IFP Ltd.] wanted to continue the way we had been continuing … [I]f there was an outstanding question, yes, I would like to have seen it cleared up and answered.[UF119]

Shadrick admits the decision "could have been" wrong[UF120] and "if we weren't supposed to be doing something, we shouldn't have been doing it … I wouldn't want to move forward on anything like that."[UF121]  But "it was never in my hands."[UF122]

**IFP Continues to Pitch Knowingly Infringing Music to Major U.S. Airlines.**

IFP continued soliciting new audio business from major U.S. airlines.  In 2009, IFP pitched United Airlines, knowing it would be providing United with infringing music, making the risky bet that the music royalties it was proposing to United would be consistent with retroactive and going-forward U.S. licenses Isherwood might someday obtain (but had not yet even begun to seek).[UF140]  Borgeson falsely told United that IFP was licensed for AOD uses in the U.S. by HFA,[UF141] then admitted to Taverner and Defibaugh that he feared this false information might "open a can of worms should [United] inquire directly with Harry Fox."[UF142]  Isherwood told Borgeson he needed to prevent United from contacting HFA because HFA could become "potentially angry" and this "may accidentally set hares running that we cannot then contain."[UF143]  Borgeson responded, "I will ask that United wait for further information from you regarding their AOD licensing,"[UF144] but Isherwood never contacted United to correct Borgeson's misinformation.[UF145]  Instead, he told Borgeson, "[c]an I suggest in the future whenever you get a copyright-related inquiry from a client airline you pass it to me for comment first? OK?"[UF143]  The "can of

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 12448367v1

worms" remained unopened.[5]

In September 2009, in an internal email concerning a pitch to American Airlines, Defibaugh wrote – under the heading "Risks" – "IFP doesn't have all record label agreements in place" and "IFP doesn't have a solution for the Digital Streaming royalties," by which he meant "[w]e don't necessarily have the right to use it." [UF123, 139] Nevertheless, IFP proceeded with the pitch to American.

**IFP Places Limitations on Isherwood's Negotiations with U.S. Rightsholders.** Isherwood's plan was to "start with the four major labels, because that would cover a vast majority of what IFP was using; and contact [HFA], regarding the musical works side."[UF147] But IFP placed strict limits on his authority. *First*, budgeting for anticipated higher U.S. licensing costs was becoming a problem; United told IFP its proposed pricing for music was higher than its main competitor.[UF149] So IFP told Isherwood that it was essential he get U.S. licenses at rates consistent with those in the U.K., and which would not require IFP to renegotiate any of its existing contracts with airlines.[UF148] IFP admittedly did not know if U.S. rightsholders would accept such terms.[UF152] But as Shadrick wrote to Borgeson:

> [U]nless we can make a deal on the mechanical rights (*similar to that which exists in the UK*), much of the encoding as well as the replication work will end up being done out of the UK ... I know you share my feelings that *we do not wish to see the LA office precluded from providing services purely due to onerous licensing costs*. This will impact the growth of the Audio Department in LA which should not be.[UF150]

---

[5] Opening a "can of worms" was a constant concern of IFP. In April 2009, United was considering charging passengers for audio access, and Borgeson fretted that IFP did not want to "open up a can of worms" on the subject of "U.S. rights[.]"[UF111] In October 2009, when a foreign airline requested that IFP help it license two songs from one of UMG's labels (A&M Records), Borgeson told Isherwood, "[w]e probably do not want to start pursuing licenses for A&M catalog material ... with the possibility that it may open a can of worms for us."[UF125]

PRINTED ON
RECYCLED PAPER
LA 12448367v1

*Second,* IFP rejected Isherwood's recommendation that IFP ***immediately*** pay to the U.S. rightsholders the money IFP had been charging airlines for music "copyright fees," but had never passed on to the U.S. rightsowners.[UF153]  Isherwood characterized IFP's excuse for this behavior "nonsense,"[UF154] and made it clear that IFP should pay this money to the U.S. copyright owners immediately.[UF155]  Even though "this sudden 'windfall' of royalties may alert the licensing organisations to investigate further … in these circumstances there is little alternative."[UF155]  IFP still refused to do so (consistent with its aversion to opening any "can of worms").

**Isherwood Cautiously Approaches U.S. Rightsholders.**  In October 2009, Isherwood introduced himself and IFP, via email, to all four major U.S. record companies[UF130] – which he knew were "unaware of inflight entertainment of any kind[.]"[UF126]  Concerned about the situation "blowing up,"[UF127] and U.S. rightsholders reacting with litigation seeking high levels of damages,[UF128] Isherwood "didn't want to come out as black-and-white, as I had done to [IFP]…. I just felt as an opening salvo, I needed to be a little bit more cautious with the wording."[UF129]

So where he had minced no words with IFP, repeatedly telling IFP it was clearly "exposed" to copyright infringement lawsuits with uncertain damages and penalties – using clear, straightforward, declarative sentences – in his emails to U.S. rightsholders, he quite differently "explained" that IFP's situation in the U.S. was what he called "a lack of documentation left by the previous management [which] means that the situation is rather unclear in certain areas" and "my role is to seek to regularize the situation."[UF130-31]  (*Huh?*)  In his sales pitch about IFP, he provided a convoluted explanation that never stated that IFP was ***already*** engaged in infringements of Plaintiffs' rights in the U.S. (which he had had no trouble explaining to IFP) – to the contrary, he represented to Plaintiffs that "***all*** duplication and encoding takes place in the U.K."[UF130]  He now reluctantly admits this language was "incorrect and misleading"[UF132] and "could have been" misinterpreted to mean "this was a U.K. issue and not an issue where there were already unlicensed reproductions occurring in

PRINTED ON
RECYCLED PAPER
LA 12448367v1

the U.S."[UF135]  He even claims he "would have" corrected it in his meetings with rightsholders[UF133] – though he also testified that when he uses the term "would have," he really means he doesn't recall one way or the other.[UF134]  And regardless, he repeated this same admittedly "incorrect and misleading" representation in his subsequent "introductory" emails to Plaintiffs' representatives *over the next two years*,[UF136, 163-164, 329, 336] and admits that, at his meetings with Plaintiffs, he "would certainly have repeated" it.[UF137]  Robert Haxton, who became the head of IFP in 2012,[UF11] admits it "wouldn't surprise him" if someone concluded from reading Isherwood's emails that "all duplications are happening in the U.K., but he wants to put in place a licence so they can *start* duplicating things in the U.S."[UF138]

**IFP's Knowledge of its Ongoing Infringements from 2009 to 2013**.  Isherwood cannot remember the details of his meetings with UMG, EMI and HFA because "well, simply it's long ago"[UF165] and "not something I have dwelt on[.]"[UF166]  In an effort to assist IFP, he attempted to "reconstruct" recollections by reviewing emails and meeting with IFP's counsel for 12 hours.[UF167-168]  For more detail about Isherwood's unsuccessful efforts to obtain U.S. licenses at these meetings, *see* pp. 32-37, *infra*.  But regardless of the dimness of his recollections,[UF168] what is *not* disputed is that Isherwood was IFP's *only* source of information about the status of its U.S. infringement problem.[UF169]  He claims he communicated to IFP honestly and accurately, primarily by email,[UF170] and the core of what he told IFP was the same orally as in writing.[UF171]  And what he told IFP was relentlessly negative and pessimistic.

In February 2010, Isherwood told Taverner that he was progressing "very slowly[,]" and "working on" getting licenses had been a "struggle."[UF158]  In March 2010, he told IFP, "I am afraid at the moment there is nothing more to report," as he had not managed "to move the discussions forward."[UF161; 6]  Defibaugh, who had

---

[6] In stark contrast, he proudly reported to IFP that its MCPS license *for the U.K.* "has

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   replaced the departed Shadrick as head of IFP USA,[UF172] knew Isherwood had not

2   obtained *any* U.S. licenses, hearing only that "there were positive discussions going

3   on with *Sony*.  It's just everything all got dropped because of so much – so many

4   issues internally[.]"[UF173, 182]  "What's going on?" Defibaugh asked Taverner, but got

5   no answer.[UF174]  This concerned Defibaugh, because "I was basically over the U.S.

6   operation, and here is a consultant [Isherwood] who wasn't reporting to me, was only

7   giving updates when I asked for it, and even then limited information[.]"[UF175]

8   Defibaugh also fielded concerns from a frustrated Borgeson[UF177] that "contracts hadn't

9   been put together.  Nothing had been memorialized."[UF178-179]

10          In February 2011, Sony Music accused United of infringing Sony's U.S.

11  copyrights, causing Defibaugh to observe in an internal email:  "This was ***bound to***

12  ***happen*** some time.  Hopefully Mark [Isherwood] has been continuing his work.

13  Otherwise we could have a problem."[UF181]  Defibaugh was concerned that U.S.

14  licensing still needed to be "set up" and "there weren't necessarily actions, you know,

15  happening to memorialize it…. We could have a problem because nothing is in place.

16  We don't have an agreement in place."[UF183]  But "[i]t was [Taverner's] responsibility,

17  not mine," and suggesting to Taverner that IFP needed licenses "would be ***basically***

18  ***stating the obvious***."[UF176]  IFP, too (through its Rule 30(b)(6) deponent), admits it

19  understood that unless "Mark [Isherwood] has got the paperwork, you know, from the

20  studios … there's a problem."[UF184]

21          In December 2011, Borgeson wrote an internal email admitting the "Status of

22  record label negotiations" was an open issue.[UF185]  Because "things were moving at a

23  slow pace,"[UF186, 188] and no one had "provided us with any clear-cut answers,"[UF185]

24  Borgeson drafted an email to Isherwood insisting "that we move forward to find

25  significant solutions to our U.S. licensing issues and questions."[UF185, 187]  IFP did not

26

27  been signed and outstanding accountings have also been submitted" and the PPL

28  license ***for the U.K.*** was "pretty much done and dusted."[UF160]

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  authorize Borgeson to send this email to Isherwood, or to contact U.S. rightsholders

2  directly,[UF190] as Borgeson alternatively requested.[UF189]  An audio engineer and disc

3  jockey by trade, Borgeson knew little about copyright law or licensing,[UF192] but knew

4  enough to feel IFP was "vulnerable" and might get sued.[UF191]  He worried IFP might

5  *never* get U.S. licenses, testifying:

6       [D]id it occur to me?  Well, of course it did.  I told you I was
7       upset about it.   I mean, what do you think? … [Y]ou're
        telling me that after three, four years did it ever occur to you
8       like I'm a dumbass?[UF193]

9

10  Meanwhile, IFP continued to charge airlines "copyright fees" and keep the

11  money, which Gething described in an internal email as "essentially that revenue

12  which is received as a result of infringement of rights[.]"[UF194-195]  In October 2011, she

13  sent an internal email again acknowledging IFP's ongoing "infringements of IP" in the

14  U.S.[UF197] and another to parent company AIA (GEE's predecessor) discussing whether

15  IFP USA's activities should be moved to the U.K., where there were "*contracts* …

16  rather than *discussions-in-progress* in LA which will require *ongoing support* from

17  [Isherwood]."[UF196, 198]  In March 2012, Thomas Moder, an executive at AIA, contacted

18  Phil Bauckham, a top IFP executive,[UF12] because AIA's auditors Ernst & Young were

19  questioning these sums IFP was "accruing" on its books for U.S. music rights.[UF199]

20  Bauckham explained to AIA and the auditors that IFP was accruing these monies "for

21  reproduction of a rights holder's Intellectual Property ('IP').  *Those rights are*

22  *infringed whenever we reproduce an artist's work*, whether that be by duplicating the

    work onto tape/CD, or encoding it digitally."[UF199, 200]

23  Around the same time, IFP was making a new pitch to American Airlines

24  (which had rejected IFP's 2009 proposal).[UF201]  IFP began to inquire more

25  aggressively of Isherwood,[UF202] but nothing had changed.  In May 2012, Isherwood

26  told IFP, "[a]t the moment things have not moved any further forward" over the past

27  year and "when I have any further input I will let you know."[UF203]  He never did.

28

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

Isherwood placated IFP by saying he would "try and push this forward with a bit more vigor,"[UF204] but admits he had privately concluded that "the history of the label – the kind of response that I got from them, probably indicated that it was hardly worth it."[UF205]   And he says he was preoccupied with other matters in 2012.[UF217, 337]

Also in May 2012, IFP Ltd. hired Robert Haxton as its CFO (and later elevated him to the head of the company, replacing Taverner).[UF11]   Recognizing it "is important to secure licenses wherever possible," Haxton claims IFP's U.S. music issues concerned him.[UF209]   He was told "the terms, the royalty rate, etcetera, had been discussed with the record labels" but he couldn't "specify if they were agreed," and knew that either side could back out of any negotiations.[UF210]   He knew Isherwood had not "progressed any further with concluding negotiations with U.S. record labels," that "an agreement would be needed" and had not been reached, and that without an agreement, any party could demand rates that the other party found "unrealistic," resulting in no deal being reached.[UF212]  And if no deal was reached?  He knew and understood that not only could IFP "not use that content," but *its prior uses were subject to potential court action*.[UF213]

Nevertheless, like Taverner before him, Haxton made the decision to proceed with the status quo,[UF214] and IFP continued its pitch to American.[UF215]  Borgeson didn't think it was "wise" to disclose IFP's lack of licenses to American because "████████ ████████████████████████████████████████████,"[UF206, 216]  So he warned Roger Grange – a high-level IFP executive (and IFP's Rule 30(b)(6) designee) "who was doing the communication with American"[UF216] that "██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████,"[UF206]  By "a real mess," Borgeson meant, "I felt there was some vulnerability to the rates.  I mean, [UMG] could come back here later and sue us.  Someone could have changed their rate perspective."[UF207]  Grange responded:  "██████████████ ████████,"[UF208]

PRINTED ON
RECYCLED PAPER
LA 12448367v1

- 16 -

But on November 7, 2012, IFP announced to Isherwood, "we have gained the audio business for American Airlines[7] and would like to make sure that we have the audio rights covered."[UF218]  On November 30, IFP offered to "████████████ ████████████████████████████████████████████████████████████████████ ███████████"[UF219]  On December 12, Borgeson wrote that Grange "████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████"[UF220]  On December 17, Borgeson requested that Grange provide "████████████████████████████ ████████████████████████████████████████████" and Grange responded, "████████████████████████████████████████████"[UF221]  After Grange told Isherwood in another email that "████████████████████████████████████ ████████████████████████████████████████"[UF222] Isherwood responded on December 20 that ████████████████████████████████ ████████████████████"[UF223]

Yet IFP did not go in the "different direction" that Borgeson recommended, nor did it take any steps to halt the progress of its ████████████████████████████, heavily reliant on Plaintiffs' music.

In January 2013, parent company AIA again asked IFP to explain the basis of the internal accruals on the books for U.S. music rights, calling this a "critical topic" and noting that "from the U.S. point of view it seems to be unsure that the U.S. record labels will claim royalties in the amount which are currently recorded in the books."[UF224]  Bauckham again re-explained to AIA and its auditors that "[t]he accruals IFP makes are for reproduction of a rights holder's intellectual property (IP)" and that "*[t]hose rights are infringed whenever we reproduce an artist's work*, whether that

[7] ██████████████████████████████████████████
██████████████████████████████████████
UF221

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 12448367v1

be by duplicating the work onto tape/CD or encoding it digitally."[UF225]  He explained to AIA and the auditors that IFP would eventually have to resolve "*separately negotiated claims* from individual rights holders in the USA," and that Isherwood had not "progressed any further with concluding negotiations with U.S. record labels."[UF225] This hardly seemed like much of an explanation, so Bauckham suggested to Haxton that IFP have Isherwood write his own letter elucidating the situation, even though "I don't think we have had much / any contact with Mark over the last year or more – *as far as I'm aware his project on looking at royalties globally has stalled*[.]"[UF226]

In February 2013, Isherwood prepared the requested letter.[UF227, 165]  He reiterated to IFP exactly what he had said in 2008 and so often in between – that "IFP requires licenses (and to pay royalties) for the reproduction (sometimes called a mechanical right) of musical works and sound recordings into the audio programs that it makes in the U.S.," and "the principle holds good that licenses are required from music publishers for musical works and record companies for sound recordings."[UF227-228]  He wrote that

> over the last four or five years, I have been in on-going discussions with music publishing companies and record companies in the US to put the requisite licences in place…. getting the requisite paperwork put in place has consistently proved difficult. *However, most importantly, this failure for the rights owners to fulfill these formalities does not in any way reduce IFP's obligations to seek and pay for appropriate licences…. As things currently stand, IFP has no licences, which leaves it open to legal proceedings.*[UF228]

Haxton, by now the head of IFP, understood and agreed with this assessment, and knew "legal proceedings" meant lawsuits in the U.S.[UF229-230]  Still, IFP did *nothing* to cease its infringements.  AIA suggested IFP *at least* consider hiring U.S. legal counsel, but Haxton decided "*we shouldn't incur much expense on this*" and declined to do so.[UF232]

In June 2013, after IFP received a cease-and-desist letter from Sony Music

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   (prefatory to Sony's subsequent lawsuit), Haxton contacted Isherwood again.[UF233]

2   Isherwood referred Haxton to Isherwood's original 2008 reports as an accurate source

3   of information, and told Haxton that "████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████

6   ██████,"[UF234]  Isherwood admitted to Haxton he had not even been ***trying*** to get

7   licenses over the last 18 months, and that "there is a risk that Sony will look for some

8   penalty payment and I am afraid if they do I have no idea what this might come

9   to."[UF234]  Isherwood concedes that, as far as he knew, Plaintiffs might also look for

10  such penalty payments, and that, too, would be an uncertain amount.[UF235]  Haxton

11  admits Isherwood's email merely "confirmed my understanding of the situation" –

12  including that Isherwood had only ***begun*** the process of obtaining U.S. licenses,[UF236]

13  ***five years*** after his June 2008 report.  Shortly after, Haxton wrote to an IFP USA

14  executive that the "[i]ssue is that in the USA … rights have to be negotiated directly

15  with ***each*** repertoire owner" and the Sony lawsuit "just brings it to a conclusion that

16  will now be negotiated."[UF237]

17       **IFP Replaces Isherwood.**  In June 2014, Haxton wrote in an internal email that

18  IFP should "███████████" of new U.S. business because "████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████,"[UF238]  Shortly after this, IFP

22  terminated Isherwood.[UF239]  IFP's view was that Isherwood had been "hammering on

23  the door and nothing coming back to get stuff done," so it hired another U.K.-based

24  licensing consultant, Iain Kemplay, to replace him.[UF240]

25       Borgeson was asked to bring Kemplay up to speed, and later that June, he wrote

26  an internal email listing Kemplay's assignments.[UF241]  Under the headings "████████

27  ██████████████████████████" Borgeson wrote, "████████████████████████

28  ████████████████████████████████,"[UF241] – precisely what

JMBM  Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1    Isherwood had been hired to do five years earlier.

2                                 <u>**Argument**</u>

3    **I.    DEFENDANTS ARE LIABLE FOR COPYRIGHT AND STATE-LAW**
4            **INFRINGEMENT.**

5           The Copyright Act protects musical compositions, as well as sound recordings

6    created on or after February 15, 1972.  17 U.S.C. §§ 102, 301(c); *U.S. v. Moghadam*,

7    175 F.3d 1269, 1271 (11th Cir. 1999); *see also* 17 U.S.C. § 103 (Copyright Act also

8    protects compilations).  Sound recordings created prior to February 15, 1972 ("Pre-'72

9    Works") receive equivalent protection under state law.  Cal. Civ. Code § 980(2); *A&M*

10   *Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 560-61 & n.6, 564 (1977).  Pursuant to

11   17 U.S.C. § 106, copyright owners possess the exclusive rights "to do or to authorize"

12   their works to be reproduced, distributed, and publicly performed (in the case of sound

13   recordings, only by means of digital audio transmissions).  Further, "[i]mportation into

14   the United States, without the authority of the owner of copyright under this title, of

15   copies or phonorecords of a work that have been acquired outside the United States is

16   an infringement of the exclusive right to distribute copies or phonorecords under

17   section 106, actionable under section 501."  17 U.S.C. § 602(a)(1); *see also* 17 U.S.C.

18   § 602(b) ("In a case where the making of the copies or phonorecords would have

19   constituted an infringement of copyright if this title had been applicable, their

20   importation is prohibited.").

21          Copyright infringement has two elements: (1) ownership and (2) infringement

22   of any one of the Section 106 exclusive rights.  *A&M Records, Inc. v. Napster, Inc.*,

23   239 F.3d 1004, 1013 (9th Cir. 2001); *see* 17 U.S.C. § 501(a) (infringement occurs

24   when alleged infringer engages in activity listed in § 106); *S.O.S., Inc. v. Payday, Inc.*,

25   886 F.2d 1081, 1085 n.3 (9th Cir. 1989) ("The word 'copying' is shorthand for the

26   infringing of any of the copyright owner's five exclusive rights").  State law is

27   analogous for Pre-'72 Works.  *Heilman*, 75 Cal. App. 3d at 560-61; *Lone Ranger*

28   *Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725 (9th Cir. 1984).  Both

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  elements are satisfied here.  *First*, Defendants have stipulated to Plaintiffs' ownership

2  of the 5,494 sound recordings and musical compositions at issue.[UF14-15]  *Second*, IFP's

3  playlists, interrogatory answers, and deposition testimony demonstrate that IFP has

4  reproduced, distributed, imported, and/or publicly performed or authorized the public

5  performance of each of these works by airlines in the U.S.[UF16-23, 25-29]

6      ● Copying Plaintiffs' music onto CDs, DVDs, and computer hard drives

7  infringes Plaintiffs' exclusive ***reproduction*** rights.  *MAI Systems Corp. v. Peak*

8  *Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (defendant's "loading of

9  copyrighted software into RAM creates a 'copy' of that software in violation of the

10  Copyright Act"); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350

11  (S.D.N.Y. 2000) (copying CDs onto computers without authorization "makes out a

12  presumptive case of infringement").

13      ● Sending copies of Plaintiffs' music to airlines for further digital public

14  performance infringes Plaintiffs' exclusive ***distribution*** rights (where the distribution

15  originates in the U.S.) or importation right (where the distribution originates overseas).

16  *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993); 17

17  U.S.C. § 602(a).[8]  The current 1976 Copyright Act's definition of "distribution" is

18  synonymous with the exclusive right of "publication" in the 1909 Copyright Act.

19  *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 299 (3d Cir. 1991);

20  H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 62, 1976 WL 14045 at *62 (1976)

21  ("Clause (3) of section 106 establishes the exclusive right of publication").  The 1976

22

23  ───────────────────
    [8] The "first sale doctrine" does not diminish Plaintiffs' importation right here, because,

24  pursuant to 17 U.S.C. § 109(d), "[t]he privileges prescribed by subsections (a) and (c)
    do not, unless authorized by the copyright owner, extend to any person who has

25  acquired possession of the copy or phonorecord from the copyright owner, by rental,
    lease, loan, or otherwise, without acquiring ownership of it."  Even if IFP was validly

26  licensed to use Plaintiffs' music in the U.K., "[e]ntering a license agreement is not a
    'sale' for purposes of the first sale doctrine."  *Microsoft Corp. v. Harmony Computers*

27  *& Electronics, Inc.*, 846 F. Supp. 208, 213 (E.D.N.Y. 1994).

28

PRINTED ON

RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

Act defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 101.  In addition, "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further … public performance … constitutes 'publication.'"  *Id.  See Elektra Entertainment Group, Inc. v. Barker*, 551 F. Supp. 2d 234, 242 (S.D.N.Y. 2008) (distributing copies or phonorecords to a group of persons "for purposes of further distribution, public performance, or public display …  can violate the distribution right of Section 106(3)"); *see also Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1084 (D. Md. 1995) ("By the clear terms of § 106, [the] owner of the copyrighted works, has the exclusive right to limit the distribution chain of its products.").

●   Effectuating public performances by air carriers of digital copies[9] of Plaintiffs' music ***directly*** infringes Plaintiffs' exclusive ***public performance*** rights. Disseminations of copies of copyrighted works (such as IFP's disseminations to air carriers) which, in turn, result in performances to members of the public (*i.e.*, airline passengers) constitute "public performances" by the original disseminator, here IFP. *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y. 1991) ("Transmissions by a cable network or service to local cable companies who in turn transmit to individual cable subscribers constitute 'public performances' by the network under" the Copyright Act); *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752, 759 n.3 (S.D.N.Y. 1988) (transmission to cable operator by cable programmer is a public performance by the cable programmer under the Copyright Act); *WGN Continental*

---

[9] *See* Digital Performance Right in Sound Recordings Act of 1995, Senate Report No. 104–128, 104th Cong., 1st Sess. 1995, 1995 WL 472241, 1995 U.S.C.C.A.N. 356 at 13-14 (1995) (right includes interactive CD performances and audio-on-demand), 33 ("digital audio transmission" means "a transmission in a digital format (or any other nonanalog format that might currently exist or be developed in the future) that embodies the transmission of a sound recording.  A transmission that is only partly in a digital or nonanalog format satisfies this definition.").

PRINTED ON

RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

*Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622, 625 (7th Cir. 1982).[10]

Alternatively, the doctrines of contributory and vicarious infringement, which "emerged from common law principles and are well established in the law," *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005), independently establish IFP's liability as to such public performances. Contributory and vicarious liability require a direct infringement by a third party, but the direct infringer need not be named as a defendant. *In re Aimster Copyright Litig.*, 334 F.3d 643, 646 (7th Cir. 2003). Here, IFP's airline clients directly infringed Plaintiffs' digital public performance right.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (citation omitted). The "knowledge" may be actual or constructive, *Napster*, 239 F.3d at 1019-20, and turning a "blind eye" to infringement is the equivalent of knowledge. *Aimster*, 334 F.3d at 650. One materially contributes to infringement by providing the "site and facilities" and "support services" for infringing activity, *Fonovisa*, 76 F.3d at 264, or by "failing to take simple measures to limit" it. *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1108 (N.D. Cal. 2008); *see Williams v. Scribd, Inc.*, No. 09cv1836–LAB (WMc), 2010 WL 10090006, *7 (S.D. Cal. June 23, 2010); *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 962 (N.D. Cal. 2010). Here, IFP provided the site and facilities (copying, encoding, delivery) which enabled the airlines' infringements, and failed to take the

---

[10] Were this not the case, content aggregators like IFP could evade liability for infringing the performance right merely by relying on their air carrier customers to "perform" the infringing works that IFP supplies to them for precisely that purpose. That is not the law or what Congress intended. *See David*, 697 F. Supp. at 759 (finding direct infringement of performance right by "organizations such as [defendant] who 'broadcast' their programs to the public indirectly, through local cable companies who pass the signal along to their individual customers").

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1   simplest measure to stop them, *i.e.*, notifying the airlines that the music it provided to

2   them was unauthorized.

3        Alternatively, one vicariously infringes "by profiting from direct infringement

4   while declining to exercise a right to stop or limit it[.]" *Grokster*, 545 U.S. at 930."

5   Vicarious liability is established where the defendant "derived a direct financial

6   benefit from the infringement and had the right and ability to supervise the infringing

7   activity." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  IFP financially

8   benefitted from its infringement, including from the "copyright fees" it charged

9   airlines, and the revenues for airline contracts as a whole, which they serviced using

10   Plaintiffs' music.  Further, "[f]inancial benefit exists where the availability of

11   infringing material 'acts as a "draw" for customers,'" *Fonovisa,* 76 F.3d at 263-64,

12   and "need not be the primary, or even a significant, draw – rather, it need only be 'a'

13   draw." *Ellison*, 357 F.3d at 1079.  Here, IFP admits that Plaintiffs' music was

14   important to its soliciting of airline contracts,[UF242-243] and American concurs.[UF244-246]

15   And IFP clearly had the ***ability*** to supervise the airlines' music content (since IFP was

16   providing it), which is all that is required.  *Grokster*, 545 U.S. at 930 n.9 (legal right

17   and practical ***ability*** to supervise, not actual supervision, is all that is required);

18   *Napster*, 239 F.3d at 1023.

19  **II.   DEFENDANTS' AFFIRMATIVE DEFENSES ARE MERITLESS.**

20        IFP is simultaneously moving for summary judgment on its affirmative

21   defenses of estoppel and statute of limitations; Plaintiffs' Opposition to that motion

22   will constitute ***Plaintiffs'*** request for summary judgment on these two affirmative

23   defenses.  Based upon all of the facts set forth herein, and the absence of contrary

24   material facts, IFP's remaining affirmative defenses are also meritless as a matter of

25   law.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000),

26   *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (on summary judgment,

27   moving party meets initial burden of establishing the absence of a genuine issue of

28   material fact by "'showing' – that is, pointing out to the district court – that there is an

PRINTED ON
RECYCLED PAPER
LA 12448367v1

*JMBM* | Jeffer Mangels
Butler & Mitchell LLP

- 24 -

1    absence of evidence to support the nonmoving party's case").

2        **Failure to State a Claim (First Affirmative Defense).**  Plaintiffs plainly state

3    cognizable claims for relief.  IFP cannot show otherwise.

4        **Express and Implied License (Third and Seventh Affirmative Defenses).**

5    No basis exists for any license defense.  IFP represented to this Court it lacks

6    sufficient evidence to prove an enforceable license.[UF247]  In any event, both express

7    and implied licenses require a "meeting of the minds" on all essential terms, *Banner*

8    *Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 359 (1998), which did

9    not occur here.  *See Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 213 (2006);

10   *Bean v. Pearson Educ., Inc.*, 949 F. Supp. 2d 941, 947 (D. Ariz. 2013) ("the evidence

11   must show that both parties … not just the defendant, intended that the defendant

12   could use or copy the plaintiff's work *without liability for copyright infringement*.")

13   (emphasis added).  And "the implied license doctrine in copyright cases is to be very

14   narrowly construed," *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.

15   Supp. 2d 1197, 1226 (C.D. Cal. 2007), and is limited to "'narrow' circumstances

16   where one party 'created a work at [the other's] request and handed it over, intending

17   that [the other] copy and distribute it.'"  *Napster*, 239 F.3d at 1026.  This did not occur

18   here.

19       **Waiver (Fifth Affirmative Defense).**  There is no evidence of an "intentional

20   relinquishment of a known right with knowledge of its existence and the intent to

21   relinquish it," as required to prove waiver.  *U.S. v. King Features Entertainment, Inc.*,

22   843 F.2d 394, 399 (9th Cir. 1988).  Waiver requires conduct that is "clear,

23   unmistakable, and without ambiguity" and "may not be inferred from mere silence or

24   inaction."  *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540

25   (S.D.N.Y. 2015); *see also DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café &*

26   *Takeout III, Ltd.*, 30 Cal. App. 4th 54, 60 (1994) (burden "is on the party claiming a

27   waiver of a right to prove it by clear and convincing evidence that does not leave the

28   matter to speculation, and 'doubtful cases will be decided against a waiver'").

PRINTED ON
RECYCLED PAPER
LA 12448367v1

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-03466-MMM-JPR

JMBM | Jeffer Mangels Butler & Mitchell LLP

**Consent (Sixth Affirmative Defense).**  Plaintiffs are not aware of *any* copyright case (and certainly none in the Ninth Circuit) recognizing an independent affirmative defense of "consent" in copyright cases.  A defense asserted only by a conclusory label is insufficient.  *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1295 (7th Cir. 1989).

**Unclean Hands (Eighth Affirmative Defense).**  "In copyright actions, the doctrine of unclean hands" requires "a showing that the party seeking equitable relief is '(1) guilty of conduct involving fraud, deceit, unconscionability, or bad faith, (2) directly related to the matter at issue, (3) that injures the other party, and (4) affects the balance of equities between the litigants.'"  *Purzel Video GmbH v. St. Pierre*, 11 F. Supp. 3d 1020, 1030 (D. Colo. 2014) (citations omitted).  Plaintiffs are not seeking equitable relief on this motion, and, regardless, IFP cannot establish the elements of this defense.  *See Cherry River Music Co. v. Simitar Entertainment, Inc.*, 38 F. Supp. 2d 310, 317 (S.D.N.Y. 1999) (rejecting defense based on claim that plaintiff "led [defendant] to believe that negotiated licenses would be forthcoming"); *Coleman*, 764 F. Supp. at 296 (summary judgment for copyright plaintiff on unclean hands defense).

**Laches (Ninth Affirmative Defense).**  Laches is not a defense to copyright infringement.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014).  The same rationale applies to Plaintiffs' analogous state-law infringement claims.  *See Shewry v. Begil*, 128 Cal. App. 4th 639, 645-46 (2005) (laches only applies to equitable claims).  Regardless, no basis exists for the defense here.

**Abandonment (Tenth Affirmative Defense).**  Abandonment requires "(1) an intent by the copyright holder to surrender rights in the work; and (2) an overt act evidencing that intent."  *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998).   No such evidence exists here.  And abandonment of a copyright "must be manifested by some overt act indicative of a purpose to surrender the rights and allow the public to copy," not merely a "lack of action."  *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1    **Airline Deregulation Act Preemption (Eleventh Affirmative Defense).**  The

2    Court has already ruled as a matter of law that this statute is inapplicable to inflight

3    entertainment.  *See* Dkt. 106 at 14-17 ("any connection between [inflight

4    entertainment] and § 980(a)(2) is too tenuous and remote to justify preemption").  In

5    any event, no facts exist to support this defense.

6    **III.    IFP'S INFRINGEMENTS WERE WILLFUL.**

7         "In a case where the copyright owner sustains the burden of proving, and the

8    court finds, that infringement was committed willfully, the court in its discretion may

9    increase the award of statutory damages to a sum of not more than $150,000" per

10   work, 17 U.S.C. § 504(c), instead of $30,000, § 504(b).  The doctrine of willfulness is

11   crucial to "'sanction and vindicate the statutory policy' of discouraging [copyright]

12   infringement."  *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir.

13   1990), *quoting F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233

14   (1952) ("a rule of liability which merely takes away the profits from an infringement

15   would offer little discouragement to infringers" and "fall short of an effective sanction

16   for enforcement of the copyright policy"); *see also Int'l Korwin Corp. v. Kowalczyk*,

17   665 F. Supp. 652, 659 (N.D. Ill. 1987) ("courts have repeatedly emphasized that

18   defendants must not be able to sneer in the face of copyright owners and copyright

19   laws."), *aff'd*, 855 F.2d 375 (7th Cir. 1988); *Frank Music Corp. v. Metro-Goldwyn-*

20   *Mayer, Inc.*, 772 F.2d 505, 520 (9th Cir. 1985) (copyright laws are designed "to

21   discourage wrongful conduct and deter infringements"); *Magnuson v. Video*

22   *Yesteryear*, 85 F.3d 1424, 1432 (9th Cir. 1996).  The doctrine of willfulness is

23   necessary to demonstrate "that it 'costs less to obey the copyright laws than to violate

24   them.'"  *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 514 (7th Cir.

25   1994) (citation omitted).

26        Where, as here, the relevant facts are admitted or otherwise undisputed,

27   willfulness is appropriately resolved on summary judgment.  *See*, *e.g.*, *Peer Int'l*, 909

28

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

F.2d at 1335-36.[11]  "Willfulness in this context means that the defendant *'recklessly disregarded' the possibility* that 'its conduct represented infringement.'"  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001) (emphasis added).  Alternatively, willfulness is shown when the "defendant knew or 'should have known' it infringed [plaintiff's] copyrights…. Willful does not mean 'malicious,' rather, it means 'with knowledge,' whether *actual or constructive*."  *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1543 (S.D.N.Y. 1991) (emphasis added), *citing Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir. 1986); *accord*, *A&M Records, Inc. v. Abdallah*, 948 F. Supp. 1449, 1457 (C.D. Cal. 1996).  "Willful blindness is knowledge, in copyright law … as it is in the law generally."  *Aimster,* 334 F.3d at 650.  A defendant's claimed subjective state of mind does not prevent summary judgment on willfulness, because "[t]o refute evidence of willful infringement, [a defendant] must not only establish its good faith belief in the innocence of its conduct, it must also show that *it was reasonable in holding such a belief*."  *Peer Int'l*, 909 F.2d at 1336 (emphasis added).

Willfulness "need not be proven directly but may be inferred from the defendant's conduct."  *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992).  Normally, circumstantial evidence is often the only form available

---

[11] *See also*, *e.g.*, *Stratton v. Upper Playground Enters., Inc.*, No. CV 09-8796 PSG (PJWx), 2010 WL 5313317, *6 (C.D. Cal. Dec. 16, 2010); *Wall Mountain Co., Inc. v. Edwards*, No. C 08-2579 PVT, 2010 WL 4940778, *2 (N.D. Cal. Nov. 30, 2010); *Broadcast Music, Inc. v. TTJ's Inc.*, No. 3:09-CV-460-BLW, 2010 WL 2867814, *1 (D. Idaho July 20, 2010); *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593, *15 (N.D. Ill. Aug. 28, 2003); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950, *10 (N.D. Ill. Jan. 22, 2001); *Microsoft Corp. v. Compusource Distributors, Inc.*, 115 F. Supp. 2d 800, 812 (E.D. Mich. 2000); *Sega Enterprises Ltd. v. Maphia*, 948 F. Supp. 923, 936 (N.D. Cal. 1996); *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1091 (D. Md. 1995); *Meadowgreen Music Co. v. Voice in the Wilderness Broadcasting, Inc.*, 789 F. Supp. 823, 827 (E.D. Tex. 1992); *Int'l Korwin*, 665 F. Supp. at 659; *Wow & Flutter Music v. Len's Tom Jones Tavern, Inc.*, 606 F. Supp. 554, 556-57 (W.D.N.Y. 1985).

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1    (since few defendants readily admit actual knowledge), and is sufficient to support

2    summary judgment.  *See Peer Int'l Corp. v. Latin American Music Corp.*, 161 F.

3    Supp. 2d 38, 54 (D.P.R. 2001) ("constructive notice may be determined at the

4    summary judgment stage as an issue of law"); *Wow & Flutter*, 606 F. Supp. at 556-57.

5    But this case is unique in that there is a mountain of admissions and other ***direct***

6    evidence of IFP's willful infringements.  The evidence is overwhelming that IFP

7    actually (not just constructively) knew it was infringing; knew the potential legal

8    consequences of that infringement (*e.g.*, claims were "bound to happen" and it was a

9    "real mess"); recklessly disregarded those risks, "right or wrong" (*e.g.*, "we do not

10   wish to see the LA office precluded from providing services purely due to onerous

11   licensing costs.  This will impact the growth of the Audio Department in LA which

12   should not be."); and displayed consciousness of guilt by seeking to cover up its

13   infringements (*e.g.*, choosing to "▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮" so as not to ▮▮▮▮▮▮▮▮▮).[12]

15          IFP treated its known, ongoing copyright infringement liability as merely "a

16   cost of doing business" – arrogantly figuring its liability would eventually be

17   "negotiated" after it was sued, and budgeting for its theft of Plaintiffs' music by

18   internally "accruing" sums equal to what it ***hoped*** its eventual liability would be[UF159,]

19   [194-197, 211] for "separately negotiated claims from individual rights holders in the

_____

[12] Even absent the overwhelming evidence of actual knowledge, IFP's commercial sophistication would preclude it from contending it was ignorant of its legal obligations under copyright law.  *See Peer Int'l*, 909 F.2d at 1336 (willfulness shown as a matter of law where defendant, "a corporation engaged in the business of manufacturing and distributing copyrighted works, does not claim ignorance as to its legal obligations").  In any event, "one who engages in a business enterprise for [many] years and makes no attempt to learn what his legal duties are in connection with that business deserves no sympathy from the Court."  *Ice Nine Publishing Co. Inc. v. Barnes*, No. 89-3227, 1990 WL 236055, *2 (C.D. Ill. Sept. 14, 1990) (granting summary judgment on willfulness); *see also*, *e.g.*, *Webloyalty.com, Inc. v. Consumer Innovations, LLC*, 388 F. Supp. 2d 435, 441 (D. Del. 2005) (willfulness shown where defendant "understood copyright protection").

PRINTED ON

RECYCLED PAPER
LA 12448367v1

- 29 -

JMBM | Jeffer Mangels Butler & Mitchell LLP

USA."[UF199, 225]   When Sony Music sued IFP, the head of IFP, Haxton, minimized the lawsuit as an event that "just brings [the U.S. infringement situation] to a conclusion that **will now be negotiated**."[UF237]   This attitude is the **epitome** of willfulness.  Where a defendant is

> willing to risk possible infringement and subsequent payment for infringement as a "cost of doing business" … **[s]uch patterns of conduct support a showing of willfulness**…. "Increased statutory damages may be necessary in a particular case to prove that it 'costs less to obey the copyright laws than to violate them.'"

*Wildlife Express*, 18 F.3d at 514 (emphasis added, citations omitted); *see also Spectravest, Inc. v. Fleet Street, Ltd.*, No. C–88–4539 RFP, 1989 WL 135386, *5 (N.D. Cal. Aug. 23, 1989) (summary judgment on willfulness based on a "lack of caution [which] indicates a reckless disregard for … copyright protection").

Finally, it is no defense to willfulness that obtaining licenses from U.S. rightsholders was supposedly difficult and frustrating.  Courts routinely reject such arguments.  *See Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) (rejecting argument that a for-profit business involving copyrighted material "cannot be held liable for copyright violations" because complying with the law was too difficult); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1177 n.22 (C.D. Cal. 2002) ("In response to the unstated premise of [defendant's] arguments that enforcement of the Copyright Act would hurt its business … the Court finds itself sympathetic to the observation [that] '[i]f a business cannot be operated within the bounds of the Copyright Act, then perhaps the question of its legitimate existence needs to be addressed.'") (Citation omitted.)

## IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON IFP'S COUNTERCLAIMS.

IFP asserts four counterclaims in the SACC.  The first three assert variations of fraud:  intentional misrepresentation, concealment, and negligent misrepresentation;

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  the fourth, a claim for intentional interference with contract.  Fed. R. Civ. P. 56

2  "mandates the entry of summary judgment … against a party who fails to make a

3  showing sufficient to establish the existence of an element essential to that party's

4  case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S.

5  at 322.  When a party moves for summary judgment on another party's claims, "the

6  burden on the moving party may be discharged by 'showing' – that is, pointing out to

7  the district court – that there is an absence of evidence to support the nonmoving

8  party's case."  *Id.* at 325.

9       IFP cannot meet its evidentiary burden on any of the Counterclaims, which are

10  beyond meritless – they are frivolous.  The true facts bear little resemblance to the set

11  of imaginary ones alleged by IFP.[13]  The three fraud-based claims are deficient for

12  numerous reasons, including because there is no evidence of any misrepresentation,

13  actual reliance (let alone ***justifiable*** reliance), or of any legally cognizable damages

14  proximately caused by Plaintiffs' alleged actions.  The intentional misrepresentation

15  and concealment claims also fail because there is no evidence Plaintiffs acted with

16  fraudulent intent.  The fourth counterclaim for interference with contract is baseless

17  for multiple reasons, including the same reasons this Court already twice dismissed it.

18  Plaintiffs' actions did not cause a breach or disruption of IFP's airline contracts, or

19  any cognizable, nonspeculative harm to IFP.  And this claim is predicated on "cease

20  and desist" communications and litigation activity that are absolutely protected by the

21  *Noerr-Pennington* doctrine and the California litigation privilege.

22       **A.     The Fraud-Based Counterclaims are Meritless.**

23       Fraud claims require proof of:  "(1) misrepresentation (false representation,

24  concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to

25  defraud (*i.e.*, to induce reliance); (4) justifiable reliance; and (5) resulting damage."

---

[13] This is especially egregious, even sanctionable, given that discovery had closed by the time IFP filed the SACC, so the complete absence of evidentiary support for the counterclaims based on that record was apparent to IFP.

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1185-86 (2014).  Negligent

2  misrepresentation "does not require intent to defraud" but does require the "assertion,

3  as a fact, of that which is not true, by one who has no reasonable ground for believing

4  it to be true."  *Conroy v. Regents of Univ. of Cal.*, 45 Cal. 4th 1244, 1255 (2009).

5           **1.**      **Additional Facts Relevant to the Fraud-Based Counterclaims.**

6         The uncontroverted facts set forth at pages 2-20, *supra*, evidence IFP's

7  knowledge of its unlicensed uses of copyrighted sound recordings and musical

8  compositions; its hiring of licensing "expert" Isherwood to advise IFP regarding its

9  legal exposure; his repeated warnings to IFP that it was infringing Plaintiffs' rights;

10  his repeated reports to IFP that he had not obtained the required licenses; IFP's

11  knowledge throughout, and as late as 2012 and 2013, that it was still committing

12  "infringement" and was "exposed" to copyright lawsuits; and IFP's repeated attempts

13  to cover up its infringements, evidencing a state of mind incompatible with any

14  justifiable belief in the legality of IFP's uses of Plaintiffs' property.

15         Regarding Isherwood's meetings themselves with certain Plaintiffs and HFA, as

16  noted, Isherwood cannot even remember much about these meetings because "well,

17  simply it's long ago"[UF165] and "not something I have dwelt on[.]"[UF166]  But what little

18  he *can* remember only reinforces the lack of any basis for any fraud-based

19  counterclaim.

20         **Isherwood's Lack of *Any* Communications with UMPG.**  Isherwood admits

21  he never even ***communicated at all*** with UMPG about musical composition licenses

22  for IFP.[UF248]  He only communicated with ***HFA***, which told him, from the very outset,

23  that it had ***no authority to enter into a license on behalf of UMPG***.[UF249]  Isherwood

24  also has no idea if HFA even ***communicated*** to UMPG about IFP.[UF250]  (It didn't.)

25  Nobody at HFA ever told Isherwood that HFA could grant a license for inflight

26  entertainment on ***anyone's*** behalf, let alone UMPG's.[UF252]  And Chris Curley of HFA

27  repeatedly requested that ***Isherwood*** send HFA a proposal if he wanted to move the

28  process forward.[UF251, 253]  Isherwood told IFP that "[a]ssuming HFA and [IFP] can find

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1    an acceptable approach, [HFA] will then share this with their members who will then

2    determine whether to opt in or out.  Those that opt out will need to be negotiated with

3    separately."[UF254]  None of this happened.

4          In late 2009, having made no progress for nearly a year,[UF255] Isherwood again

5    contacted HFA by email, "[e]xtremely belatedly … to take up discussions again with

6    regard to [IFP] in Los Angeles … Clearly [IFP] needs a license for the reproduction of

7    copyright musical works that it uses in its programme production."[UF256]  In March

8    2010, he told IFP, "I have heard nothing from HFA regarding musical works."[UF257]  He

9    arranged a meeting with HFA in April 2010,[UF258] but his notes reflect that HFA "was

10    pretty flaky about whether it could license – whose repertoire it could license."[UF259]

11          As of May 2010, HFA was still awaiting *Isherwood's* proposal.[UF260]  Isherwood

12    did not contact HFA again until September 2010[UF162, 261-262] and did not meet with

13    HFA again until March 2011.[UF263]  He claims a license fee of 10% was "discussed"

14    (*not* agreed) at this meeting[UF264]; HFA's Curley testified that he "wouldn't have told

15    [Isherwood] that we're going to give him a license because we can't just give

16    somebody a license…. [W]e were in no position to just turn over a license[.]"[UF265]

17    Instead, HFA and Isherwood were still in the initial phases of discussing a *licensing*

18    *services agreement*, a preliminary document that HFA needed *before* it could even

19    *begin* talking to music publishers like UMPG about IFP.[UF266]

20          In June 2012, Isherwood told IFP, "I am still not able to get a clear answer in

21    relation to the HFA fees.  They have still not provided me with a proposal for a

22    license[.]"[UF267]  Nor did HFA provide him with a proposal after that date,[UF268] and,

23    even if it had done so, and IFP had agreed to it (none of which happened), Isherwood

24    admits UMPG probably would have *opted out* of any such proposed license.[UF269]

25    Based on Isherwood's communications, IFP understood HFA didn't "cover all music,

26    musical works,"[UF272] had no idea "whether there was any specific reference to UMPG

27    in any conversations with" HFA,[UF270] and knew the rate at which HFA might license

28    any inflight content on behalf of *anyone* (let alone UMPG) "was still to be threshed

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM   Jeffer Mangels Butler & Mitchell LLP

1   out[.]"[UF271]

2   **Isherwood's Limited, Sporadic, and Inconclusive Communications with**

3   **EMI.**  Isherwood initially inquired of EMI (including plaintiff Capitol Records, LLC)

4   in September 2009,[UF273-275] to which EMI's Kevin Carson responded that he had no

5   experience with inflight licensing and asked *Isherwood* to send *him* a proposed

6   license.[UF276]  Isherwood did so – admittedly as a "starting point"[UF278] – telling Carson

7   any license would still have to be approved by IFP's lawyers.[UF277]  In November 2009,

8   Carson emailed Isherwood with four questions about IFP, which IFP never

9   answered.[UF300-301]

10   Isherwood did not meet with Carson until May 2010.[UF279]  According to

11   Isherwood's notes, Carson asked for IFP's "old playlists back to 2008"[UF280]; expressed

12   concern about "touchscreen availability"[UF281]; asked for a delivery fee[UF282]; demanded

13   at least a $10,000 per year advance[UF283]; told Isherwood that EMI "would prefer [IFP]

14   to take down repertoire as we needed from [EMI's digital] repository"[UF284]; and told

15   Isherwood "there are certain catalogs within [EMI's] repertoire that they are not in a

16   position to license for this type of service," and may have told Isherwood that EMI

17   could, at best, only license 80% of its catalog to IFP.[UF285]  In June 2010, Isherwood

18   told IFP that it would "need to agree to" pay EMI back royalties to January 2008,[UF286]

19   and that any agreement with EMI "will not cover the entire catalogue.  For example,

20   they are unable to include The Beatle[s] repertoire in the agreement."[UF286]  IFP never

21   provided any of the information EMI requested, did not address any of the issues

22   Carson raised, and did not even cease using the Beatles or other EMI copyrighted

23   content.[UF287-292]

24   Isherwood also does not recall any discussions with Carson about the nature,

25   content, and frequency of the accountings EMI would require of IFP (for both money

26   and content use),[UF293] an important issue to IFP because, as IFP's Borgeson stated in

27   an email to his superiors in October 2009, "our concern is … the additional effort

28   required by [record] labels to track content use."[UF294]  And, because IFP was willing to

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    offer EMI only a trivial annual advance, Isherwood "throughout this period, always

2    acknowledged to myself that this was not likely to be a priority for [EMI], yes."[UF297]

3         In September 2010, Isherwood emailed Carson again, asking for a conference

4    call and a "pro forma contract."[UF164, 299]   Isherwood admits that even if Carson ***had***

5    sent him a "pro forma contract" despite all the unanswered questions and open issues,

6    he "knew that there would … be some back and forth over terms."[UF298]

7         In May 2011, Isherwood met with EMI's Jarrett McGehee, though Isherwood

8    has no recollection of the meeting.[UF302]   At Isherwood's request, McGehee later ***did***

9    send Isherwood a "template" agreement "to get the ball rolling" (noting it would need

10   to be "tweaked"),[UF303-304] but Isherwood felt it "did not give me what I needed in terms

11   of the principal elements of the contract."[UF305]   So he ***ignored*** McGehee's template,

12   and ***never contacted EMI again***.[UF306-308]   EMI never told Isherwood that any of his

13   proposals was acceptable,[UF309] and IFP has no knowledge whether Isherwood and EMI

14   ever reached agreement on ***anything***.[UF310]   McGehee (now employed by a third party

15   in Austin, Texas) testified that he had no authority to allow EMI's works to be used

16   without a written license or to grant a retroactive license, and would never have done

17   so.[UF311]

18        **Isherwood's Limited, Sporadic, and Inconclusive Communications with**

19   **UMG.**  In October 2009, Isherwood met with four people at UMG, including in-house

20   lawyer Bill Waddell, for about 45 minutes.[UF312]   He has no notes of this meeting,[UF313]

21   doesn't "remember the specific conversations" or anything anyone said,[UF314] cannot

22   recall anyone from UMG affirmatively accepting anything he was saying,[UF315] and

23   says it "felt a little bit more like a job interview" than a meeting.[UF316]   Isherwood never

24   communicated to IFP that UMG promised him a "contract," that IFP had the right to

25   use UMG's recordings, or that UMG had excused any past unauthorized uses.[UF317]

26   Nor did any of Isherwood's occasional, brief emails to UMG in the following months

27   confirm any such promises (or any others), though he admits nothing prevented him

28   from sending such a written confirmation – and that IFP supposedly being a "small

PRINTED ON

RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  fry" compared to UMG was "perhaps" all the more reason to do so.[UF318]  He also

2  "knew that *any agreement* with the major labels would *have to be immortalized in a*

3  *full-length contract*," and that UMG would not consent to *any* short form

4  confirmation or informal understanding.[UF319]

5      Isherwood did not meet with Waddell again until May 2010.[UF320]  "[B]y this

6  time, six months had passed" and Isherwood admits "it seemed likely that Bill

7  Waddell would not recall what happened at the meeting six months ago."[UF321]

8  Following this meeting, Isherwood informed IFP that they needed "to talk through the

9  consequences of" Waddell's request that any license "break out" U.S. air carriers from

10  one of IFP's U.K. licenses, and "I need information about the legal entity in L.A. in

11  order to provide the information [Waddell] need[s]."[UF322]  IFP never got back to

12  Waddell on the U.S. air carrier issue[UF323] or provided the information Waddell

13  needed.[UF324]

14      In September 2010, Isherwood again emailed Waddell, again reintroducing IFP

15  because "I felt it best to explain everything again to sort of refresh their memories,"

16  again not mentioning any promise having been made by UMG, and insisting that IFP

17  was only willing to pay a trivial advance for a license.[UF163, 327]  No progress was made;

18  Waddell (now an attorney in private practice) testified that he had a conversation with

19  Isherwood sometime in 2010 in which he told Isherwood that "it didn't seem like we

20  were going to be able to get the deal done.  And the reason was … that the kind of

21  money that he was willing to pay as an advance didn't make sense to [UMG]."[UF326]

22  Waddell also testified that he never agreed to provide IFP with a contract containing

23  terms acceptable to UMG, as that is not how contracts were entered into and approved

24  at UMG – he "would have never, ever made a representation that I had the authority to

25  bind the company to a contract.  I didn't."[UF325]

26      Eight months later, in May 2011, Isherwood arranged a meeting with Lisa

27  Rogell, an in-house attorney who had replaced the now-departed Waddell.[UF328]

28  Because Isherwood realized he "was starting again" with a "new person," and "there

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1   was already a history of … people forgetting, you know, what [IFP] was,"[UF330] he sent

2   Rogell an email in advance of the meeting, again *introducing* IFP, which was almost

3   identical to the two he previously sent to Waddell[UF329] – and far from confirming any

4   prior promise by UMG about *anything*, Isherwood's email to Rogell stated that IFP

5   would "*like to put in place* a … license agreement with UMG … [I] had *hoped to get*

6   *a meeting with [Waddell]* to move this all forward."[UF329]   Isherwood has no notes

7   from this meeting with Rogell,[UF331] nor any recollection of Rogell saying *anything*

8   affirmative to him.[UF332]   Rogell describes it as a "hi, I want to come in and meet with

9   you kind of" meeting that she barely recalls.[UF333]   Four weeks after this meeting,

10   Rogell emailed Isherwood asking for the name of his client, which indicated to him

11   she "didn't even remember the name of the company" he represented.[UF334]   Yet for

12   four months, he did not even *identify* IFP, and shortly afterwards, dropped the issue

13   entirely,[UF335-336] and never contacted UMG again.[UF337]   IFP never learned "the details"

14   of Isherwood's discussions with UMG.[UF295, 296, 338]

15          **2.      There is No Evidence Plaintiffs Made Any Misrepresentations.**

16          Though IFP has the burden of proof on all of its Counterclaims, the evidence

17   confirms that IFP knew and understood it did *not* have licenses to use Plaintiffs'

18   works and was subject to copyright infringement claims and lawsuits.   Plaintiffs'

19   supposed silence in the face of Isherwood's oral presentations is no basis to "infer"

20   any promises because "silence alone, as distinguished from misleading half-truth or

21   partial disclosures, is not actionable" when the speaker has no duty to disclose

22   anything to the listener.   *Franceschi v. Harrah's Entertainment, Inc.,* No. 2:10-cv-

23   00205-RLH-RJJ, 2011 WL 9305, *6 (D. Nev. Jan. 3, 2011), *citing Wiechmann*

24   *Engineers v. State of Cal. ex rel. Dep't Pub. Works,* 31 Cal. App. 3d 741, 751 (1973);

25   *see also First v. Allstate Ins. Co.,* 222 F. Supp. 2d 1165, 1174 (C.D. Cal. 2002).   IFP

26   cannot establish any such duty here, let alone that Isherwood even *asked* for such

27   promises in his pitches to Carson, McGehee, Waddell and Rogell.   To the contrary,

28   Isherwood admits he *knew* that major record companies would *not* commit to a short-

PRINTED ON
RECYCLED PAPER
LA 12448367v1

1   form or informal confirmatory writing – let alone anything *orally*.

### 3.   IFP Did Not Justifiably Rely on Any Representation or Omission.

To establish justifiable reliance, a party must prove both "actual reliance" and "that the reliance was reasonable." *Hoffman*, 228 Cal. App. 4th at 1194.  A party's "particular knowledge and experience should be considered in determining whether the reliance upon the misrepresentation or nondisclosure was justified." *Id.*

The evidence makes abundantly clear that, far from relying on anything Plaintiffs allegedly said (Isherwood recalls no such affirmative statements), IFP – from the highest levels of its management down to its Los Angeles Audio Department – *knew* IFP needed to be licensed and wasn't, *knew* IFP was infringing on a massive scale, *knew* nothing serious was being done about it other than Isherwood's feeble, desultory efforts to set up a few meetings and send a few emails, and *knew* Isherwood's efforts had been a failure, that he had completely given up by late 2011, and that his project had "stalled."  IFP knew this because this is what Isherwood conveyed to IFP, again and again.  He told IFP it was unlicensed and infringing in 2008, in 2013, and many times in between.

Not only are IFP's claims that it *actually* relied on any "promise" from Plaintiffs unsupported by the evidence, but it would make no difference if IFP had done so, because under the circumstances, no such reliance would have been *remotely* justifiable.  Merely because (some) Plaintiffs were willing to entertain the *possibility* of licenses in a few brief meetings was no reasonable basis for IFP to infer it could continue infringing Plaintiffs' works in the meantime.  If IFP was "relying" on anything, it was Isherwood's mystical ability to conjure licenses out of brief, failed meetings and occasional emails, or its own ability to negotiate its way out of infringement claims after they were filed.  Indeed, where, as here, a party admittedly expected to enter into a formal written agreement that never came to fruition, it cannot "show that [it] reasonably relied on any promise implied from [the other party's]

PRINTED ON
RECYCLED PAPER
LA 12448367v1

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1  conduct during negotiations." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262,

2  265 (2d Cir. 1984); *see Am. Viking Contractors, Inc. v. Scribner Equip. Co., Inc.*, 745

3  F.2d 1365, 1371 (11th Cir. 1984) (alleged promise which was "merely an agreement

4  to agree in the future … cannot be reasonably relied upon and thus cannot form the

5  basis for an action in fraud"); *Big Tree Enters., Ltd. v. Mabrey*, No. 93-4024-SAC,

6  1994 WL 191996, *4-6 (D. Kan. Apr. 15, 1994).  In addition, IFP never told any of

7  the Plaintiffs it was relying on their alleged silence by continuing to use their property

8  without a license.  *Hoffman*, 228 Cal. App. 4th at 1197 (reliance was not justifiable as

9  a matter of law, where party never told the other that they were acting "based upon an

10 understanding" from an "ambiguous statement").

### 4.    There is No Evidence of Fraudulent Intent.

12       "A promise of future conduct is actionable as fraud only if made without a

13 present intent to perform."  *Magpali v. Farmers Group, Inc.*, 47 Cal. App. 4th 471,

14 481 (1996).  "The non-performance of a promise alone will not support a finding of

15 promissory fraud."  Dkt. 362 at 31:20-23, *citing Tenzer v. Superscope, Inc.*, 39 Cal. 3d

16 18, 30-31 (1985).  "[I]f plaintiff adduces no further evidence of fraudulent intent than

17 proof of nonperformance of an oral promise, he will never reach a jury."  *Tenzer,* 39

18 Cal. 3d at 30-31.  IFP alleges, pursuant to *Tenzer*, that a jury could infer fraudulent

19 intent from Plaintiffs' alleged "failure to even attempt performance" and "continued

20 assurances" of performance.  This claim is unsupported by the actual facts.

21       There is no evidence any Plaintiff ***ever*** promised IFP or Isherwood that a license

22 would be provided, let alone agreed or authorized IFP to continue using its works in

23 the meantime.  Isherwood never even spoke to UMPG ***at all***, and EMI initially asked

24 ***Isherwood*** to provide a license, then later provided a "template" to be "tweaked" that

25 Isherwood found so unacceptable he didn't even respond to EMI ever again.  There is

26 no evidence UMG ever offered to provide IFP with a license, only that Isherwood

27 claims he "expected" a draft based on UMG's silence (at a meeting he admits felt like

28 a "job interview").  In any event, Isherwood learned very quickly that his claimed

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    expectation was unfounded, and that the UMG representatives barely remembered him

2    or anything they had discussed, much less having "promised" him anything from their

3    silence.  Moreover, Isherwood admits that even if he were to have received any draft

4    licenses from Plaintiffs, there would still need to be "back and forth" over terms

5    before any such license could be finalized – and IFP understood sending a draft

6    license was only "stage one" of any negotiation, and any actual license would require

7    internal, high-level IFP approvals, including from lawyers.[UF339]  And when HFA,

8    EMI, and UMG specified various license requirements and specific information they

9    would need from IFP, IFP neither accepted the requirements nor provided the

10   information.

11          Nor can IFP establish that Plaintiffs "failed to even attempt" to provide a draft

12   license.  Isherwood never even communicated with UMPG, so IFP cannot have

13   expected UMPG to "attempt performance" of something of which UMPG was not

14   even aware.  UMG and EMI did briefly meet with Isherwood to discuss his request,

15   and EMI's Carson *did* send him a template contract, to which he never responded and,

16   instead, broke off contact with EMI without providing the information Carson had

17   requested.  UMG's Waddell asked Isherwood for information which he did not

18   provide, and UMG's Rogell did follow up (to ask for the name of Isherwood's client)

19   and he took four months to even provide her with *that* basic information.

### 5.    The Negligent Misrepresentation Claim Fails Because It Is Not Premised on Actionable Misrepresentations.

22          "California law does not recognize a claim for negligent misrepresentation on

23   the basis of a false promise; a negligent misrepresentation claim can be based only on

24   a false statement concerning a ***past or existing fact***."  Dkt. 362 at 39:8-11, *citing*

25   *Tarmann v. State Farm Mut. Auto Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991) (emphasis

26   added).  "[A]n opinion or prediction of future events" is not enough.  *Brakke v. Econ.*

27   *Concepts, Inc.*, 213 Cal. App. 4th 761, 769 (2013).  Yet, in the SACC, IFP stubbornly

28   continues to allege the same inadequate false promises.  *Compare* Dkt. 307, ¶ 120 *with*

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  SACC ¶ 120; *see* Dkt. 362 at 39:8-28.

2      IFP futilely attempts to salvage this defective claim by also alleging that

3  Plaintiffs made certain "misrepresentations of fact" (*see* SACC ¶ 120), but these are

4  unsupported by the evidence.  There is no evidence, as IFP alleges, that UMG told

5  Isherwood it was "working on preparing a license for IFP" nor that EMI told

6  Isherwood it was "prepared to issue a license to IFP."  And again, EMI *did* provide

7  Isherwood with a "draft template contract" to "get the ball rolling," to which he never

8  responded.  And he never communicated with UMPG at all.

9      **B.**    **The Intentional Interference Claim is Meritless.**

10      A claim for intentional interference with contractual relations requires evidence

11  of:  "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge

12  of this contract; (3) defendant's intentional acts designed to induce a breach or

13  disruption of the contractual relationship; (4) actual breach or disruption of the

14  contractual relationship; and (5) resulting damage."  Dkt. 362 at 46, *citing Quelimane

15  Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998).

16      As a threshold matter, the Court should strike IFP's new allegations in the

17  SACC regarding a contract with a fifth airline, United (¶¶ 94, 95, 101, 127, 129), and

18  regarding purported communications and a purported settlement agreement between

19  American and Plaintiffs (¶ 129).  *None* of these allegations are in the prior

20  counterclaims [Dkt. 307], nor are they directed to "cure the specific defects the court

21  has noted" in dismissing this claim with leave to amend.  Dkt. 362 at 49 ("Should any

22  amended counterclaim exceed the scope of leave to amend granted by this order, the

23  court will strike the offending portions under Rule 12(f).").

24      Regardless, IFP alleges three interconnected acts of supposed "interference,"

25  SACC ¶¶ 96-98, but none is supported by evidence.  IFP has *no* evidence of any

26  interfering communications between any Plaintiff and any airline, or any foreign rights

27  or collection society.[UF340]  And IFP admits ███████████████████████

28  ████████████████████████████████████████████████

PRINTED ON RECYCLED PAPER
LA 12448367v1

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1 ███████████████████████████████████████████████

2 ██████████████████████████████████████████

3 ██████████████████████████████████████

4 ████████ [UF341]  None of these can be actionable.

### 1. The *Noerr-Pennington* Doctrine and the Litigation Privilege Still Bar This Claim.

As this Court has twice concluded, the Cease and Desist Letter is privileged and cannot, as a matter of law, sustain a claim for intentional interference with contractual relations. Dkt. 362 at 43-44. All of the other allegedly "interfering" communications relate to the Cease and Desist Letter and the issues in this lawsuit – *i.e.*, whether IFP infringed Plaintiffs' rights. Plaintiffs named American as a defendant in this lawsuit, which relates to the contents of the Cease and Desist Letter (*see* First Amended Complaint, Dkt. 108) and later settled with American (Dkt. 218). IFP's own pleadings allege Plaintiffs' communications with airlines were "cease and desist" communications about IFP's infringements. SACC ¶ 98.

IFP has no evidence the Cease and Desist Letter was "objectively baseless." Thus, as this Court previously concluded, it is privileged under the *Noerr-Pennington* doctrine and cannot support a claim for intentional interference with contract as a matter of law. Dkt. 362 at 41-43. The claim is likewise barred under the California litigation privilege, which does not even provide an exception for "bad faith" communications (as this Court also previously ruled). *Id.* at 43-44. Nor can any other purported communications by Plaintiffs support such a claim, because they were "incidental to a lawsuit" and, thus, also privileged. *See id.* at 41, *citing Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 935-36 (9th Cir. 2006).

### 2. There is No Evidence of any Breach or Disruption of IFP's Airline Contracts.

IFP insists it has **not** breached any agreement with any airline because it was

PRINTED ON
RECYCLED PAPER
LA 12448367v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    never obligated to provide *Plaintiffs'* music to airlines in the first place.[UF342]   For this

2    reason alone, IFP's interference claim fails.  *Heartland Payment Systems,, Inc. v.*

3    *Mercury Payment  Systems, LLC*, No. C 14-0437 CW, 2014 WL 5812294, *8 (N.D.

4    Cal. Nov. 7, 2014) (no evidence any contract was breached, "much less breached

5    because of interference by" plaintiffs); *Farmers Ins Exch. v. State of California*, 175

6    Cal. App. 3d 494, 506 (1986) ("Where, as here, the contract allegedly interfered with

7    is not breached, there can be no interference with contract cause of action."); *Davis v.*

8    *Nadrich,* 174 Cal. App. 4th 1, 10 (2009) (no interference without "an actual breach").

9        Nor can IFP establish that its agreements with airlines were "disrupted" because

10   IFP's performance was supposedly "made more costly and difficult to perform" due to

11   IFP's decision to move its reproduction activities overseas.  As IFP itself asserts, it

12   wasn't contractually obligated to provide Plaintiffs' music to airlines in the first place

13   (even if airlines were expecting it),[UF342] so IFP could have continued operating in the

14   U.S. without using Plaintiffs' music (or even with it, if IFP truly believed the Cease

15   and Desist Letter was objectively baseless).  Its alleged decision to relocate its

16   duplication activities was entirely voluntary.  *See Avocados Plus Inc. v. Freska*

17   *Produce Int'l LLC*, No. CV06-896-RGK (JTLx), 2007 WL 5091680, *7 (C.D. Cal.

18   Jan. 26, 2007) (no disruption merely because party "had to retain a partner … in order

19   to fulfill its contractual obligations"); *County of San Luis Obispo v. Abalone Alliance*,

20   178 Cal. App. 3d 848, 861 (1986) (claim "that more services were required [at]

21   increased expense … is not the kind of 'disruption of the relationship' required to state

22   a claim").  In any event, as discussed below, there is also no evidence that moving its

23   facilities harmed IFP.

24       **C.    There is No Evidence of Legally Cognizable Damages Proximately**
             **Caused By Plaintiffs on Any of the Counterclaims.**
25

26       "In order to recover for fraud, as in any other tort, the plaintiff must plead and

27   prove the 'detriment proximately caused' by the defendant's tortious conduct."  *Serv.*

28   *by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (1996), *quoting* Cal.

PRINTED ON

RECYCLED PAPER
LA 12448367v1

- 43 -

1  Civ. Code § 3333.  Likewise, "[i]t is the settled rule in actions for wrongful

2  interference with contract rights that an essential element of the cause of action is that

3  the conduct charged be ***the procuring cause*** of the interference and the harm." *Moore*

4  *v. Apple Inc.*, 309 F.R.D. 532, 547 (N.D. Cal. 2015), *quoting Beckner v. Sears,*

5  *Roebuck & Co.*, 4 Cal. App. 3d 504, 507 (1970) (emphasis added). "Damage … must

6  be such as follows the act complained of ***as a legal certainty***." *Goehring v. Chapman*

7  *Univ.*, 121 Cal. App. 4th 353, 364 (2004) (citation omitted; emphasis added).

8  Speculative damages are not recoverable. *Champagne v. City and County of San*

9  *Francisco*, No. C 06-05425 JSW, 2008 WL 1990889, *5 (N.D. Cal. May 5, 2008).

10  IFP seeks to recover what it calls its "extraordinary additional costs" to move its

11  operations overseas in response to the Cease and Desist Letter, and attorneys' fees

12  resulting from third party indemnity claims it has received from airlines – including,

13  incredibly, damages caused by IFP's breach of ***its*** indemnification obligations. *See*

14  SACC ¶¶ 100, 101, 109, 116, 124, 131.  No such "damages" were proximately caused

15  by ***Plaintiffs'*** alleged actions.

### 1.   Plaintiffs Did Not Cause IFP to Move Overseas.

17  After receipt of the Cease and Desist Letter, IFP claims it made the voluntary

18  decision to relocate its duplication operation to London and Singapore, where, it

19  contends, "we had the appropriate licenses."[UF344]  There is no logical connection

20  between any alleged promises made by any Plaintiff (or Plaintiffs' Cease and Desist

21  Letter) and IFP's relocation expenses.  IFP claims if it had received the Cease and

22  Desist Letter from UMG in 2009, it would have done "[w]hat then we did later in

23  2013 ... revamped our business because the licensing regime would have changed.

24  We would have had to have taken a decision on how we were going to react to that….

25  That could have made a material difference to our business in the way that we

26  developed our business from 2009 on.  ***Who knows where we would have ended up.***

27  ***Maybe we wouldn't have offered audio at all***."[UF345]  *See also* SACC ¶ 100.

28  Further, IFP has no evidence of any actual damages resulting from the

PRINTED ON
RECYCLED PAPER
LA 12448367v1

relocation.[UF346]  IFP admits it has not suffered *any* reduction in revenues under any airline contract as a result of not providing Plaintiffs' music.[UF343]  To the contrary, it admits it *benefitted* by not relocating its operations earlier, and instead waiting until it received the Cease and Desist Letter,[UF347] and that it would be "purely speculative" to try to determine whether it would have incurred greater or fewer costs had it moved its operations in 2009, rather than in 2013.[UF348]  Indeed, IFP never explains why it had to relocate at all – it could have just stopped infringing Plaintiffs' music.

### 2. Plaintiffs Did Not Cause IFP to Dispute Its Indemnity Obligations.

When American Airlines sued IFP for breaching its indemnity obligations to American, the suit was entirely predicated on IFP's alleged breach of those obligations with respect to Sony Music – not UMG.[UF350-352]  Thus, UMG was not the "procuring cause" of IFP's legal dispute with American (or anyone else).

In any event, IFP made a voluntary and independent decision to fight airlines' alleged demands for indemnification.  If IFP's refusal to indemnify the airlines was justifiable, then presumably it will prevail against those airlines in court and vindicate its position.  Nothing *Plaintiffs* allegedly did forced the airlines to unjustifiably demand indemnity from IFP, or, conversely, forced IFP to take a non-meritorious position *refusing* indemnity.  If the issue of indemnity as between IFP and the airlines is ambiguous, that is a result of the way they drafted their own agreements or their own course of dealing, not anything Plaintiffs did to protect their own copyrights.

### Conclusion

For all of the foregoing reasons, Plaintiffs request that the Court grant summary judgment to Plaintiffs on liability, willfulness, and the SACC.  *See* [Proposed] Order.

DATED:  November 30, 2015      JEFFER MANGELS BUTLER & MITCHELL LLP

By: /s/ Jeffrey D. Goldman
JEFFREY D. GOLDMAN
Attorneys for Plaintiffs and Counter-Defendants

PRINTED ON
RECYCLED PAPER
LA 12448367v1