SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MARTIN D. KATZ, Cal. Bar No. 110681
JAY T. RAMSEY, Cal. Bar No. 273160
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701
mkatz@sheppardmullin.com
jramsey@sheppardmullin.com

Attorneys for Defendants and Counter-Claimants
GLOBAL EAGLE ENTERTAINMENT INC.,
INFLIGHT PRODUCTIONS USA INC., AND
INFLIGHT PRODUCTIONS LTD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC. et al.<br><br>       Plaintiffs,<br><br>     v.<br><br>GLOBAL EAGLE ENTERTAINMENT INC., et al.,<br><br>       Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:14-cv-03466-MMM (JPR)<br><br>**DEFENDANTS AND COUNTER-CLAIMANTS' OPPOSITION TO UNIVERSAL'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE**<br><br>**Date:  January 25, 2016**<br>**Time: 10:00 a.m.**<br>**Ctrm: 780**<br><br>Complaint Filed: May 5, 2014 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   UNIVERSAL FAILS TO SET FORTH MATERIAL FACTS ...................... 3

III.  RELEVANT FACTUAL BACKGROUND ......................................... 5

      A.    Inflight Entertainment And Industry Custom And Practice .................. 5

      B.    IFP's Business As An Airline CSP ......................................... 8

      C.    From October 23, 2009 To November 14, 2013, UNIVERSAL
            Expressly Or Impliedly Authorized IFP's Activities In The U.S. ........ 10

            1.    IFP discovers licensing gaps, set outs to close them and
                  receives assurances from UNIVERSAL regarding its
                  ongoing operations in the U.S. ..................................... 10

            2.    UNIVERSAL's distortions of its interactions with IFP ............. 13

      D.    UNIVERSAL's Distortions Of IFP's Internal Understandings ............ 17

            1.    The temporal context of the evidence regarding IFP's
                  intent .................................................................... 17

            2.    The witness-by-witness context for assessing IFP's intent ........ 18

                  a.    IFP US employees ............................................ 18

                  b.    IFP UK employees and Isherwood ........................... 21

IV.   LEGAL ARGUMENT ................................................................ 26

      A.    Ownership And Copying .................................................... 26

      B.    Infringement ................................................................. 26

            1.    UNIVERSAL has failed to establish a violation of its
                  reproduction, distribution and importation rights ................ 26

                  a.    UNIVERSAL's reproduction right .......................... 26

                  b.    UNIVERSAL's distribution and importation rights ........ 28

                  c.    Application to UNIVERSAL's works ........................ 28

            2.    UNIVERSAL has failed to establish a violation of its
                  public performance rights .......................................... 30

      C.    UNIVERSAL Has Failed To Negate IFP's Affirmative Defenses ...... 34

            1.    Waiver .................................................................. 35

1

      2.      Oral license (including implied terms)/implied license .............36

2

      3.      Preemption of state law claims – Airline Deregulation Act.......37

3

   D.      UNIVERSAL Has Failed To Establish Willfulness .............................39

4

   E.      UNIVERSAL Has Failed To Negate IFP's Counterclaims.................40

5

      1.      Intentional/negligent misrepresentation and concealment .........40

6

         a.      UNIVERSAL's     misrepresentations     and
              concealments ..................................................................40

7

         b.      IFP's reliance was justified ............................................41

8

         c.      The evidence supports a finding of fraudulent intent.......42

9

         d.      UNIVERSAL's negligent misrepresentations of fact.......43

10

      2.      Intentional interference with contract.........................................44

11

V.     CONCLUSION ...............................................................................45

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A & M Records, Inc. v. Napster, Inc.*
   239 F.3d 1004 (9th Cir. 2001) ............................................................. 32

*Adobe Syst. Inc. v. Canus Prods., Inc.*
   173 F. Supp. 2d 1044 (C.D. Cal. 2001) .............................................. 31

*Am. Geophysical Union v. Texaco Inc.*
   60 F.3d 913 (2d Cir. 1994) ................................................................. 27

*Am. Viking Contractors, Inc. v. Scribner Equip. Co.*
   745 F.2d 1365 (11th Cir. 1984) .......................................................... 42

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ............................................................................. 2

*Aniero Concrete Co., Inc. v. N.Y. City Const. Authority*
   308 F. Supp. 2d 164 (S.D.N.Y. 2003) ................................................ 29

*Arista Records LLC v. Myxer Inc.*
   2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) .................................... 33

*Armstrong v. Virgin Records, Ltd.*
   91 F. Supp. 2d 628 (S.D.N.Y. 2000) .................................................. 27

*Big Tree Enterprises, Ltd. v. Mabrey*
   1994 WL 191996 (D. Kan. Apr. 15, 1994) ........................................ 42

*Breslin v. Dickinson Township*
   2012 WL 7177278 (M.D.Pa. Mar. 23, 2012) ....................................... 4

*City Solutions, Inc. v. Clear Channel Commnns., Inc.*
   365 F.3d 835 (9th Cir. 2004) .............................................................. 41

*Coleman v. ESPN, Inc.*
   764 F. Supp. 290 (S.D.N.Y. 1991) ..................................................... 30

*Crispin v. Christian Audigier, Inc.*
   839 F. Supp. 2d 1086 (C.D. Cal., 2011) ............................................ 36

-iii-

*Danjaq LLC v. Sony Corp.*
    263 F.3d 942 (9th Cir. 2001) ............................................................. 39

*David v. Showtime/Movie Channel, Inc.*
    697 F. Supp. 752 (S.D.N.Y. 1988) .................................................... 30

*Dias v. Nationwide Life Ins. Co.*
    700 F. Supp. 2d 1204 (E.D. Cal., 2010) ........................................... 16

*Dixon v. Wells Fargo Bank, N.A.*
    798 F. Supp. 2d 336 (D. Mass. 2011) ................................................ 42

*Ellison v. Robertson*
    357 F.3d 1072 (9th Cir. 2004) ................................................... 31, 34

*Equal Rights Ctr. v. Equity Residential*
    798 F. Supp. 2d 707 (D.Md. 2011) .................................................... 38

*Errico v. Pacific Capital Bank*
    753 F. Supp. 2d 1034 (N.D. Cal. 2010) .............................................. 41

*Field v. Google Inc.*
    412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................ 37

*First v. Allstate Ins. Co.*
    222 F. Supp. 2d 1165 (C.D. Cal. 2002) .............................................. 41

*Fonovisa, Inc. v. Cherry Auction, Inc.*
    76 F.3d 259 (9th Cir. 1996) ................................................. 32, 33, 34

*Franceschi, Jr. v. Harrah's Entm't, Inc*
    2011 WL 9305 (D. Nev. Jan. 3, 2011) ................................................ 41

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*
    772 F.2d 505 (9th Cir. 1985) ............................................................ 39

*Gantt v. Absolute Mach. Tools, Inc.*
    2007 WL 2908254 . (M.D.Pa. Oct. 4, 2007) ...................................... 4

*In Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*
    180 F. 3d 1072 (9th Cir. 1999) .......................................................... 27

*Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*
    2008 WL 205209 (E.D. Mich. Jan. 22, 2008) .................................... 42

-iv-

*Jackson Rapid Delivery Service, Inc. v. Thompson Consumer Electronics*
210 F. Supp. 2d 949 (N.D. Ill. 2001)....................................................................29

*Keybank Nat'l Assoc. v. Moses Lake Indus.*
2010 WL 933973 (E.D. Wash. Mar. 11, 2010)....................................................42

*Kirtsaeng v. John Wiley & Sons, Inc.*
133 S. Ct. 1351, 185 L. Ed. 2d 392 (2013) .........................................................28

*Levitin v. Sony Music Entm't*
101 F. Supp. 3d 376, 385 (S.D.N.Y. 2015) ..........................................................27

*London Film Prods. Ltd. v. Intercontinental Commc'ns, Inc.*
580 F. Supp. 47 (S.D.N.Y. 1984) .........................................................................27

*Lusche v. Verengo Inc.*
2014 WL 5794627 (C.D. Cal. Oct. 22, 2014) .....................................................3, 4

*MAI Systems Corp. v. Peak Computer, Inc.*
991 F.2d 511 (9th Cir. 1993) ...............................................................................27

*Malin v. JPMorgan*
860 F. Supp. 2d 574 (E.D. Tenn. 2012) ..................................................................4

*Maraschiello v. City of Buffalo Police Dep't*
709 F.3d 87 (2d Cir.) ............................................................................................38

*Microsoft Corp. v. Harmony Computers & Electronics, Inc.*
846 F. Supp. 208 (E.D.N.Y. 1994) .......................................................................28

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) ..............................................................................................39

*In re Napster Copyright Litigation*
377 F. Supp. 2d 796 (N.D. Cal. 2005)..................................................................31

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*
210 F.3d 1099 (9th Cir. 2000) ...................................................................35, 36, 38

*Omega S.A. v. Costco Wholesale Corp.*
776 F.3d 692 (9th Cir. 2015) ................................................................................28

*Outdoor Cent., Inc. v. GreatLodge.Com, Inc.*
643 F.3d 1115 (8th Cir. 2011) ..............................................................................29

-v-

*Park v. Veasie*
   2011 WL 1831708 (M.D.Pa. May 11, 2011) ....................................... 4

*Peer Int'l Corp. v. Pausa Records, Inc.*
   909 F.2d 1332 (9th Cir. 1990) ...................................................... 39

*Perfect 10, Inc. v. CCBill LLC*
   488 F.3d 1102 (9th Cir. 2007) ...................................................... 34

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*
   494 F.3d 788 (9th Cir. 2007) ....................................................... 31

*Religious Technology Center v. Netcom On-line Communication Servs.*
   907 F. Supp. 1361 (N.D. Cal. 1995) .............................................. 34

*Reprosystem, B.V. v. SCM Corp.*
   727 F.2d 257 (2d Cir. 1984) ........................................................ 42

*Roshi v. Comm. of Social Security*
   2015 WL 6454798 (D. Mass. Oct. 26, 2015) .................................... 4

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*
   256 F. Supp. 399 (S.D.N.Y. 1966) ............................................... 31

*Smith v. Allstate Ins. Co.*
   160 F. Supp. 2d 1150 (S.D. Cal. 2001) ......................................... 43

*Smith v. BarnesandNoble.com, LLC*
   2015 WL 6681145 (S.D.N.Y. Nov. 2, 2015) .................................... 32

*Sony Corp. of Am. v. Universal City Studios*
   464 U.S. 417 (1984) .................................................................. 33

*U.S. ex rel. Oliver v. The Parsons Corp.*
   498 F. Supp. 2d 1260 (C.D. Cal. 2006) .......................................... 3

*UMG Recordings, Inc. v. MP3.Com, Inc.*
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) .......................................... 27, 10

*UMG Records, Inc v. Sinott*
   300 F. Supp. 2d 993 (E.D. Cal. 2004) ........................................... 31

*WGN Continental Broadcasting Co. v. United Video, Inc.*
   693 F.2d 622 (7th Cir. 1982) ...................................................... 30

SMRH:473926653.17

*Zamani v. Carnes*
   491 F.3d 990 (9th Cir. 2007) .............................................................. 4

**State Cases**

*Columbia Pictures Corp. v. De Toth*
   87 Cal. App. 2d 620 (1948) ................................................................ 36

*Cty. of San Luis Obispo v. Abalone All.*
   178 Cal. App. 3d 848 (1986) .............................................................. 45

*Hoffman v. 162 North Wolfe LLC*
   228 Cal.App.4th 1178 (2014) ............................................................ 42

*Hoffman v. Red Owl Stores*
   26 Wis. 2d 683 (1965) ....................................................................... 42

*LiMandri v. Judkins*
   52 Cal.App.4th 326 (1997) ................................................................ 40

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*
   6 Cal.App.4th 603 (1992) .................................................................. 40

*McLaughlin v. Dep't of Water & Power of City of Los Angeles*
   18 Cal. App. 2d 41 (1936) ................................................................. 29

*Shapiro v. Equitable Life Assur. Soc.*
   76 Cal. App. 2d 75 (1946) ................................................................. 16

*Tanner v. Title Ins. & Trust Co.*
   20 Cal.2d 814 (1942) ........................................................................ 36

*Tenzer v. Superscope, Inc.*
   39 Cal. 3d 18 (1985) ......................................................................... 43

*Varni Bros. Corp. v. Wine World, Inc.*
   35 Cal. App. 4th 880 (1995) .............................................................. 36

*Vega v. Jones, Day Reavis & Pogue*
   121 Cal.App.4th 282 (2004) .............................................................. 40

**Federal: Statutes, Rules, Regulations, Constitutional Provisions**

17 U.S.C. § 106(6) ................................................................................. 30

17 U.S.C. § 114 ...................................................................................... 30

49 U.S.C. § 41713(b)(1) .............................................................. 38

Local Rule 56-1 .................................................................... 3, 4

**<u>State: Statutes, Rules, Regulations, Constitutional Provisions</u>**

Cal. Business & Professions Code § 17200 ............................... 37

Cal. Civil Code § 980(a)(2) ................................................. 37, 38

SMRH:473926653.17   OPPOSITION TO UNIVERSAL'S MOTION FOR SUMMARY JUDGMENT

# I.    <u>INTRODUCTION</u>

This case revolves around 5,494 musical works owned by UNIVERSAL (4,160 sound recordings owned by UMG or CAPITOL, and 1,087 musical compositions owned by UMPG).  IFP does not dispute UNIVERSAL's ownership in the works and has so stipulated.  IFP disputes copying only with respect to works identified on US Airways playlists.

Infringement, on the other hand, is a hotly contested issue for two reasons.  First, UNIVERSAL has not set forth a *prima facie* case regarding how each work was infringed – was it from copying in the U.S.; importation/delivery of a copy made outside the U.S. to airlines (or their integrators); or contributory infringement (as a result of airlines performing UNIVERSAL's works within U.S. airspace and, if so, which airlines)?  Because some of these acts do not constitute a violation of U.S. law, the Court cannot tell from UNIVERSAL's motion which works were infringed, let alone why (*i.e.*, even according to UNIVERSAL).  Second, with respect to acts which would otherwise be infringing, UNIVERSAL's claims are barred by the statute of limitations (for all alleged infringements prior to November 14, 2010)[1] and estoppel (as to all alleged infringements).  To the extent there are disputed material facts regarding these or other affirmative defenses, those disputed material facts preclude a finding in UNIVERSAL's favor on infringement.

UNIVERSAL's claim for willfulness fails for the same reasons.  Moreover, IFP has rebutted UNIVERSAL's willfulness claim by proffering evidence from which a trier of fact could conclude that IFP had a reasonable, good faith belief that its conduct was authorized.  Although UNIVERSAL disingenuously dismisses years of communications between the parties, the record evidence establishes that

---

[1]    In the ownership stipulation between the parties (Ex. W), UNIVERSAL set forth its contentions regarding when each of the works was copied by IFP.  As to all works identified on Exhibits C, D and H to the stipulation, UNIVERSAL concedes that they were copied only before November 14, 2014.  As a result, at a minimum, the statute of limitations bars any recovery by UNIVERSAL for these works.

UNIVERSAL led IFP to reasonably believe that it was authorized to continue using its works in the U.S. on terms essentially mirroring its overseas licenses.

UNIVERSAL failed to negate any element of IFP's affirmative defenses of waiver, oral license and preemption of state law claims. UNIVERSAL also failed to negate any element of IFP's counterclaims. Thus, a trier of fact could find in IFP's favor with respect to its defenses and counterclaims; indeed, summary judgment should be granted in IFP's favor of on its preemption defense.[2]

Moreover, there is a fatal structural defect in UNIVERSAL's motion – namely, UNIVERSAL's failure to identify undisputed *material* facts, rather than evidentiary or non-material facts. That alone should serve as a basis for denying its motion. To put this issue in perspective: nearly half of UNIVERSAL's 353 "facts" pre-date the first meeting between IFP and UNIVERSAL (which occurred on October 23, 2009). UNIVERSAL focuses on earlier events to tar and feather IFP when, in reality, they are merely background for the extensive communications that followed and on which IFP's affirmative defenses and counterclaims are based. Moreover, UNIVERSAL has attempted to cast the evidence in a light most favorable to it, omitting material facts that completely undermine its position. That, too, is contrary to how the Court must view the record on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("evidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor").

There are material issues of fact in dispute with respect to one or more elements of UNIVERSAL's claims and the elements of IFP's affirmative defenses and counterclaims that UNIVERSAL challenged in its motion. Accordingly, UNIVERSAL's motion should be denied except for: (a) ownership of works per the parties' stipulation; and (b) copying, with one notable exception.

---

[2] IFP does not contest UNIVERSAL's motion with respect to its defenses of failure to state a claim, laches, unclean hands or abandonment. The consent defense is duplicative of IFP's other defenses and is withdrawn as a separate defense.

## II.   __UNIVERSAL FAILS TO SET FORTH MATERIAL FACTS__

UNIVERSAL's motion hardly reads like a motion for summary judgment. Nowhere does UNIVERSAL attempt to set forth the identifiable undisputed *material* facts that it contends individually or collectively support each element of its claims or defeat one or more elements of each of IFP's affirmative defenses and counterclaims.  Indeed, so as to create the illusion that there are no "undisputed" facts, UNIVERSAL frequently resorts to the clever, but unavailing, tactic of claiming that it is undisputed that "witness 1 testified that 'a, b and c'" or that "employee 2 wrote 'x, y and z.'"  Of course, no party could ever dispute that a witness so testified or that an employee so wrote (assuming, of course, that the moving party accurately quoted from the witness's deposition or a document produced in the case).  That type of recitation of evidence as "fact" may be acceptable in a closing argument, but it cannot support a motion for summary judgment, which requires undisputed *material* facts.

Local Rule 56-1 is designed to preclude the very tactic that UNIVERSAL has employed here, requiring that a party filing a motion for summary judgment "lodge a proposed 'Statement of Uncontroverted Facts and Conclusions of Law.'  Such proposed statement shall set forth the *material* facts as to which the moving party contends that there is no genuine dispute."  (Emphasis added.)  *See, e.g., Lusche v. Verengo Inc.,* 2014 WL 5794627, at *3 (C.D. Cal. Oct. 22, 2014) ("Presenting all material facts in the [Statement of Undisputed Facts] is important: it safeguards against obfuscation and overreaching by the moving party, ensures the opposing party recognizes the facts to which it must respond, and ensures that the facts are parsed out reasonably and presented in a format the opposing party and the Court can easily examine."); *U.S. ex rel. Oliver v. The Parsons Corp.,* 498 F. Supp. 2d 1260, 1264 n.3 (C.D. Cal. 2006) ("Plaintiff's purported Statement of Uncontroverted Facts and Conclusions of Law [was]… an [] unintelligible restatement of her Memorandum of Points and Authorities in support of her Motion

for Summary Judgment" where she "ma[de] no effort whatsoever to clearly set forth only the material *facts*.") (emphasis in original).

UNIVERSAL has flagrantly violated Local Rule 56-1 by failing to distinguish between ***material*** facts, on the one hand, and evidentiary facts or non-material facts, on the other. On their face, many of UNIVERSAL's 353 "undisputed facts" are obviously evidentiary facts. *See, e.g.,* F 37-50.[3]  Many others are non-material (or even entirely irrelevant) facts. *See, e.g.*, F 7-13.  Neither IFP nor the Court has any way of telling which "facts" UNIVERSAL contends are material, let alone which ones are material to each claim, affirmative defense and counterclaim. UNIVERSAL's failure to file a compliant separate statement alone justifies denial of its motion. *See Lusche v. Verengo Inc.,* 2014 WL 5794627 at *3 (denying motion for summary judgment); *Park v. Veasie,* 2011 WL 1831708 at *4 (M.D.Pa. May 11, 2011) (striking separate statement); *Gantt v. Absolute Mach. Tools, Inc.*, 2007 WL 2908254 at *3.  (M.D.Pa. Oct. 4, 2007) (denying motion for summary judgment).[4]

---

[3]    As used herein, "F_x-y" refers to the numbered facts identified in IFP's Response to UNIVERSAL's Separate Statement ("Responsive Separate Statement"), whether they were offered initially by UNIVERSAL (F 1-353) or by IFP as additional facts (F 354-393).  When IFP cites to a fact initially offered by UNIVERSAL, it intends to refer to that fact as clarified or supplemented by IFP in its response to the fact (which appears in the right hand column of IFP's Responsive Separate Statement).

[4]    Oftentimes, as is the case here, the alternatives to denying the motion are not satisfactory. *Breslin v. Dickinson Township*, 2012 WL 7177278, at *3 (M.D.Pa. Mar. 23, 2012); *Gantt*, 2007 WL 2908254, at *4.  UNIVERSAL may attempt to remedy this problem in its reply, but that is simply an unacceptable form of sandbagging. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012); *Roshi v. Comm. of Social Security*, 2015 WL 6454798, at *15 (D. Mass. Oct. 26, 2015).

-4-

1   III.   **RELEVANT FACTUAL BACKGROUND**

2        A.   **Inflight Entertainment And Industry Custom And Practice**

3        For decades, music programming has been offered by airlines as part of their

4   inflight entertainment (IFE) service.  Historically, airlines offered approximately ten

5   "broadcast" channels that would play simultaneously during a flight.  The channels

6   are akin to radio broadcasts from which a passenger can make a selection.  Until

7   technology advanced in the mid-2000s, airline passengers could not fast forward,

8   rewind or pause the channels, but they could freely select between them.  Starting in

9   the mid-2000s, audio-on-demand (AOD) offerings, with fast forward, rewind and

10  pause functions became available on a limited number of airplanes.  Because aircraft

11  have long lifespans and do not routinely get upgraded with new IFE systems, AOD

12  has been offered on a limited basis until very recently. F. 16.

13       Airlines typically hire content service providers (CSPs) to produce and supply

14  programs for "broadcast" channels and, more recently, to supply audio content for

15  AOD offerings.  Airlines also engage separate vendors, referred to as integrators, to

16  load content on to its fleet (or a portion of its fleet).  The airline then "performs" the

17  content when it makes it available to passengers as part of its IFE service.   F. 16.

18       There are four basic rights relating to the use of music in IFE: (1) the right to

19  reproduce and distribute musical compositions ("publishing rights" covering notes

20  and lyrics on the page); (2) the right to reproduce and distribute sound recordings

21  (the recorded version of a musical composition); (3) the public performance of

22  musical compositions; and (4) the public performance of sound recordings.  Given

23  the global nature of the airline business, with flights crossing from one country's

24  airspace to another, differences between copyright laws in various territories and the

25  international nature of some CSP businesses (with reproduction and distribution

26  around the globe), music licensing has become complex.   F. 16.  Accordingly,

27  certain customs and practices have developed, some of which are specific to IFE:

28

**Licensing of reproduction and distribution rights**  A CSP supplying sound recordings and musical compositions is expected to obtain authority in the territory where the reproductions are made.  In certain jurisdictions (*e.g.*, UK, Singapore, Ireland), licensing is accomplished through rights and collection societies that act on behalf of major and independent record labels and publishers.  F. 16.[5]

If a CSP performs *portions* of the reproduction process in more than one territory, but those activities taken together generate a single revenue stream for the CSP, based on industry custom and practice, that CSP would not be required to pay twice on the single revenue stream – once in each jurisdiction – and the rights owner would not expect to receive more than one license fee for a single use of its works. F16.[6]  Works completed abroad can be distributed throughout the world.  The PPL, for example, authorized CSPs to "Encode Masters and to authorise and license the Loading of Encoded Masters in the form of Programmes and/or Sound Recordings on to Aircraft Databases throughout the world . . . ."  And, where licenses do not expressly cover activities outside the territory, licensors frequently authorize such uses (expressly or impliedly) and accept payment for such uses. F 16.

**Licensing of performance rights**   By custom and practice, public performance licenses are the responsibility of the party playing (*i.e.*, "performing")

---

[5]    For licensing reproduction and distribution rights, in the UK, Phonographic Performance Limited (PPL) has jurisdiction over sound recordings and Mechanical-Copyright Protection Society Limited (MCPS) has jurisdiction over musical compositions.  UNIVERSAL, through its foreign affiliates, is a member of these societies, which are charged collecting fees from licensees like IFP and distributing an allocable share of the fees to its members.  There are no such licensing structures in place in the U.S. for reproduction and distribution rights.  *See* F 16.

[6]    For example, if a rights owner receives a license fee for the reproduction of a work in the territory where the encoding is done, the rights owner would not expect to receive a separate fee for the creation of an intermediate file (*e.g.*, a .wav file) even if that is done in another territory if the CSP does not receive a separate fee for creating the .wav file.  For reasons of its own, a rights owner may request that the license fee be paid in one territory, rather than another.  F. 16.

the work.   In the context of IFE, therefore, public performance licenses are considered the responsibility of the airline, not the CSP.   In this regard, by custom and practice, public performance licenses for IFE "follow the flag" of the airline, not the airspace into which each aircraft flies.[7]   There are various societies outside the U.S. from which airlines can and do regularly obtain public performance licenses. In the U.S., airlines obtain public performance licenses for musical compositions from ASCAP, BMI and SESAC (although they sometimes contract with their CSP to administer the process on their behalf).   However, there are no societies in the U.S. from which airlines can obtain public performance licenses in sound recordings to the extent such licenses are needed.   F 353.[8]

**<u>Documenting license agreements</u>**   It sometimes takes an inordinate amount of time (due to the pressure of other business, the relatively small amount of license fees involved, the lack of attention to the matter by the licensor or the licensee or some other reason) to negotiate and document a license.   As a result, for practical reasons, the use of sound recordings and musical compositions sometimes starts before a finalized license is in place and sometimes even before the negotiation of license terms has begun or been completed.   *See, e.g.*, F 360.c.[9]

By custom and practice, a record label or publisher that does ***not*** want a known use of its works to occur or continue will issue a cease and desist letter or similar communication objecting to the use or, at the very least, reserving rights with respect to ongoing uses.   *Id.*   Indeed, if parties are negotiating or documenting a

---

[7]     Thus, an airline based in the UK will procure and pay for a public performance license in the UK, even though its aircraft fly into foreign airspace.

[8]     As explained below in Section IV.B.2, with respect to the public performance of sound recordings in an airplane, copyright law protects only digital interactive performances (AOD), not linear performances of broadcast programs.

[9]     Examples of licenses negotiated and documented after the beginning of the term of the license can be found in the UMG's license with Spafax and various agreements between IFP and PPL, MCPS and other foreign societies.   F 360.c.

1  license, and the rights owner is aware of the ongoing use of its works, the failure to
2  object will generally be understood as authorization to use the music subject to the
3  terms of the finalized license.  This will result in the retroactive payment of license
4  fees at the agreed upon rate (or at then-prevailing market rates if the license is not
5  concluded).    Otherwise, the CSP would either need to shut down its affected
6  business operations (which neither side intends) or subject itself to potential liability
7  (which neither side intends during the course of good faith negotiations).  F 360.c..

8  **B.**    **IFP's Business As An Airline CSP**

9      IFP is a CSP for airlines, supplying movies, television programs and
10  music/audio programs to domestic and international airlines for use in their IFE
11  services.   F 16.  With respect to music/audio, for many years IFP supplied only
12  looped "Broadcast Programs."  *Id.*  Starting in or about 2005, IFP began supplying
13  AOD programming for certain airlines.  *Id.*

14      On the ***creative*** side of production, on a periodic basis (*e.g.*, bi-monthly), IFP
15  created scripts and playlists for Broadcast Programs and selection lists for AOD.  On
16  the ***technical*** side (where reproduction occurs), IFP's process consisted of two or
17  three steps, depending on the airline.  IFP first created *internal* .wav files.  Then, to
18  turn the .wav files into a usable deliverable, IFP encoded the files for delivery to
19  airlines or their integrators (who would load the files onto the portion of the airline's
20  fleet offering IFE services).  In some cases, IFP also duplicated the usable files onto
21  CDs for loading onto aircraft with compatible equipment.   *Id.*   IFP receives
22  compensation for producing programs and encoding (and duplicating) audio files.  It
23  does not receive compensation for the mere creation of internal .wav files.  *Id.*  The
24  allegedly infringing works break down into four groups:[10]

25

26

27  [10]    UNIVERSAL has failed to identify how IFP allegedly violated its copyrights
28  with respect to each of the 5494 works at issue.  Moreover, after filing its motion,
    UNIVERSAL informed IFP that it was withdrawing its claims with respect to 95

**Group 1:  Works reproduced entirely outside the U.S.**  During the period at issue, the vast majority of IFP's technical production took place overseas.  F 16.  When IFP reproduced content abroad, it tendered payment to the applicable foreign society, (*e.g.*, PPL and MCPS in the UK).  (*Id.*)

**Group 2:  Works where .wav file was created in the U.S., but the encoded deliverable was created outside the U.S.**  IFP's music/audio activities in the U.S. were generally limited to the creation of internal .wav files.  F 16.  The .wav files were then encoded (and sometimes duplicated onto CDs) in the UK or Singapore. IFP tendered payment to the applicable foreign rights society for the revenue stream it received from airlines for encoding services.  *Id.*

**Group 3:  Works where internal .wav files were created, but no encoded deliverable was ever made or delivered**  IFP stored some .wav files on an internal hard drive, but never used those files in a playlist.  F 356.

**Group 4:  Works where both the .wav file and the encoded deliverable were created in the U.S.**  IFP created and encoded .wav files in the U.S. for three airlines.  For Air Transat (a Canadian airline), IFP made payments to the Canadian rights societies:  AVLA Audio-Video Licensing Agency and the Societe de Gestion Collective des Droits Des Producteurs de Phonogrammes et de Videogrammes du Quebec.  F 16.  For United and certain Continental programming, IFP created reserves in line with its discussions with UNIVERSAL to cover retroactive fees it agreed to pay upon receipt of the licenses UNIVERSAL agreed to send. F 16, 377.[11]

**Public Performance Licenses**  Pursuant to industry custom and practice, IFP's airline customers were obligated to obtain any necessary public performance

---

works.  In any event, from what IFP can tell, a substantial number of sound recordings and musical compositions fall within each group described below.  F. 16.

[11]     Consistent with its discussions with UNIVERSAL, IFP's reserves were also intended to capture production revenue streams to the extent not reported to foreign rights and collection societies (irrespective of whether both the .wav file and the encoded deliverable or just the .wav file were created in the U.S.).  F. 16.

-9-

licenses.   At times, the airline engaged IFP to obtain or pay the fees for certain public performance licenses.  With respect to such licenses in the U.S. for musical compositions (obtained from ASCAP, BMI and SESAC), United handled licensing itself; Continental obtained licenses itself, but engaged IFP to administer payments; and American engaged IFP to obtain licenses in its name.  F 353.

### C.   From October 23, 2009 To November 14, 2013, UNIVERSAL Expressly Or Impliedly Authorized IFP's Activities In The U.S.

In its motion for partial summary judgment (statute of limitations, estoppel), IFP described its historical dealings with UNIVERSAL, all of which is incorporated herein.  For context, IFP summarizes those dealings below.

#### 1.   IFP discovers licensing gaps, set outs to close them and receives assurances from UNIVERSAL regarding its ongoing operations in the U.S.

In 2008, IFP UK engaged a music rights consultant, Mark Isherwood, to determine if IFP had licenses in place around the world for its various activities. Isherwood identified certain licensing gaps (including in the U.S.), some of which had a financial impact on the rights owners (*e.g.,* when IFP encoded works in the U.S. and did not report encoding revenues to foreign rights societies) and some of which did not (*e.g*., when IFP created .wav files in the U.S. but encoded the works abroad and reported encoding revenues to the applicable foreign rights society).

IFP did ***not*** try to hide what Isherwood uncovered.  To the contrary, IFP tasked Isherwood with contacting rights owners to close all licensing gaps.  IFP decided to continue its U.S. operations, but ***only*** pending the outcome of these discussions.  Isherwood contacted publishers (through their agent, The Harry Fox Agency (HFA)) in November 2008 and record labels (including UMG and CAPITOL) in September 2009.  Numerous communications followed:

**UMG**   On October 23, 2009, Isherwood met with UMG in person.  UMG was represented by four executives (including Business Affairs executive William

-10-

Waddell).  At the meeting, Isherwood sought, and UMG stated that it was amenable to issuing, a license that would permit IFP to continue reproducing UMG's repertoire in the U.S. for use on airlines in exchange for a license fee equal to an allocable share of fifteen percent (15%) of IFP's revenues (less expenses) received as a result of its production activities in the U.S.  The meeting ended with the understanding that UMG would send Isherwood a license in line with their discussions.  Over the course of the next two years, Isherwood had two additional meetings, one on May 7, 2010 (with Waddell) and one on May 10, 2011 (with Waddell's replacement, Lisa Rogell), as well as numerous email communications. At each point, Isherwood was assured that a license would be issued and that IFP's past and ongoing activities in the U.S. would be covered retroactively at the rate agreed upon for the anticipated license.  IFP set up a reserve consistent with these discussions, retroactive to January 1, 2008, which Isherwood thoroughly discussed with UMG (both Waddell and Rogell) on multiple occasions.  In June 2011, Rogel represented to Isherwood that she was "trying to move forward since our meeting"; Isherwood confirmed his understanding regarding the anticipated license in a September 14, 2011 email.  Nevertheless, UMG has not produced in discovery even an internal draft of the license it told Isherwood it would send.  *See* F 357.b.

**CAPITOL**  Isherwood contacted CAPITOL in 2009.  Over the course of two years, CAPITOL made the same assurances that UMG had made.  This was done at meetings with Isherwood on May 5, 2010 (Kevin Carson) and May 3, 2011 (Jarrett McGehee) and in various emails.  In an early email, Carson confirmed: "I certainly have no objection to licensing content for use on planes."  Isherwood sent CAPITOL a draft license on October 27, 2009.  The parties agreed to cover IFP's past and ongoing activities at the fifteen percent (15%) fee agreed to for the license and Isherwood informed CAPITOL of the reserve IFP established to cover those fees.  Isherwood later prompted CAPITOL for the license:  "You will recall that we met in May [2011] to discuss a license from CAPITOL for Inflight Productions.

You indicated at the time that you would be able to provide a contract for review." McGehee responded:  "I'll try and get something to you next week."  CAPITOL sent a license template on October 5, 2011 "to get the ball rolling," acknowledging that "we'll need to tweak it a bit to match the specific services of your client and past accruals, but it's a start."  But, there is no evidence that CAPITOL did anything to move ball forward before it was acquired by UMG's parent.  *See* F 358.b.[12]

**UMPG**   On the publishing side, Isherwood had similar contacts with HFA. At meetings with Christopher Curley and David Schneider on April 12, 2010 and Curley on March 30, 2011, Isherwood and HFA discussed the scope of the anticipated license and IFP's need to be covered for past and ongoing activities, retroactive to January 1, 2008, for which IFP had set up a reserve.  HFA had the authority to issue IFP a license on the spot without going through a lengthy publisher opt-in procedure, but that was not disclosed to IFP.  Nevertheless, HFA desired to implement a new licensing scheme for all airline CSPs.  HFA asked for additional information about IFP's systems, which Isherwood provided.   HFA represented to Isherwood that it would send IFP a license after it finalized its new internally-created form license.   In a September 14, 2011 email, Isherwood confirmed:  "Last time we met you indicated that HFA was close to being in a position to provide IFP with a license."  HFA noted internally that the preparation of the new form was "holding up deals."  It appears the form was never completed; in any event, HFA failed to ever send a form or contract to IFP.  *See* F 359.c.

*                        *                        *

While UNIVERSAL feigns ignorance of IFP's activities in the U.S. while the parties were engaged in discussions over a two-year period, record evidence confirms that UNIVERSAL was fully apprised of IFP's activities.  Putting aside

---

[12]   UNIVERSAL asserts that CAPITOL asked Isherwood questions in an email, to which he did not respond.  That is untrue; Isherwood responded in an April 8, 2010 email.  F 301.

whether UNIVERSAL's communications, conduct and silence constituted "promises," "representations," "assurances" or "agreements" (or whether it intentionally or negligently misled IFP), IFP continued its U.S. operations (even bidding on new work from American Airlines) in reliance on its dealings with UNIVERSAL. ***That was the point of establishing a reserve for IFP's past and ongoing U.S. operations, which IFP openly discussed with UNIVERSAL.*** F 377.

In fact, UNIVERSAL was well aware that a variety of airline CSPs (including Spafax, PACE, DMI, SoundTrack Marketing) were operating in the U.S. without *any* licenses in place, with the exception of Spafax, which had a sound recording license for non-AOD uses and no reproduction license for musical compositions. Indeed, UNIVERSAL had specific knowledge of unlicensed AOD uses of its works on airlines as early as 2005 and rampant unlicensed uses of its works throughout 2009. Yet, UNIVERSAL took no action against any of these CSPs or their airline customers. *See* F 357.a., 358.a., 359.a-b. UNIVERSAL fails to explain why; the answer lies somewhere between utter dysfunctionality (or worse) at one end of the spectrum and its desire to maintain its existing revenue streams from IFE uses of its works (*e.g.,* ASCAP, BMI, SESAC revenues from U.S. airlines and revenues from foreign rights societies for the reproduction of its works abroad) at the other end.

It makes complete sense, therefore, that UNIVERSAL assured IFP that it would close the licensing gaps that Isherwood identified. Only two conclusions are permissible based on the record evidence: either getting the paperwork in place was a low priority for UNIVERSAL or UNIVERSAL intended to lure IFP into a statutory damages trap. UNIVERSAL's suggested conclusion – that IFP was a willful infringer – is not supported by the record. At the very least, it is for the trier of fact to unravel the rich evidentiary record and decide what really happened here.

**2.     UNIVERSAL's distortions of its interactions with IFP**

UNIVERSAL distorts the evidence and the testimony of both Isherwood and its own witnesses. IFP addresses UNIVERSAL more egregious assertions below.

-13-

**Mark Isherwood**    Isherwood testified that IFP came "clean" to UNIVERSAL – a "mea culpa" – and that he didn't "mince words."  Nevertheless, UNIVERSAL suggests that Isherwood was not forthright about IFP U.S. activities, focusing on his initial email (which he cut and paste into subsequent emails) because it stated that all duplication and encoding occurred overseas.  F 127-132. *See also* Motion ("UM") at 12:9-13:7.   In the email, Isherwood distinguished between "programme production" (which includes the creation of .wav files), on the one hand, and the encoding (and, where applicable, duplication onto CDs) of those files, on the other. His emails were accurate, therefore, with the exception of limited AOD work done in the U.S., which he was unaware of when he wrote his initial emails.    In any event, it is crystal clear that Isherwood accurately informed UNIVERSAL of IFP's work in the U.S. both at in-person meetings and in numerous emails ("[t]here is some encoding that takes place in the US"; "Inflight produces the programmes on their Sadie systems and then mixes the programmes to a master DVD. The DVD is then shipped to the UK for duplication.").  F 127.  Isherwood even sent UNIVERSAL a list describing the audio content IFP was creating *in the U.S.,* identifying the specific nature of the AOD offerings for Continental ("CD SELECTIONS (30 CD'S)" and United ("CD SELECTIONS (10 CD'S), CD SELECTIONS (320 Songs)").  *Id.*  And, in an email to HFA, he described the AOD work done by "Inflight in LA" as "CD selections that the passengers can select and listen to."  *Id.*

Contrary to UNIVERSAL's assertion that Isherwood did not discuss paying back royalties (UM at 34:17-18), the evidence conclusively establishes that he did.  Isherwood even provided UNIVERSAL with rough estimates of what it would receive for *past uses* of its works in the U.S. (retroactive to January 1, 2008) based on the agreed-upon license fees.  F 156.    *That would only have made sense if Isherwood had disclosed the nature of IFP's U.S. operations*; otherwise, nothing would have been due for past uses.

-14-

Moreover, Isherwood also disclosed to UNIVERSAL the global nature of IFP's ***distribution*** of the music files encoded and copied abroad: "The copies of programmes are then distributed throughout the world to each airline . . ." and "The copies [made in the UK] may be shipped back to the US to be loaded on the planes . . . .") *See* F357.b(x), 358.b(vi). 359.c(iii).  This is the precise "importation" for which UNIVERSAL is asserting infringement claims in this action.

UNIVERSAL also suggests that Isherwood's testimony should not be credited because he could not remember precise details of his meetings (UM at 13:11-15; 35:7-8; 35:19-23; 37:2-8). However, Isherwood testified in sufficient detail about UNIVERSAL's statements, conduct and inaction and credibility is for the trier of fact. *See, e.g.*, F 165.  UNIVERSAL's citation to Isherwood's testimony that he expected an exchange of written drafts, perhaps even involving U.S. lawyers, before executing a documented licenses (UM at 34:10-35:6; 36:1-4), is not surprising, but irrelevant to what UNIVERSAL agreed to or led IFP to believe regarding the propriety of its ongoing U.S. activities pending documentation. UNIVERSAL asserts that IFP "placed strict limits on [Isherwood's] authority," suggesting that Isherwood was pre-destined to claim that he reached agreements with UNIVERSAL to please IFP (UM at 11:10-15), but there is no evidence to support that outlandish theory.  UNIVERSAL also suggests that Isherwood was terminated for cause, but the evidence is directly to the contrary.  F. 239.

**Bill Waddell** UNIVERSAL cites Waddell's testimony regarding what he ***would not*** have said to Isherwood.  (UM at 36:22-25.)  But, Waddell could not even remember Isherwood, let alone his meetings with Isherwood.  F 325.

UNIVERSAL also cites Waddell's testimony to the effect that he had a telephone conversation with Isherwood after September 21, 2010 in which he relayed that 'it didn't seem like we were going to be able to get the deal done.  And the reason was . . . that the kind of money that [IFP] was willing to pay as an advance didn't make sense to the [UMG]."  (F 326; UM at 36:18-25.)  Isherwood

-15-

denies that the conversation took place, at least as characterized by Waddell – and Waddell's credibility is at issue:  for the first 5 hours of his deposition, Waddell repeatedly testified that he could not remember *anything* about Isherwood or IFP. F 326.  Waddell also conceded that he could not remember telling Isherwood that UMG wanted IFP to stop its activities in the U.S. because of the purported issue over an advance (or otherwise).  (*Id.*)  Thereafter, Isherwood met with Rogell, who again confirmed that UMG intended to issue a license to IFP (representing thereafter that she was "trying to move forward since our meeting").  F 357.a(x-xv).

**Jarrett McGehee**  UNIVERSAL cites McGehee's testimony that he could not, alone, have bound CAPITOL to issue a license.  (UM at 14-17.)   However, McGehee could not remember Isherwood or their meetings, and therefore cannot competently testify about what he told Isherwood in this regard.  F 311.

**HFA**  UNIVERSAL desperately tries to distance itself from HFA, noting that Isherwood spoke to HFA, not UMPG.  (F 248; UM at 32:20-22.)  But HFA was UMPG's licensing agent (which UMPG concedes), meaning that UMPG is charged with both HFA's knowledge and its conduct.  F 248.[13]  UNIVERSAL asserts that HFA had no authority to issue a license on UMPG's behalf. (UM at 32:22-33:3.) That is not only irrelevant, it is simply untrue:  HFA had actual authority to issue such a license (in the form of an "electronic transcription" license), but opted not to go that route.  F 359.a(i).  Moreover, UMPG *wanted* HFA to issue licenses to airline CSPs and, if it was going to be a publisher opt-in license, UMPG would have opted in.  F 359.c(vii).  Finally, UNIVERSAL asserts that license fees were merely

---

[13]    *See, e.g.*, *Shapiro v. Equitable Life Assur. Soc.*, 76 Cal. App. 2d 75, 86–87 (1946) (while acting "within the scope of his agency and within the limitation of his authority as agent… [the agent's] acts were…the acts of [the principal], and his knowledge of the facts…was likewise [the principal's] knowledge"); *Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1221 (E.D. Cal., 2010) (although a soliciting agent "could not make a binding contract…he could fraudulently induce" by making "misrepresentations," which are chargeable to the principal).

1  "discussed," rather than agreed upon.  (UM at 33:11-34:1)  But, Isherwood recalls

2  agreement on a 10% fee.  *See* F 264, 359c.

3  **D.      UNIVERSAL's Distortions Of IFP's Internal Understandings**

4       Presumably, to support a claim for *willful* infringement, UNIVERSAL plucks

5  snippets of documents and testimony, weaving them together to craft a wild, but

6  very distorted, tale.  UNIVERSAL equates IFP's recognition that it was "exposed"

7  *before* Isherwood met with UNIVERSAL, and its concern about being "vulnerable"

8  when  UNIVERSAL  failed  to  send  the  licenses  it  promised,  with  willful

9  infringement.  That is entirely disingenuous, as context is everything (precisely why

10  a trier of fact is typically needed to assess credibility and resolve factual disputes).

11  IFP sets forth below the: (a) temporal context; and (b) witness-by-witness context in

12  which UNIVERSAL's rendition of "facts" regarding IFP's intent must be assessed.

13       **1.      The temporal context of the evidence regarding IFP's intent**

14       October 23, 2009 is a critical date.  That was when Isherwood first met with

15  UMG.  IFP's concern about the lack of a license was allayed at that meeting; IFP

16  understood that it was authorized to continue its U.S. activities while the license was

17  documented. Isherwood's communications with CAPITOL and UMPG (HFA)

18  followed.  In all cases, IFP was led to believe that UNIVERSAL would send IFP

19  licenses to cover its U.S. activities; in no case did UNIVERSAL object, let alone

20  issue a cease and desist.  As a result, all of the supposedly damaging evidence

21  relating to the period before Isherwood made contact with UNIVERSAL – generally

22  the pre-October 2009 time-period – is relevant only as background.

23       As time went on, some IFP employees became frustrated and concerned.  The

24  frustration was largely directed at UNIVERSAL because of its failure to send

25  licenses, as promised.  The concern was about whether an unscrupulous rights

26  owner might try to renege on what it had told Isherwood, leading to a potential

27  battle over the import of the numerous discussions and emails.  Nevertheless, IFP's

28  internal understanding remained consistent; namely, that it could reasonably rely on

-17-

the good faith of UNIVERSAL to continue its activities in the U.S. This is reflected throughout the testimony of IFP's witnesses, discussed below.

### 2. The witness-by-witness context for assessing IFP's intent

UNIVERSAL cites to the testimony (and emails) from 9 current or former employees of IFP. To give context to UNIVERSAL's incomplete and misleading citations to the evidence, IFP summarizes the testimony (and emails) of each of these witnesses. The discussion below is divided between IFP US witnesses and IFP UK witnesses. As will be evident, IFP UK (in consultation with Isherwood) was responsible for decisions regarding how to proceed with inflight audio, **not** IFP US. The testimony from the IFP US witnesses is of value, therefore, mostly from the standpoint of what they learned from IFP UK or Isherwood.

### a. IFP US employees

**<u>Gerard Shadrick</u>** UNIVERSAL cites Shadrick's testimony regarding: (i) his belief that a written agreement is more secure than an oral one; (ii) his understanding about whether reproducing audio content without a written license was "right" or "wrong"; and (iii) his concern that if written licenses were not obtained, IFP USA's audio department might not be able to grow. (*See, e.g.*, UM at 9-11.) This is much ado about nothing.

First, Shadrick was the CEO of IFP USA from March 2007 to **mid-September 2009**. His managed "day-to-day running of the office" and used his "background in post-production" to build a "post-production facility" in the U.S. (but **not** for audio). Shadrick "would assume" and "would think" (incorrectly) that a *written* license was required, but his testimony in that regard "is speculative." It is also irrelevant: Shadrick was not a music licensing expert or responsible for licenses covering IFP's U.S. activities; that was handled by IFP UK management. F70.

Second, with respect to Shadrick's belief that a written agreement is more secure than an oral one, who wouldn't agree with that proposition? Had UNIVERSAL issued the licenses it told Isherwood would be forthcoming, this

-18-

lawsuit would not have been filed.  The question *for the trier of fact* is whether UNIVERSAL has acted negligently or opportunistically (or worse), attempting to take advantage of its own failure to send Isherwood the licenses it said it would.

Third, Shadrick left IFP USA *before Isherwood had even his initial meeting with UNIVERSAL* on October 23, 2009.  F 70.  IFP freely acknowledged, internally and to UNIVERSAL, that there was a gap in its licenses for which it was seeking resolution.  That was the whole point of Isherwood's dialogue with UNIVERSAL.

Finally, Shadrick's concern about growth of the U.S. office (which was mostly a "logistical" concern over client service), and what might happen if UNIVERSAL were to rebuff Isherwood's anticipated approach, is precisely what one would expect from an executive. But, it proves nothing – UNIVERSAL did not rebuff Isherwood's approach *after* Shadrick left the company.

**Jeff Borgeson**   UNIVERSAL cites snippets from Borgeson's testimony and emails, claiming it establishes: (i) his concern about the lack of agreements *before* IFP contacted UNIVERSAL;[14] (ii) his frustration regarding the progress made by Isherwood between 2010 and 2012; and (iii) his worry that IFP was vulnerable until licenses were documented.  (*See, e.g.*, UM at 5, 14-15, 17.)  In context, the evidence supports IFP's view of the case; at the very least, the meaning and weight of the evidence is for the trier of fact.

Borgeson was the primary music *programmer* at IFP US (*i.e.,* he was on the creative side).  He was "not a licensing expert"; obtaining licenses was not "part of [his] job duty" and – with a couple of important exceptions (discussed below) – he was "not privy to Isherwood's communication with upper management in the UK"

---

[14]     Borgeson's testimony that IFP's production in the U.S. had been "under the radar" *before* Isherwood contacted the labels and publishers is thus entirely understandable.  After Isherwood contacted UMG, IFP's activities were no longer "undetected," "not widely known" or "not accounted for."  Borgeson's emails about not wanting to "open a can of worms" also were sent before Isherwood met with UMG.  (F 111, 125, 140-145; *see also* UM at 10:11-11:1 and n.11.)

or the details of Isherwood's on-going communications with UNIVERSAL.  F 59.

The exceptions – where Borgeson *was* apprised – are consistent with IFP's summary of facts, not UNIVERSAL's.  ***Within hours of Isherwood's October 23, 2009 meeting with UMG, Borgeson was informed by Isherwood of UMG's agreement to issue a license for a 15% fee.***  Borgeson viewed that as a watershed moment because that meant IFP's U.S. operations could continue.  Borgeson reported Isherwood's success to his supervisor, Ian Defibaugh, and the Managing Director of IFP UK, Tony Taverner.  As for CAPITOL, Borgeson learned that it agreed to "15 percent, same as Universal."  With respect to UMPG (HFA), Borgeson learned that fees were agreed between 6 and 10%.  Borgeson believed that UNIVERSAL did not object to IFP's U.S. operations.  F 59.

Over time, Borgeson understandably became concerned with the lack of documentation.  When commenting that IFP might be "vulnerable," his concern was *not* about infringement, but whether an unscrupulous party could renege on what it previously told Isherwood, leading to a possible battle over the import of those discussions . . . and, of course, here we are. Borgeson questioned whether Isherwood could get the documentation completed, but:  "my anger being upset wasn't toward Isherwood.  It was towards the labels that were still jerking us around."  F 191.[15]

**Ian Defibaugh**   UNIVERSAL cites testimony and emails from Defibaugh about his concerns that IFP had not received signed license agreements as Isherwood expected, and that, as a result, IFP could not be 100% certain that it had the rights to produce certain audio programs.  (*See, e.g.*, UM at 5, 9, 11, 14.)

Defibaugh was at IFP USA from late 2008 to August 2012.  In 2009, he took

---

[15]   In 2012, when IFP was pitching for the audio work on American Airlines, Borgeson expressed concern about alerting American to IFP's lack of documented licenses.  (UM at 16:17-28.)  His concern was again about a lack of documentation, not a lack of agreement:  "The 'can of worms' is this documentation issue . . . . We're still waiting for documentation from Universal.  You know, this has been going on for years."  F 206.

over Shadrick's role as the senior executive in the U.S.  He was not a licensing expert or charged with ensuring that IFP had licenses to cover its U.S. activities, which he understood was handled by IFP UK management.  F 39.

Defibaugh testified that while IFP UK decided not to discontinue its U.S. audio operations ***prior*** to Isherwood's contact with rights owners, ***that decision was dependent on the outcome of Isherwood's meetings.***  The essence of his testimony is that he understood that UNIVERSAL agreed to send licenses and that IFP could continue its U.S. operations on the basis that the licenses would be documented in good faith.  Defibaugh acknowledged that he wanted executed license agreements and would have some concern until they were issued.  Who wouldn't?  While non-exclusive oral licenses are enforceable, and a party's conduct may give rise to defenses and counterclaims, no one in their right mind would prefer this litigation to enforce IFP's rights over executed licenses.  F 39.[16]  Defibaugh confirmed that he was comfortable with operations continuing in the U.S. based on Isherwood's discussions with UNIVERSAL:  "My understanding is that we were basically in agreement that 15 percent – a fee of 15 percent of gross or basically a revenue stream would be the . . . royalties that we needed to pay which . . . allowed us to . . . basically move forward because there was no cease and desist."  F 39.

### b.    IFP UK employees and Isherwood

**Tony Taverner, Roberts Hunter, Jayne Gething, Phil Bauckham**  IFP's course was directed by IFP UK's Managing Director, Taverner (until September 2011) and Hunter (until December 2012).  Taverner was Isherwood's next door neighbor; he received both written reports and oral updates from Isherwood.

Gething (Head of Finance) and Bauckham (reported to Gething, since became Head of Finance) were primarily responsible for establishing a reserve in early

---

[16]    Given his preference for written licenses, Defibaugh's statement that "this was bound to happen" – after Sony lodged a complaint with United in early 2011 – is completely understandable.  Again, context is everything.

2010, retroactive to January 1, 2008, to cover license fees that would be paid upon receipt of the anticipated licenses.  The reserve was to pay what IFP believed would be due and owing for retroactive fees (per Isherwood) when it received the anticipated licenses; it was ***not*** a "litigation reserve."  F 194, 377a.[17]

There is a gaping hole in UNIVERSAL's motion: it offered no testimony from any of these witnesses.  That is because UNIVERSAL made no effort to elicit testimony from Taverner, Hunter and Gething and it failed to ask Bauckham a single question about the reserves when he was deposed.[18]  The Court is thus left with the testimony of IFP US witnesses regarding IFP UK's decision-making process (which IFP detailed above), Bauckham's declaration regarding the reserves (summarized above) and Isherwood's testimony (summarized below) on both of these subjects.

**<u>Robert Haxton</u>**      UNIVERSAL cites Haxton's testimony regarding: (i) his desire to "secure licenses wherever possible"; (ii) his concern that without written licenses, there is a risk that the other side could back out (or try to do so); and (iii) his belief that IFP should have continued to push for documented agreements after Sony asserted claims in 2013.  (*See, e.g.*, UM at 16.)

Of course, UNIVERSAL fails to explain why Haxton's views are material, let alone harmful to IFP's position.  Haxton started at IFP in June 2012 (replacing

---

[17]      UNIVERSAL cites documents from Gething and Bauckham describing the reserve as covering IFP's "infringement" of rights.  (UM at 15, 17.)  In context, "infringement" means "use"; Gething and Bauckham were ***not*** opining whether IFP was violating copyrights.  It is also clear that the reserve was set up in reliance on Isherwood's discussions with UNIVERSAL and other rights owners, not because of any perceived infringing uses.  Thus, when IFP's auditors suggested that IFP liquidate the reserve, IFP maintained it.  That is consistent with IFP's understanding that fees would be paid retroactive to January 1, 2008 once it received the anticipated licenses. *See, e.g*, F 194, 377.

[18]      Taverner, Hunter and Gething are former employees of IFP UK (and Taverner works for Spafax, an IFP competitor).  Taverner and Gething will not appear without legal process.  Bauckham is a current employee of IFP UK and he was deposed by UNIVERSAL as a 30(b)(6) designee.

Gething); he became Managing Director in December 2012 (until June 2015). He was made aware of IFP's reserve and informed that it was based on Isherwood's communications with the rights owners. "It's my understanding that rate was negotiated, and we were just waiting to close the documents." F 138.

Haxton certainly preferred executed licenses, as if that should be a surprise to anyone. He testified that without completed documentation, rights owners might "back out" of what they agreed to during negotiations and that, if that occurred, IFP would have to stop its activities in the U.S. (as it has). F 138. But that doesn't mean that Haxton believed IFP was without legal recourse if a party, as UNIVERSAL has done here, pulled such a stunt. Indeed, as Haxton testified, "We were relying on good faith discussions that had taken place previously where the royalty rate had been discussed and allowed us to continue – our operations in America." *Id.*

**Roger Grange**   UNIVERSAL cites Grange's testimony relating to: (i) there being some concern at IFP about the potential for a problem without documented licenses; (ii) there being some frustration about not receiving documented license agreements; and (iii) his understanding that IFP and UNIVERSAL reached an agreement on key terms, but perhaps not all terms. (*See, e.g.*, UM at 17-20.)

None of Grange's testimony is the least bit surprising. As time went on, IFP became concerned that it might have to rely on years of communications with UNIVERSAL, which is certainly less ideal than executed licenses. Moreover, Grange repeatedly made clear: (1) IFP believed, based on Isherwood's communications, that UNIVERSAL would send IFP licenses to cover its activities in the U.S.; (2) IFP was proceeding in good faith with its activities in the U.S. pending its receipt of the license; (3) UNIVERSAL never indicated that IFP should cease its activities in the U.S. and, if it had, IFP would have moved its activities overseas where it had documented licenses in place with foreign rights societies; (4) IFP's concerns related to not having documented license agreements, not to whether UNIVERSAL had agreed to send licenses in its discussions with Isherwood or

objected to IFP's ongoing U.S. activities; and (5) IFP's frustration was directed at UNIVERSAL for not completing the documentation.  "All I know is that at no time did we hear from [Isherwood] that the position had deteriorated between UMG and IFP, that we should stop doing what we're doing, that we've got a problem. . . .  But at no point was the communication this isn't going to happen.  We've got to stop what we're doing.  We've got to rethink about how we're doing this.  There's a problem.  Not at all . . . ."  Grange also testified:  "[U]nder no time did we ever have an inkling, did we ever have, you know, any report from Mark or from anybody to say that these deals weren't going to get done.  And pretty much straight-away after Mark met with UMG he said, 'This is done.  They are going to send me a contract.'"  F 184, 230.

**Mark Isherwood**  With respect to IFP's understandings, UNIVERSAL distorts Isherwood's testimony and emails in three key respects.

First, UNIVERSAL focuses on the 2008 or early 2009 period, when Isherwood told IFP that it was "exposed" because it did not have, but should obtain, licenses covering its U.S. activities.  It was in relation to this period that Isherwood stated that collecting fees from airlines but not paying rights owners is "nonsense."  And, it was in his 2008 report that he noted that paying rights owners all at once might alert to them to past uses (notably, the reference was to the PPL and MCPS and the fees were paid once those licenses were finalized (F 52)).  (*See, e.g.*, UM at 6-9, 12.)  This evidence has no bearing on IFP's intent ***post***-October 23, 2009.

Second, UNIVERSAL cites Isherwood's statements to the effect that written, executed licenses are preferable.  (UM at 7, 8.)  Again, no one would disagree with that proposition, but that is irrelevant to the legal import of Isherwood's communications with UNIVERSAL.

Third, UNIVERSAL asserts that Isherwood's reports to IFP about his negotiations with the labels and publishers were "relentlessly negative."  (UM at 13:21-26.)  That is directly contradicted by the evidence UNIVERSAL cites.  At

-24-

best, that evidence reflects Isherwood's acknowledgement that the documentation process was slow going, which he presumed was because the documentation was a low priority for UNIVERSAL, not because UNIVERSAL did not want to issue the licenses it said it would.  F 158, 161.  UNIVERSAL does not cite any evidence suggesting that Isherwood reported to IFP that UNIVERSAL had not agreed on a license fee or to issue a license.  To the contrary, Isherwood's testimony was that he believed that UNIVERSAL's representatives had authority to agree to issue licenses, he advised IFP that UNIVERSAL had agreed to do so and IFP was relying on UNIVERSAL's communications, conduct and inaction:  "The company was relying on the conversations I'd had, that it was 15 percent of revenue.  There had been no objection to that.  There had been no objection to us carrying on with what we were doing; and that we could therefore rely on those conversations, pending the provision of an actual contract."  *See, e.g.*, F 368a; Ex. J (Isherwood Depo at 141:10-16).  In December 2012, before IFP supplied American with content for the "first onboard cycle" for which it was the CSP, Isherwood responded to an IFP inquiry regarding whether "everything [was] in order":  "I have been in discussions with the labels and HFA on this for at least three years.  Whilst all of them want to give a license all of them have failed to provide documentation to support that.  So, should anyone get itchy about the AA launch, we would point to all the emails and meetings that I have had during that time."  F 377a.[19]

---

[19]     UNIVERSAL also cites evidence regarding Isherwood's communications with Sony and Warner, which is largely irrelevant to IFP's communications with UNIVERSAL.  Nevertheless, UNIVERSAL distorts that part of the story, too.  After Sony raised an issue with United Airlines in early 2011, Isherwood continued the licensing discussion with Sony and believed that Sony was in agreement until it again raised an issue with United in early 2013.  IFP did not learn about that until months-after-the-fact, in June 2013.  Ultimately, Sony filed suit against United, IFP and another CSP for United.  The matter was settled and no one knows how that case would have turned out had it been litigated.  Warner sent IFP a written agreement as UNIVERSAL had agreed to do, which corroborates Isherwood's

## IV.   <u>LEGAL ARGUMENT</u>

### A.   <u>Ownership And Copying</u>

IFP does not contest UNIVERSAL's ownership of the works that are the subject of the parties' stipulation regarding ownership.  IFP contests UNIVERSAL's claim that it made a copy of its works only insofar as such works are identified on Exhibit X to the Goldman Declaration as appearing on US Airways playlists.  IFP began servicing US Airways in April 2014, once it was acquired by American Airlines (the works that IFP then copied are reflected on the American playlists). F 35.  Works appearing only on US Airways playlists should not be part of this case.

### B.   <u>Infringement</u>

IFP believes that the Court should first address IFP's motion for partial summary judgment regarding its statute of limitations and estoppel defenses; if IFP prevails on that motion, UNIVERSAL's infringement claims necessarily must fail. To the extent there are disputed material facts regarding those affirmative defenses or the others discussed in Section IV. C, UNIVERSAL also cannot prevail on its infringement claims at summary judgment.  Below, IFP discusses *additional* reasons why UNIVERSAL has not met (and, indeed, in some cases cannot meet) its burden to present a *prima facie* case of infringement by IFP.  To analyze this properly, IFP addresses each of the rights that UNIVERSAL claims was infringed.

#### 1.   UNIVERSAL has failed to establish a violation of its reproduction, distribution and importation rights

##### a.   *UNIVERSAL's reproduction right*

UNIVERSAL is claiming that its reproduction rights were violated only for copies made in the U.S.  (UM at 21.)  To the extent UNIVERSAL contends otherwise, that argument must be rejected because UNIVERSAL has not sued for violation of its reproduction rights in foreign territories.  (*See* Dkt. No. 108, at ¶ 7

---

testimony about what he expected to receive from UNIVERSAL.  While the Warner license has not been executed, Warner also has not asserted any claim against IFP.

(suing only for "copyright infringement under the Copyright Act of the United States, 17 U.S.C. § 1101 *et seq.*, and under state law").[20]

To the extent UNIVERSAL claims infringement from the mere creation of an internal file – when there is no deliverable to a customer using the work – that claim must fail.  First, UNIVERSAL's complaint did not put IFP on notice of such a claim.  Second, UNIVERSAL has not cited any case for the proposition that an internal copy made for "space shifting" purposes constitutes infringement, especially when use of a subsequent copy is non-infringing (and licensed).  IFP is aware of no such case, and the reasoning in *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) suggests that such a "space shifting" copy alone is not infringing.  The Second Circuit described an "intermediate use" by a business as the functional equivalent of an individual's personal use, which can be analyzed under the analogous fair use framework.[21]  *Id.* at 916, 921.  The court ultimately found that the internal copies were infringing, but only because the plaintiffs "demonstrated a substantial harm to the value of their copyrights" from the defendant's internal copying.  *Id.* at 931.[22]  Here, UNIVERSAL has made no such claim.

---

[20]    *See Levitin v. Sony Music Entm't*, 101 F. Supp. 3d 376, 385 (S.D.N.Y. 2015) ("Unless 'the act taking place in the United States ... itself violate[s] the Copyright Act,' there is no cause of action under the U.S. Copyright Act for foreign copyright infringement.") (citations omitted); *London Film Prods. Ltd. v. Intercontinental Commc'ns, Inc.*, 580 F. Supp. 47, 48 (S.D.N.Y. 1984) (claims for infringement under foreign copyright laws must be brought under "the Court's diversity jurisdiction"); *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 638 (S.D.N.Y. 2000) (plaintiff alleging violations of international copyright law must provide "reasonable notice concerning the foreign laws upon which he seeks to rely").

[21]    The Ninth Circuit has not addressed the issue, but it follows the rule that "space shifting" for convenience is not infringing.  *See In Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,* 180 F. 3d 1072, 1079 (9th Cir. 1999).

[22]    Not surprisingly, UNIVERSAL's cases are easily distinguishable.  *See generally MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (defendant's unauthorized copying was used in its provision of services that

### b.   *UNIVERSAL's distribution and importation rights*

Whether UNIVERSAL can establish a violation of its distribution or importation rights depends on what IFP did and where it did it.   UNIVERSAL agrees:  it asserts a violation of distribution rights only for works copied in the U.S. and importation rights only for works copied abroad.   (UM at 20-21.) UNIVERSAL's importation claims must fail unless IFP imported illegally made copies or exceeded the scope of its license to distribute copies made abroad.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1355-56, 185 L. Ed. 2d 392 (2013) (copies "lawfully made abroad" can be imported without violating copyright law); *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 695 (9th Cir. 2015).[23] UNIVERSAL has made no such claim, let alone submitted evidence to support it.

### c.   *Application to UNIVERSAL's works*

With these points in mind, IFP addresses UNIVERSAL's infringement claims by reference to each of the groupings of UNIVERSAL's works described above.

Group 1:   Works reproduced entirely outside the U.S.

UNIVERSAL is not asserting that its reproduction or distribution rights were violated with respect to these works.   In any event, any such claim would fail because copies made by IFP abroad were made and distributed pursuant to valid licenses.   UNIVERSAL's importation claims must also fail because IFP had the right to distribute the works copied abroad throughout the world.  F 354.

---

directly competed with plaintiff's services); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (defendant's use "usurp[ed] a further market that directly derive[d] from reproduction of the copyrighted works.").

[23]   UNIVERSAL's citation to *Microsoft Corp. v. Harmony Computers & Electronics, Inc.,* 846 F. Supp. 208 (E.D.N.Y. 1994) is unavailing.   In that case, the plaintiff entered into licensing agreements with customers granting a use-only software license.   Clearly, such a license does not permit distribution or importation.

1    Group 2:    .wav files created in the U.S., encoded deliverables (and CDs)

2    created outside the U.S.

3    UNIVERSAL's claims fail with respect to these works.  First, the encoded

4    deliverables were made and delivered pursuant to valid licenses and the internal

5    .wav files are not subject to copyright protection in the absence of substantial harm

6    to UNIVERSAL's copyrights.  F 355.  Second, even if the .wav files were protected,

7    IFP tendered payment to a legal representative of UNIVERSAL (or its affiliate)

8    based on its encoding revenues (F 355); UNIVERSAL could not have reasonably

9    expected double payment for the same revenue stream.  F. 16.[24]

10   Group 3:    .wav files created, no encoded deliverable was made or delivered

11   to a third party

12   These internal .wav files were not themselves distributed (or imported).

13   UNIVERSAL's reproduction claims fail because they creation of these internal .wav

14   did not cause substantial harm to UNIVERSAL's copyrights: they were not encoded

15   or otherwise copied or delivered to any third party.  F 356.

16   Group 4:    Works where both the .wav file and the encoded deliverable

17   were created in the U.S.

18   IFP agrees that as to these works, it would be liable for infringement ***if***

19   ***UNIVERSAL were to defeat all of IFP's affirmative defenses***.  Of course, IFP does

20   not believe the Court can render such a ruling on summary judgment for the reasons

21   set forth in IFP's motion for partial summary judgment and in Section VI.C. below.

22

23

24   _____

25   [24]    *See generally Jackson Rapid Delivery Service, Inc. v. Thompson Consumer*

26   *Electronics*, 210 F. Supp. 2d 949,  954 (N.D. Ill. 2001); *Outdoor Cent., Inc. v.*

     *GreatLodge.Com, Inc.*, 643 F.3d 1115, 1120 (8th Cir. 2011); *Aniero Concrete Co.,*

27   *Inc. v. N.Y. City Const. Authority*, 308 F. Supp. 2d 164, 196 (S.D.N.Y. 2003);

     *McLaughlin v. Dep't of Water & Power of City of Los Angeles*, 18 Cal. App. 2d 41,

28   46 (1936) (unreasonable to construe a statute so as to require double payment).

### 2. UNIVERSAL has failed to establish a violation of its public performance rights

First, UNIVERSAL has not asserted any public performance claims with respect to the performance of its (*i.e.*, UMPG's) *musical compositions*.  Nor could it: (a) it is the airlines' obligation to obtain public performance licenses from ASCAP, BMI and SESAC ("Performing Rights Organizations" or "PROs"); and (b) the airlines have done so.  Sometimes airlines engage IFP to obtain or administer such licenses for them, but that is their decision.  United handled all such licenses itself; Continental engaged IFP to administer the payments only; and American engaged IFP to obtain such licenses on its behalf and in American's name.  F 353.

Second, with respect to UNIVERSAL's public performance claims in its (*i.e.*, UMG's, CAPITOL's) *sound recordings*, there is no such right if the recording is transmitted via an analog system.  *See* 17 U.S.C. § 106(6).  Nor is there any such right if the recording is transmitted via a digital system in a business establishment (*e.g.*, a plane) so long as the system is not interactive.  17 U.S.C. § 114(d)(1)(C)(ii) ("The performance of a sound recording publicly by means of a digital audio transmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of . . . a transmission within a business establishment, confined to its premises or the immediately surrounding vicinity").  Accordingly, this claim is limited to sound recordings performed through an AOD system, which UNIVERSAL has failed to identify.

Third, this claim is based on UNIVERSAL's unsupported assertion that IFP is contributorily or vicariously liable for the infringement of its sound recordings by certain airlines.[25]  First the elements: (a) for **contributory infringement**,

---

[25]    UNIVERSAL asserts that an electronic transmission of its works to airlines (if that occurred) constitutes a "performance," but that is not so. *See* 17 U.S.C. § 114(d)(1)(C)(iv) (no infringement from digital audio transmission "if the performance is part of . . . a transmission to a business establishment for use in the

UNIVERSAL must prove **three** elements: (1) direct infringement by a third party; (2) a material contribution by IFP to the infringing activities of the direct infringer; and (3) actual or constructive knowledge by IFP, at the time of its alleged contribution, that third parties were directly infringing;[26] and (b) for **vicarious infringement**, UNIVERSAL must prove **three** elements: (1) direct infringement by a third party; (2) IFP's right and ability to supervise the infringing conduct;[27] and (3) an "obvious and direct" financial interest by IFP in the infringement.[28]

Here, UNIVERSAL has not even attempted to satisfy its burden to establish each of the elements of these claims. Nor can it. First, as to the common element of "direct infringement," UNIVERSAL proffered no evidence to establish that any

_____

ordinary course of its business"). Each of UNIVERSAL's cases involved transmission of a television signal from a network to local cable companies, who then passed the signal to subscribers. *See Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y. 1991); *David v. Showtime/Movie Channel, Inc.*, 697 F. Supp. 752, 759 n.3 (S.D.N.Y. 1988); *WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622 (7th Cir. 1982). In any event, for reproductions made overseas, that type of "performance" would be covered by IFP's distribution rights.

[26]   *See In re Napster Copyright Litigation*, 377 F. Supp. 2d 796, 801 (N.D. Cal. 2005); *UMG Records, Inc v. Sinott*, 300 F. Supp. 2d 993, 998 (E.D. Cal. 2004) (defendant must have "knowledge of the direct infringement at the time it materially contributes to the direct infringement."); *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp. 399, 404-405 (S.D.N.Y. 1966).

[27]   *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007) ("the mere ability to withdraw a [] "carrot" does not create the 'stick' of 'right and ability to control' that vicarious infringement requires"); *Adobe Syst. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1053 (C.D. Cal. 2001) (right to "eject any objectionable person" from the defendant's computer fair did not show control).

[28]   *See Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) ("[T]he central question of the 'direct financial benefit' inquiry [] is whether the infringing activity constitutes a draw for [customers], not just an added benefit."); *Adobe Syst. Inc.*, 173 F. Supp. 2d at 1052-53 (liability only if alleged vicarious infringer's "success (or even existence) came to depend" on direct infringer's infringement).

-31-

airline was guilty of direct infringement.[29] Even if certain airlines publicly performed UNIVERSAL's sound recordings without a license (*i.e.*, through an AOD service), IFP does not concede that the airlines were *ipso facto* guilty of direct infringement. As early as 2005, UNIVERSAL knowingly permitted airlines to use its sound recordings for AOD uses without a license. *See, e.g.,* F 357a., 358a.

Second, with respect to whether IFP made a material contribution to the alleged direct infringement by certain airline customers (an essential element of contributory infringement), UNIVERSAL proffered no evidence on the point other than the mere fact that IFP supplied the airlines with audio content. However, a defendant "cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001). *See also Smith v. BarnesandNoble.com, LLC*, 2015 WL 6681145, at *7 (S.D.N.Y. Nov. 2, 2015) (even where defendant "provided the site and facilities" for the third party's alleged direct infringement there was no contributory infringement because the defendant's facilities were "capable of substantial non-infringing use").[30]

Third, with respect to IFP's knowledge (also an essential element of contributory infringement), there is no evidence that IFP was aware that its airline customers were directly infringing UNIVERSAL's sound recordings; UNIVERSAL

---

[29] The custom and practice of the industry is that, to the extent needed, public performance licenses are based on the flag of the airline. F 353. In other words, a UK airline must obtain a public performance license in the UK, which covers it on a worldwide basis (*e.g*., when it enters U.S. airspace). Thus, at most, the public performance issue would apply here only to the extent that a U.S. based airline directly infringed UNIVERSAL's sound recordings.

[30] Unlike *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996), which UNIVERSAL cites, IFP did not provide contemporaneous, ongoing support for the airlines' public performance. There was an intermediary between IFP and the airlines, namely, integrators engaged by the airlines, who arguably provided the type of support that UNIVERSAL is relying on.

has proffered no such evidence.[31]   The custom and practice of the industry is that airlines are responsible for obtaining public performance licenses, not their CSPs. And, whether or not that is correct, Isherwood so advised IFP when the subject arose.   IFP's understanding is corroborated by its acceptance of the airlines' respective decisions to engage or not engage IFP to administer or obtain public performance licenses on their behalf (from the PROs).  At the very least, there is a triable issue regarding IFP's contemporaneous knowledge of direct infringement by its airline customers (if, in fact, that occurred).[32]

The doctrine of vicarious infringement is not even applicable to this case. Vicarious liability "generally refers to the liability of a principal, such as an employer, for the torts committed by this agent, or employee for example, in the course of the agent's employment.  *Arista Records LLC v. Myxer Inc.*, 2011 WL 11660773, at *45 n.34 (C.D. Cal. Apr. 1, 2011).  Vicarious liability has been extended in the copyright area, but only to those cases "in which the only effective relief is obtainable from someone who bears a relation to the direct infringers that is

---

[31]   UNIVERSAL claims that IFP agreed in certain airline contracts to obtain all necessary copyrights in the works it was supplying.  True enough, but under IFP's view, that was limited to the copyrights necessary to deliver non-infringing content. Once received by the airlines, it was their responsibility to obtain public performance licenses, as they were the parties performing the works.  F 353.  That is not to say that the language in IFP's airline contracts is not open to debate.  That lack of clarity resulted in two airlines (American Airlines and United Airlines) asserting claims against IFP when UNIVERSAL asserted claims against each of them.  But, that hardly establishes that IFP knew of the airlines' infringement at the time it was happening; indeed, it suggests that the opposite is true.  *Id.*

[32]   The cases cited by UNIVERSAL are easily distinguishable.  In each case, actual knowledge of the infringing activity was ***undisputed***.  *See, e.g., Fonovisa*, 76 F.3d at 261.  The critical question is whether IFP knew that public performance licenses were needed (beyond the licenses issued by the PROs) and, if so, that the airlines had not obtained them.  *See generally Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984) (defendant does not have constructive knowledge merely because it sells a product used to infringe).

-33-

analogous to the relation of a principal to an agent." *Id.* Here, if any such analogous relationship existed, IFP would be the agent for the airlines, not the other way around. UNIVERSAL's lack of understanding on this score is underscored by its argument that IFP had control because it supplied airlines with content. It is not IFP's ability to control the content that matters, but whether IFP had the ability to control whether the airlines performed the content without a license.

UNIVERSAL's vicarious liability claim must also fail because it has not and cannot establish that IFP had a direct financial interest in the allegedly infringing public performances by its airline customers. A party does not receive a financial benefit directly attributable to the infringing activity if its compensation does not turn on whether the use by the party it has supplied is infringing. *See Religious Technology Center v. Netcom On-line Communication Servs.*, 907 F. Supp. 1361, 1361 (N.D. Cal. 1995);  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007). The fee IFP receives from its airline customers does not change based on whether the airlines perform UNIVERSAL's works with or without a license. And, IFP's ability to gain more airline customers is not related to whether those airlines choose to perform UNIVERSAL's works with or without a license.[33]

### C.   UNIVERSAL Has Failed To Negate IFP's Affirmative Defenses

As noted above, IFP's affirmative defenses also preclude any finding of infringement. That is true irrespective of whether the Court finds that IFP's defenses are valid as a matter of law (*e.g.*, statute of limitations, estoppel) or

---

[33]   UNIVERSAL's cases regarding direct financial benefit are easily distinguishable. In *Ellison*, the Ninth Circuit held that there was no evidence that the defendant "attracted or retained subscriptions because of the infringement or lost subscriptions because of [its] eventual obstruction of the infringement" and granted summary judgment in favor of the defendant as to vicarious liability. 357 F.3d at 1079. In *Fonovisa, Inc.*, there was a direct financial benefit because "defendants reap[ed] substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow[ed] directly from customers who want[ed] to buy the counterfeit recordings at bargain basement prices." 76 F.3d at 263.

-34-

disputed issues of material fact exist (as to those or any other defense).  IFP's statute of limitations and estoppel defenses are addressed in IFP's motion for partial summary judgment; IFP addresses its other affirmative defenses below.

### 1.     Waiver

UNIVERSAL relegated its argument regarding IFP's waiver defense to a single paragraph, arguing that waiver cannot be inferred from "***mere*** silence or inaction" and IFP lacks evidence establishing waiver. UNIVERSAL's motion offers no analysis or citation to evidence, let alone any demonstration of an absence of evidence, thereby failing to shift the burden to IFP at the summary judgment stage. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000) ("A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence.").

A trier of fact could reasonably conclude that the intentional relinquishment of a known right is precisely what UNIVERSAL intended to do when it knowingly permitted IFP to continue using its works in the U.S. while the parties were negotiating and documenting the licenses that UNIVERSAL said it would issue. *See, e.g.,* F 357-362.  Of course, UNIVERSAL not only failed to issue a cease and desist to IFP, it did not even object to (or reserve rights regarding) IFP's ongoing use of its works.  To be clear, however, IFP need not rely on UNIVERSAL's "***mere*** silence or inaction."  Here, the parties actually discussed the matter and agreed on license terms.  And, irrespective of whether the parties agreed on all essential terms, there is uncontroverted evidence that IFP and UNIVERSAL discussed handling IFP's past and ongoing uses of its works through the payment of fees retroactive to January 1, 2008.  Indeed, the parties discussed the retroactive reserve that IFP had created and payment to UNIVERSAL of its allocable share of the reserve upon receipt of the anticipated licenses.  Moreover, this way of dealing with "out of contract" uses was entirely consistent with both industry custom and practice and

UNIVERSAL's practice.  Accordingly, a trier of fact could reasonably conclude that UNIVERSAL waived its right to seek statutory damages, disgorgement of IFP's profits or any other form of damages for IFP's past and ongoing uses of its works – other than retroactive fees at the agreed upon rate (which, for strategic reasons, UNIVERSAL is not seeking in this action).  *Id.*

### 2.    Oral license (including implied terms)/implied license

UNIVERSAL relegated its argument regarding IFP's oral license defense to one paragraph, arguing a single point – namely, that there must have been a meeting of the minds on all essential terms.  UNIVERSAL then asserts, with no analysis or citation to evidence, that this "did not occur here."  (UM at 25:8-9.)  Again, that bald assertion is insufficient to shift the burden to IFP at the summary judgment stage. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102, 1105.  Rather, UNIVERSAL was obligated to "point[] to the absence of evidence to support" IFP's defenses following its efforts to discover whether IFP had sufficient "evidence to carry its ultimate burden of persuasion at trial."  *Id.*  UNIVERSAL's failure to do so relieves IFP of any obligation to present evidence at the summary judgment stage.  *Id.*

In any event, there is more than sufficient evidence for a trier of fact to conclude there was an oral license.  A ***nonexclusive*** copyright license can be granted orally; it can include both express and ***implied*** terms, such as terms established by industry custom and practice;[34] and the fact that parties intend to ultimately execute a written license "does not alter the binding validity of the oral

---

[34]    *See, e.g., Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086, 10994 (C.D. Cal., 2011) (disputed evidence regarding terms of alleged oral license "raises a triable issue of fact"); *Tanner v. Title Ins. & Trust Co.*, 20 Cal.2d 814, 824 (1942) (implied terms are justified "when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed"); *Varni Bros. Corp. v. Wine World, Inc.*, 35 Cal. App. 4th 880, 890 (1995), modified on denial of reh'g (July 7, 1995) ("custom or usage regarding a term of a contract is admissible [] where the evidence establishes there was no discussion regarding the disputed term by the parties").

agreement." *Columbia Pictures Corp. v. De Toth*, 87 Cal. App. 2d 620, 629 (1948). Given the extensive record evidence of meetings, emails and other communications between IFP and UNIVERSAL, a trier of fact could reasonably conclude that the parties agreed on the material terms of a nonexclusive license. The parties agreed on the license fee (or method of calculation), the scope of the license (to cover IFP's U.S. operations) and retroactivity to January 1, 2008. The trier of fact can look to the automatically renewable term and advance (or lack thereof) in UMG's agreement with Spafax, the draft agreement and template exchanged between CAPITOL and IFP and HFA's prior licenses with airline CSPs (and the template it created in 2012 for airline CSPs). And, the trier of fact can evaluate the evidence against the backdrop of international rates and terms for airline CSPs (*e.g.*, the PPL and MCPS agreements) and expert testimony regarding industry custom and practice. *See, e.g.,* F 363-365. The issue is not whether IFP will prevail at trial, but whether a reasonably jury could find for IFP based on the totality of the evidence. A trier of fact could so find; notably, UNIVERSAL does not even discuss any of the allegedly missing terms, let alone cite to any evidence, in this section of its motion.[35]

### 3.    Preemption of state law claims – Airline Deregulation Act

UNIVERSAL's state law claims seek to impose liability on IFP for its use of UNIVERSAL's pre-1972 sound recordings.[36]   IFP contends that these claims are

---

[35]    UNIVERSAL makes one other point, namely that the implied license doctrine is limited to circumstances in which one party creates a work and turns it over to another at the other's request. First, this argument in no way impacts IFP's oral license with implied terms argument. Second, some cases hold that an implied license can exist even where the copyright owner does not create a custom work for the putative licensee. *See, e.g., Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (copyright owner's knowledge of the defendant's use coupled with the owner's silence constitute an implied license).

[36]    The Copyright Act protects sound recordings fixed on or after February 15, 1972. For earlier ("pre-1972") works, UNIVERSAL asserts claims for violation of Cal. Civil Code § 980(a)(2) and Cal. Business & Professions Code § 17200 and

preempted by the Airline Deregulation Act (ADA).  The ADA preempts state laws "related to a price, route, or service of an air carrier."  49 U.S.C. § 41713(b)(1).

UNIVERSAL relegated its argument regarding IFP's ADA preemption defense to two sentences, in which it asserts that: (a) the Court has already ruled on the defense; and (b) "no facts exist to support this defense."  (UM at 27:4-5.)  Both arguments fail and, indeed, summary judgment should be entered IFP's favor.

The Court previously found that IFE was a "service" (Dkt No. 106, at 14:21-22), but that "the connection between [IFE] and § 980(a)(2) [was] too tenuous and remote to justify preemption" (*Id*. at 17:15-17).  However, that ruling was made in the context of IFP's motion to dismiss UNIVERSAL's state law claims, ***without the benefit of an evidentiary record***.  The denial of a motion to dismiss is dispositive of a later summary judgment motion only "***if the factual showing were essentially congruent with the factual allegations made in the complaint***."  *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 721 (D.Md. 2011) (emphasis added).[37]

UNIVERSAL repeats its unsupported mantra that "no facts exist," which, without more, is insufficient to shift the burden to IFP.  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102-03, 1105.  Even so, there is now an abundance of evidence demonstrating that the connection between IFE (and, specifically, the use of pre-1972 works for IFE) and the state law claims at issue is substantial.  UNIVERSAL has repeatedly claimed that inflight audio programming is a valuable service – to airlines and passengers alike.  Pre-1972 sound recordings comprise a significant amount of the inflight audio programming provided by CSPs to their airline

---

common law unfair competition based thereon. Pre-72 sound recordings may be protected by state law, but only to the extent such laws are not otherwise preempted.

[37]  The doctrine of law of the case is likewise "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."  *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir.) *cert. denied*, 134 S. Ct. 119, 187 L. Ed. 2d 36 (2013) (law of the case "doctrine would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations").

customers, as demonstrated by the fact that UNIVERSAL's pre-1972 sound recordings account for **twenty percent (20%)** of the sound recordings that UNIVERSAL claims IFP infringed. *See, e.g.,* F 366-367. The state laws upon which UNIVERSAL's pre-1972 claims are based, therefore, would curtail airlines' ability to provide IFE to their passengers. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 389 (1992). UNIVERSAL has offered no contrary evidence or analysis, **warranting summary judgment in favor of IFP**.

### D.   UNIVERSAL Has Failed To Establish Willfulness

Despite UNIVERSAL attempt to establish willfulness based on a string of partial quotes from numerous cases, each of those cases turned on the specific facts presented, as must this one. Moreover, a defendant can rebut claims of willful infringement with evidence of its "good faith belief in the innocence of its conduct" and that "it was reasonable in holding such a belief." *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990). Because "willfulness" requires an assessment of the defendant's state of mind, it is not usually susceptible to summary judgment. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985) (defendant's infringement not willful, "[a]lthough their contention ultimately proved to be wrong, it was not implausible").

The extensive record of Isherwood's communications with UNIVERSAL, his reportings to IFP and IFP's internal understanding demonstrate that IFP had a good faith, reasonable belief that its use of UNIVERSAL's works was authorized. *See, e.g.,* F 368-370. UNIVERSAL's failure to even object to IFP's ongoing U.S. activities supports that conclusion. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 958 (9th Cir. 2001) (defendant's belief reasonable where plaintiff did not assert claim despite years of interaction). At the very least, a trier could so conclude, which is sufficient to defeat summary judgment.

### E.  UNIVERSAL Has Failed To Negate IFP's Counterclaims

#### 1.  Intentional/negligent misrepresentation and concealment

After presenting five pages of a distorted and woefully incomplete recitation of facts, UNIVERSAL attacks these claims on four grounds: (1) no evidence of misrepresentations; (2) no justifiable reliance; (3) no fraudulent intent; and (4) negligent misrepresentation not premised on actionable misrepresentations.

*a.  UNIVERSAL's misrepresentations and concealments*

UNIVERSAL bases its motion on only two points: (1) IFP knew it did not have licenses to use UNIVERSAL's works and was subject to infringement claims; and (2) UNIVERSAL's silence is not actionable because it had no duty to speak.

UNIVERSAL does not dispute that it made the misrepresentations that IFP delineated in its Second Amended Counterclaims (SACC). That is notable because the Court already held that, if proven, a trier of fact could find them actionable. (*See* ECF Dkt. No. 362 [ruling on motion to dismiss].) Instead, UNIVERSAL focuses on what IFP knew (which goes to the issue of reliance, not misrepresentation). In any event, the record supports the conclusion that UNIVERSAL falsely promised IFP that licenses would be forthcoming and that the rates would be applied retroactively to January 1, 2008. F 371-378.

A nondisclosure constitutes actionable concealment "when [a] defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997). Here, UNIVERSAL did far more than remain silent. At the very least, from the parties' ongoing dialogue over the course of years, UNIVERSAL knew that IFP was expecting to receive licenses covering past and ongoing uses of UNIVERSAL's works. IFP confirmed those expectations during various meetings and in numerous emails. *See, e.g.,* F 379-383. A trier of fact could conclude that if UNIVERSAL did not intend to send the licenses or address IFP's past and ongoing uses of its works through a retroactive fee, it was obligated to disclose that to IFP. *See Vega v. Jones, Day Reavis & Pogue*, 121

Cal.App.4th 282, 292 (2004) ("Even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated."); *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603, 613-14 (1992) (same).[38]

### b.   IFP's reliance was justified

UNIVERSAL asserts that IFP did not actually rely on UNIVERSAL's misrepresentations and that, if it did, such reliance was not justifiable.   IFP's evidence of actual reliance is undeniable:  it maintained its U.S. operations (which could have been moved overseas, where licenses were in tact) and, indeed, bid on the American Airlines contract, based on its understanding that UNIVERSAL would be issuing the licenses it said it would.  F 377.

In light of UNIVERSAL's consistent statements that it was "trying to move forward since our meeting," sending a draft template contract "to get the ball rolling" and "close to being in a position to provide IFP with a license," IFP's reliance was reasonable.  Moreover, Isherwood repeatedly confirmed his expectation that UNIVERSAL would issue licenses in line with their discussions and no UNIVERSAL representative ever disabused him of that understanding.  *See* F 371, 373, 375.  Not surprisingly, numerous courts have held that a party may ***justifiably*** rely on promises, representations, assurances and agreements made during the course of contract negotiations, notwithstanding the parties' intent to ultimately execute a written contract.  *See, e.g., Errico v. Pacific Capital Bank*, 753 F. Supp. 2d 1034, 1048 (N.D. Cal. 2010) (a party may reasonably rely on promises made during

---

[38]   UNIVERSAL's cases are easily distinguishable.  *See, e.g., Franceschi, Jr. v. Harrah's Entm't, Inc*, 2011 WL 9305, at *6 (D. Nev. Jan. 3, 2011) *aff'd sub nom. Franceschi v. Harrah's Entm't, Inc.*, 472 F. Appx 615 (9th Cir. 2012) (no "duty to speak or act" where casino aired ads without mentioning policy of refusing service to card counters); *First v. Allstate Ins. Co.*, 222 F. Supp. 2d 1165, 1174 (C.D. Cal. 2002) (defendant's omissions not actionable where it made no representations regarding its agent's qualifications).

contract negotiations); *City Solutions, Inc. v. Clear Channel Commnns., Inc.*, 365 F.3d 835, 838-840 (9th Cir. 2004) (trier of fact can find justifiable reliance on promises made during negotiation even though "no contract was ever formed"); *Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*, 2008 WL 205209, at *15 (E.D. Mich. Jan. 22, 2008) ("the absence of a signed contract will not preclude a finding of reasonable reliance").[39]  This is particularly true where, as here, there are repeated assurances during negotiations that essentially have "strung along" the other party.  *See Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 346-48 (D. Mass. 2011) (defendant "opportunistically [] strung along" the plaintiffs by promising "to engage in negotiating a loan modification).[40]  At the very least, the trier of fact could find that IFP's reliance was justifiable.

c.      *The evidence supports a finding of fraudulent intent*

UNIVERSAL challenges IFP's claim of fraudulent intent first by reiterating its assertion that there is no evidence of the alleged misrepresentations and concealments.  IFP has already identified an abundance of evidence on the point.

---

[39]     *See also Keybank Nat'l Assoc. v. Moses Lake Indus.*, 2010 WL 933973, at *2 (E.D. Wash. Mar. 11, 2010) ("The absence of an enforceable agreement is not a valid basis for dismissal of a claim in tort."); *Inland Waters Pollution Control, Inc.*, 2008 WL 205209, at *15; *Hoffman v. Red Owl Stores*, 26 Wis. 2d 683 (1965) (repeated promises actionable in tort even though those promises may not have been definite enough to give rise to an enforceable agreement).

[40]     UNIVERSAL's cases are easily distinguishable.  *See, e.g.*, *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984) (no reasonable reliance where alleged promises were not separate and apart from underlying promise to purchase six subsidiaries); *Am. Viking Contractors, Inc. v. Scribner Equip. Co.*, 745 F.2d 1365, 1372 (11th Cir. 1984) (promise that is "a nullity under Georgia law" cannot be relied on); *Big Tree Enterprises, Ltd. v. Mabrey*, 1994 WL 191996, at *6 (D. Kan. Apr. 15, 1994) *aff'd*, 45 F.3d 439 (10th Cir. 1994) (no evidence of alleged misrepresentation).  Nor is there authority for the proposition that one party **must** tell the other that it is relying on its alleged silence.  UNIVERSAL cites *Hoffman v. 162 North Wolfe LLC*, 228 Cal.App.4th 1178, 1197 (2014), but the defendant's claimed reliance was at odds with the evidence.

-42-

UNIVERSAL also argues that non-performance of a promise "*alone*" cannot, establish fraudulent intent (and that it attempted performance of the very promises it is simultaneously disavowing).  (UM at 39:14-20, 40:11-19.)  But, as this Court already held, fraudulent intent can be established by evidence that a party never *attempted* performance (*Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30-31 (1985)); repeated representations or promises to perform over time, combined with the failure to act in accordance therewith (*see id.*); and contrary actions taken contemporaneously with a claimed misrepresentation or concealment (*Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1153 (S.D. Cal. 2001)).

There is more than ample record evidence supporting each point.  There is not even an internal draft of the license UMG promised; CAPITOL sent a template it conceded was woefully deficient; HFA failed to send IFP the new form license it told Isherwood it was preparing.  And, UNIVERSAL's misstatements were constant over the course of years; it failed to correct IFP's expectation that licenses would be forthcoming, even when Isherwood clearly set forth his understanding in emails. UMG told Isherwood one thing about accepting IFP's reserve for past and ongoing uses of its works, while communicating something different to its sister company in the UK.  HFA represented it would send its new airline CSP form license when completed, but there is no evidence HFA ever sent it to *any* CSP.  F 372, 374, 376.

### d.      UNIVERSAL's negligent misrepresentations of fact

UNIVERSAL feebly asserts that there is no evidence of misrepresentations of fact.  UMG denies there is evidence that it told Isherwood it was working on preparing a license for IFP.  (UM at 41:4-5)  That evidence can be found in Rogell's June 8, 2011 to Isherwood, which he then confirmed in an email dated September 14, 2011.  F 384.  CAPITOL asserts there is no evidence that it told Isherwood it was prepared to issue a license to IFP; ironically, it then seeks absolution because it sent Isherwood a draft template.  (UM at 41:5-8)  But, CAPITOL repeatedly told Isherwood it was prepared to issue a license, even though it had not undertaken any

of the steps necessary to do so before it was acquired by UMG's parent.  F 385. UMPG merely notes that Isherwood did not communicate "with UMPG at all." That is disingenuous, as Isherwood dealt with its agent, HFA, and UMPG is charged with both HFA's knowledge and its conduct (*see* Section III.C.2, *supra*), which included false statements of fact regarding its authority to issue airline CSP licenses and its purported need to prepare a new form license.  F 386.

## 2.    Intentional interference with contract

UNIVERSAL's assorted attacks on IFP's intentional interference claim fail. First, with respect to the application of the *Noerr-Pennington* doctrine, the Court now has before it a robust record from which it can conclude that UNIVERSAL's November 20, 2013 cease and desist communication was "objectively baseless." That communication from in-house litigator Darren Schmidt followed his October 31, 2013 email to Isherwood regarding a similar suit filed by Sony.   But, interestingly, Schmidt's email purports to respond to Isherwood's email to Rogell from September 14, 2011 – two years earlier!  Clearly, Schmidt was aware of the years of communications between the parties when he wrote the cease and desist (even though he refused to disclose what he knew at his deposition).

Moreover, as the Court previously noted, IFP's interference claim is not based **solely** on the cease and desist letter.  Rather, UNIVERSAL needlessly upped the *ante* by telling IFP's airline customers (specifically, American and United) that **they** were unauthorized allegedly based on IFP's conduct, while simultaneously attempting, for the first time, to license directly to those airlines.  Part and parcel of those communications was UNIVERSAL's assertion of meritless claims against American and United – meritless because those claims were premised on UNIVERSAL's disavowal of years of promises, representations, assurances or agreements with IFP.  That, in turn, triggered indemnity claims by American and

1   United against IFP, for which IFP has incurred liability to United,[41] may incur

2   liability to American and has incurred attorney's fees to defend against American's

3   claim.   IFP was also forced to incur expenses to move operations overseas.

4   UNIVERSAL conveniently ignores these additional acts of interference.[42]

5   Based on these facts, and more (*see* F 389-393), a trier of fact could find for

6   IFP on its interference claim, and therefore UNIVERSAL's motion must be denied.

7   **V.    CONCLUSION**

8   UNIVERSAL's motion should be denied except with respect to ownership

9   and copying (other than the US Airways playlists).   As to the remainder of its

10  motion, UNIVERSAL has failed to identify **material** facts on which it is relying.

11  Insofar as UNIVERSAL's hundreds of so-called undisputed facts are concerned, the

12  record is rife with classic evidentiary disputes and typically the evidence is subject

13  to competing inferences.   IFP's preemption defense is an exception, for which

14  summary judgment should be granted in IFP's favor.

15  Dated:  December 14, 2015     SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

16  
      By _____
                    */s/ Martin D. Katz*
17                     MARTIN D. KATZ
                        JAY T. RAMSEY
18              Attorneys for Counter-Claimants
19           INFLIGHT PRODUCTIONS USA INC. AND
                INFLIGHT PRODUCTIONS LTD.
20

21

22  _____

23  [41]   IFP first incurred liability to United on October 30, 2015 (Suppl. Comp. Ex. EE), which is why it was entitled to identify that airline contract in its SACC.

24  [42]   UNIVERSAL's cases are all distinguishable.   Unlike IFP's situation, in

25  *Avocados Plus Inc. v. Freska Produce Int'l LLC*, there was no actionable interference where the plaintiff could not "demonstrate a breach or other disruption

26  vis a vis its contract with the growers."  2007 WL 5091680, at *7 (C.D. Cal. Jan. 26,

27  2007).  Similarly, in *Cty. of San Luis Obispo v. Abalone All.*, 178 Cal. App. 3d 848, 861 (1986), there was no actual impact on plaintiff's contracts as a result of

28  defendant's interference.

-45-