## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-3466-GW(JPRx) | Date | March 31, 2016 |
|---|---|---|---|
| Title | *UMG Recordings, Inc., et al. v. Global Eagle Entertainment, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Talya Goldfinger | Jay T. Ramsey |
| Jeffrey D. Goldman | Martin D. Katz |
| | Bridget J. Russell |

**PROCEEDINGS:**     **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR AN ORDER IDENTIFYING MATERIAL FACTS NOT GENUINELY IN DISPUTE RE: (1) LIABILITY AND WILLFULNESS; AND (2) COUNTERCLAIMS OF DEFENDANTS INFLIGHT PRODUCTIONS LTD. AND INFLIGHT PRODUCTIONS (USA) INC.; AND MOTION TO STRIKE [370];**

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: THEIR STATUTE OF LIMITATIONS DEFENSE; (2) THEIR DEFENSE OF ESTOPPEL [374];**

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT RE DEFENSES [398]**

The Court's Tentative Ruling is circulated and attached hereto.  Court hears oral argument.  For reasons stated on the record, the above-entitled motions are TAKEN UNDER SUBMISSION.  Court to issue its ruling.

|  | 1 | : | 05 |
|---|---|---|---|
| Initials of Preparer | JG | | |

***UMG Recordings, Inc., et al. v. Global Eagle Entm't, et al.***, Case No. CV-14-3466-GW (JPR)
Tentative Rulings on: (1) Plaintiffs' Motion for Summary Judgment or Partial Summary
Judgment, or, Alternatively, for an Order Identifying Material Facts Not Genuinely in Dispute,
and Motion to Strike; (2) Defendants' Motion for Partial Summary Judgment; and (3) Plaintiffs'
Cross-Motion for Partial Summary Judgment

## I. Background

Plaintiffs[1] are various record companies and music publishers.  *See* First Am. Compl.
("FAC") ¶¶ 11-25, Docket No. 108.  Plaintiffs filed their First Amended Complaint against
Defendants[2] on February 24, 2015, asserting four causes of action: (1) copyright infringement of
sound recordings, (2) copyright infringement of musical compositions, (3) violation of California
Civil Code § 980(a)(2), and (4) violation of California Business and Professions Code § 17200
and common law unfair competition.  *See id.*

The Record Company Plaintiffs allegedly hold copyrights in numerous sound recordings.
*See id.* ¶¶ 14, 37-38; *see also id.* Ex. B (list of copyrighted sounds recordings).  They also hold
and exploit copyrights in thousands of music videos.  *See id.* ¶ 14.  The Music Publisher
Plaintiffs allegedly hold copyrights in certain musical compositions identified on a separate
exhibit attached to the FAC.  *See id.* ¶¶ 24-25, 45-46; *see also id.* Ex. C (list of copyrighted
musical compositions).  Plaintiffs contend that Defendants provide "various airlines," including
American, with Plaintiffs' copyrighted sound recordings, musical compositions, and music
videos, which the airlines publicly perform for the benefit of their passengers.  *See id.* ¶ 1.
Defendants purportedly have no license or other authorization to perform the copyrighted sound
recordings, music videos, and musical compositions publicly, but have nonetheless reproduced,
distributed, publicly performed, imported, and unlawfully advertised and promoted the sound
recordings, musical compositions, and music videos "for the entertainment of airline
passengers."  *See id.* ¶¶ 1-2, 5, 31-33; *see also id.* Exs. A-1 (exemplar of Defendants' allegedly
unlawful advertising).  In this way, Plaintiffs assert, Defendants have infringed and otherwise

---

[1] "Plaintiffs" are UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("EMI") (collectively, the "Record
Company Plaintiffs") together with Universal Music Corp.; Songs of Universal, Inc.; Universal-PolyGram
International Publishing, Inc.; Universal-Songs of PolyGram International, Inc.; Universal-Polygram International
Tunes, Inc.; Universal Music-MGA NA, LLC; Universal Music-Z Tunes, LLC; Rondor Music International, Inc.;
and Universal Musica, Inc. (collectively, "UMPG" or the "Music Publisher Plaintiffs").  *See* FAC ¶¶ 11-25.

[2] "Defendants" are Global Eagle Entertainment, Inc., d/b/a Inflight Productions, Inflight Entertainment Alliance, and
IFP ("Global Eagle"); Inflight Productions USA Inc. a/k/a AAEC Inc. and d/b/a Inflight Productions, Inflight
Entertainment Alliance, and IFP ("IFP USA"); and Inflight Productions Ltd. ("IFP Ltd.") (collectively, "IFP")
together with American Airlines, Inc. ("American").  *See* FAC ¶ 1.

misused their intellectual property, and have had a material adverse impact on Plaintiffs' revenues and profits.[3]  *See id.* ¶¶ 34-35.

With respect to Plaintiffs' first copyright infringement claims, Plaintiffs assert that Defendants have willfully reproduced, distributed, publicly performed, and imported the enumerated copyrighted sound recordings and musical compositions and many more of Plaintiffs' copyrighted sound recordings, musical compositions, and music videos in violation of 17 U.S.C. §§ 106 and 602.  *See id.* ¶¶ 39-40, 42, 47-48, 50.  Alternately, they contend that, with actual or constructive knowledge of the infringing nature of the activity, Defendants induced, caused, or materially contributed to infringement by others, and derived financial benefit from it.  *See id.* ¶¶ 41, 49.  They seek statutory damages under the Copyright Act, punitive damages, injunctive relief, and attorneys' fees and costs.  *See id.* ¶¶ 42-43, 50-51.

In addition, the Record Company Plaintiffs allege that they possess exclusive ownership interests in thousands of recordings under California Civil Code § 980(a)(2) (sound recordings initially fixed prior to February 15, 1972), including those identified in Exhibit D.  *See id.* ¶ 53 and Ex. D.  They assert that Defendants have reproduced, distributed, and publicly performed these recordings without permission, and seek injunctive relief and compensatory and punitive damages in an amount to be proved at trial.  *See id.* ¶¶ 53-55.  Finally, the Record Company Plaintiffs assert an unfair competition claim under the UCL and common law.  *See id.* ¶ 58.  They contend that Defendants' unlawful appropriation of their property rights constitutes unfair competition, and ask that the Court order Defendants to account for all profits and compensation obtained through their unlawful conduct and permanently enjoin any further infringement of their exclusive rights.  *See id.* ¶¶ 59-61.  They also seek punitive damages.  *See id.* ¶ 62.

On March 10, 2015, Global Eagle, IFP USA, and IFP Ltd. (collectively, "IFP") filed counterclaims for (1) intentional misrepresentation, (2) fraudulent concealment, (3) negligent misrepresentation, (4) intentional interference with contractual relations, (5) intentional interference with prospective business advantage, and (6) negligent interference with prospective business advantage against all Plaintiffs except for Universal-Songs of PolyGram International, Inc.  *See* Docket No. 118.  On April 3, 2015, Plaintiffs filed a motion to dismiss the counter-claims, which the Court granted on June 22, 2015, giving IFP twenty days to amend.  *See* Docket

---

[3] Specifically, they contend Defendants' unauthorized use of their musical compositions, sound recordings, and music videos conveys to the general public that their property is without value, and diminishes the value of the property for other purposes, including first use premiums and other exclusive uses.  *See* FAC ¶ 35.

Nos. 142, 239, 279.   On July 14, 2015, IFP filed first amended counterclaims, which alleged claims for (1) intentional misrepresentation, (2) fraudulent concealment, (3) negligent misrepresentation, and (4) intentional interference with contractual relations.   *See* Docket No. 307.   On July 27, 2015, Plaintiffs moved to dismiss the amended counterclaims.   *See* Docket No. 314.   The Court granted the motion in part and denied it in part on October 30, 2015.   *See* Docket No. 362.   IFP filed second amended counterclaims on November 19, 2015, pleading the same four claims.   *See* Second Am. Countercl. ("SACC"), Docket No. 363.

Now pending before the Court is Plaintiffs' Motion for Summary Judgment or Partial Summary Judgment, or, alternatively, for an Order identifying material facts not genuinely in dispute, and Motion to Strike.   *See* Pls.' MSJ, Docket No. 441.[4]   Plaintiffs move for an Order granting summary judgment in their favor with respect to (1) liability and willfulness as to Plaintiffs' claims for copyright and state law infringement;[5] (2) IFP's first, third, and fifth through eleventh affirmative defenses (respectively, failure to state a claim, license or authorization, waiver, consent, implied license, unclean hands, laches, abandonment, and preemption by the Airline Deregulation Act, 49 U.S.C. § 41713); and (3) all of IFP's counterclaims.   *Id.*   IFP has filed an Opposition, which withdraws its defense of consent and does not challenge Plaintiffs' Motion with respect to its defenses of failure to state a claim, laches, unclean hands, and abandonment.   *See* Opp'n to Pls.' MSJ at 2 n.2, Docket No. 400.   Plaintiffs have filed a Reply.   *See* Reply ISO Pls.' MSJ, Docket No. 419.

Also pending before the Court is IFP's Motion for Partial Summary Judgment with respect to their second and fourth affirmative defenses, of statute of limitations and estoppel.   *See* IFP's MSJ, Docket No. 432.   Plaintiffs have filed an Opposition and Cross-Motion for Summary Judgment on these affirmative defenses, *see* Opp'n to IFP's MSJ, Docket No. 397-4, and IFP has filed a Reply, *see* Reply ISO IFP's MSJ, Docket No. 414.

## II.  Legal Standard

Summary judgment is proper when the pleadings, the discovery and disclosure materials

---

[4] Plaintiffs' use of superscripted citations violates this Court's local formatting rules in an effort to contravene the page limit set by the Court, and is particularly inappropriate given the generous 45-page limit permitted for their Motion.   *See* C.D. Cal. 11-3.1.1 ("A proportionally spaced font must be standard (e.g., non-condensed) 14-point or larger.").   Moving forward, the Court will strike any document, filed by *either party*, that fails to comply with or attempts to evade the local rules.

[5] The Motion does not address Plaintiffs' claim for violation of California Business and Professions Code § 17200 and common law unfair competition.

on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[6]  Fed. R. Civ. P. 56; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).  As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

To satisfy its burden at summary judgment, a moving party with the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); Schwarzer, Tashima, et al., Cal. Prac. Guide Fed. Civ. Proc. Before Trial (The Rutter Group 2013) § 14:126, at 14-42.  By contrast, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."  *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  In addition, the evidence presented by the parties must be admissible.  *See* Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See*

---

[6] Under Federal Rule of Civil Procedure 56, the same legal standard applies to motions for partial summary judgment and ordinary motions for summary judgment.  *See* Fed. R. Civ. P. 56(a); *see also California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998); *Barnes v. Cnty. of Placer*, 654 F.Supp.2d 1066, 1070 (E.D. Cal. 2009) *aff'd*, 386 F.App'x 633 (9th Cir. 2010) ("A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment.").

*Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage, and must view all evidence and draw all inferences in the light most favorable to the non-moving party.  *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

When "parties submit cross-motions for summary judgment, each motion must be considered on its own merits," and courts must consider "the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134-36 (9th Cir. 2001) (internal citations and quotation marks omitted, punctuation altered); *see also Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1043 (9th Cir. 2014).

If a court "does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g); *see Meador v. Hammer*, No. 2:11-CV-3342 KJM, 2015 WL 1520307, at *1 (E.D. Cal. Mar. 31, 2015) (indicating that Rule 56(g) "authorizes but does not require" the court to issue such an order).

## III.  Analysis

### A.  *Undisputed Facts*[7]

#### 1.  Plaintiffs' Motion

---

[7] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiffs or Defendant.  The Court has reviewed all of the parties' disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the evidence.  To the extent that the cited "undisputed" facts have been the subject of a party's attempt to deem them to be "disputed," the Court finds that the stated disputes: (1) fail to controvert the proffered facts, (2) challenge the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position.  As such, the Court treats such facts as undisputed.  Any proffered facts not included in this Tentative Ruling were found to be duplicative of other facts set forth herein, were improper opinions or conclusions rather than facts, were unsupported by admissible evidence, and/or were deemed extraneous or irrelevant to the Court's present analysis.

   IFP may notice that many of its proffered facts are not reflected herein.  That is largely because: (1) the liberties taken by IFP in characterizing the evidence often border on sanctionable conduct and (2) IFP's repeated attempts to set forth legal conclusions and argument as fact is at once improper and unavailing.  The Court has endeavored to salvage relevant facts supported by the cited evidence within IFP's proffered "facts" and has included those facts herein.

   Finally, the parties have made several evidentiary objections to the evidence submitted in support of their positions.  *See* Docket Nos. 399, 400-2, 414-3, 419-5, 423.  The Court overrules the objections to the extent it has relied upon evidence in this Tentative Opinion to which either party has objected; and will file its specific rulings after oral argument on the motions.

#### a. The Parties

Plaintiffs UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("EMI") are record companies engaged in the business of producing sound recordings and manufacturing, distributing, selling, and licensing the distribution and sale of their sound recordings in the United States and the importation of such sound recordings into the United States. *See* Pls.' Resp. to Statement of Genuine Disputes ("Pls.' RSGD") ¶ 1, Docket No. 424 (citing FAC ¶¶ 11-13). Universal Music Corp.; Songs of Universal, Inc.; Universal-PolyGram International Publishing, Inc.; Universal-Songs of PolyGram International, Inc.; Universal-Polygram International Tunes, Inc.; Universal Music-MGA NA, LLC; Universal Music-Z Tunes, LLC; Rondor Music International, Inc.; and Universal Musica, Inc. (known collectively as the Universal Music Publishing Group and referred to herein as "UMPG") are music publishing companies engaged in the acquisition, ownership, administration, and exploitation of musical compositions. *Id.* ¶ 2 (citing FAC ¶¶ 15-24).

Defendant IFP USA is wholly owned by Defendant IFP Ltd., was formed in the 1990s, and is located in Southern California. *Id.* ¶ 3. Defendant Global Eagle, successor-in-interest to Advanced Inflight Alliance AG ("AIA"), bought IFP Ltd. and IFP USA in or about 2007. *Id.* ¶ 4. IFP USA, IFP Ltd., and Global Eagle are collectively referred to herein as "IFP." Global Eagle has wholly owned both IFP Ltd. and IFP USA at all times from 2008 to the present. *Id.* ¶ 5.

#### b. IFP's Business Practices

One of IFP Ltd.'s goals in establishing IFP USA "was to be able to offer actual or potential airline clients a mix of both music and video offerings for their passengers" and to do so locally. *Id.* ¶ 6; Decl. of Roger Grange ("Grange Decl.") at 89:12-90:22, Docket No. 378-4. IFP USA was originally focused on video work, but then "hired a couple of producers to produce shows locally [so] that [IFP's] international customers could have the flavor of . . . US-produced music." Pls.' RSGD ¶ 6; Grange Decl. at 90:23-91:4, Docket No. 378-4.

IFP USA's audio department creates both radio-type broadcast programs accessed through airplane armrests and, more recently, audio-on-demand ("AOD") programs with interactivity (*e.g.*, the ability to pause, fast forward, rewind, rearrange, and otherwise manipulate music tracks) using seatback touchscreen panels. Pls.' RSGD ¶ 16. To create audio programs, IFP created lists of popular music ("playlists") in various genres of music. *Id.* ¶ 17. IFP then

acquired the music included on the playlists by purchasing or otherwise obtaining physical CDs or individual digital tracks, including by purchasing them at physical and online retail stores, and copied the physical CDs or individual digital tracks onto its internal hard drives. *Id.* ¶¶ 17-18. For both broadcast and AOD programs, IFP first created an individual copy (or ".wav" file) for each song on the playlist. *Id.* ¶ 19. For broadcast programs, IFP then "mixed" the programs on its computer system, adding interviews and commentary, before creating another .wav copy of the mixed program.[8] *Id.* ¶¶ 20-21.

After creating a final copy of each program (a physical DVD or digital file), IFP either sent the copy to a U.S.-based, third-party "integrator" or to one of IFP's overseas offices to be encoded or duplicated for each airline's technical specifications.[9] *Id.* ¶ 25. Even where the encoding process took place overseas, a copy of the program was eventually imported back to the U.S. either directly to a U.S. airline hub to be loaded on aircraft, or to a third-party integrator to be distributed to U.S. airlines. *Id.* ¶¶ 26-27. After Sony filed a lawsuit against IFP in 2013, IFP still created playlists in Los Angeles, but sent the playlists to an overseas office for mixing and encoding. *Id.* ¶ 28. The final encoded programs, however, were still imported back into the United States for distribution and integration on airlines. *Id.* ¶ 29.

### c. IFP's Duplication of Plaintiffs' Sound Recordings and Musical Compositions

UMG and EMI own, and as of the last use disclosed by IFP in discovery owned, the copyrights, exclusive rights under copyright, or state law rights for the 4,160 sound recordings listed in Appendices A-F of the parties' Stipulation, attached as Exhibit W to the Declaration of Jeffrey D. Goldman ("Goldman Decl."). *Id.* ¶¶ 14, 35; Goldman Decl. Ex. W, Docket No. 379-11 at 8-196. UMPG owns − and as of the last use disclosed by IFP in discovery, owned − the copyrights or exclusive rights under copyright for each of the 1,334 musical compositions listed in Appendices G-I of the parties' Stipulation, attached as Exhibit W to the Goldman Declaration.

---

[8] IFP USA made .wav copies for all broadcast programs (with the exception of nine mostly foreign-music programs) for the following airlines: Continental/Copa, Aircalin, EVA, Air New Zealand, Qatar, Cathay Pacific, North American-World, National, Singapore, Thomas Cook, American, and Atlas Air. Pls.' RSGD ¶ 22. IFP USA made .wav copies for the following airlines' AOD programs: Continental, United, Qatar (2012-2013), American (2013), and Air Transat. Pls.' RSGD ¶ 23.

[9] "Encoding" a work means "taking [a] WAV file and converting it to the specifics of the aircraft and the system" before renaming it. Pls.' Second Supp'l Statement of Uncontroverted Facts ("Pls.' SSSUF") ¶ 400, Docket No. 419-2. In other words, encoding a work constitutes a "second copy" of the work, with the .wav file being the first. *Id.* ¶ 401.

Pls.' RSGD ¶¶ 15, 35; Goldman Decl. Ex. W, Docket No. 379-11 at 197-261.  Since the parties stipulated to Plaintiffs' ownership, however, Plaintiffs have withdrawn their claims with respect to 95 of the sound recordings and musical compositions listed therein.  Pls.' RSGD ¶¶ 14-15; Decl. of Jay T. Ramsey ("Ramsey Decl.") Ex. HH, Docket No. 400-7 at 144-49.  Plaintiffs identified the works listed in Exhibit W in IFP's productions of playlists and data from its U.S. hard drive data, although the works on IFP's hard drives were not necessarily on any playlist IFP produced.  Pls.' RSGD ¶¶ 31-35.  Of works listed in Exhibit W, Plaintiffs found that 3,437 "playlist" works were reproduced by IFP in the U.S., 970 works were copied onto IFP's U.S. hard drives, 841 works appeared on playlists for U.S.-based airlines, and 246 works appeared on playlists for which IFP did not provide sufficient data for Plaintiffs to determine where the copying took place.  *Id.* ¶ 36.

> ### d.  *Isherwood Investigates IFP's Licensing Situation and Identifies IFP's Exposure to Liability*

In 2008, Tony Taverner ("Taverner"), IFP Ltd.'s Managing Director, and Jayne Gething ("Gething"), IFP Ltd.'s then-CFO, commissioned licensing "expert" Mark Isherwood to "look into any sort of exposure that the company may have with regards to audio licensing."  *Id.* ¶¶ 9-10, 40.  When Isherwood came on board at IFP, he "was asked to do an appraisal of the position with regard to IFP and all its different territories, and whether they had all the appropriate licenses in place for the work – for the activity that they had been carrying out, because there didn't appear to be any paperwork that Tony [Taverner] and his staff could locate which indicated what the situation was."  *Id.* ¶ 42.  In the initial phase of his work for IFP, Isherwood asked IFP "to find out what paperwork there was," concluded "there were some potentially significant gaps" in that paperwork, and prepared a report analyzing his findings.  *Id.* ¶ 44.  In June 2008, Isherwood reported to IFP that its "licensing arrangements were not sophisticated enough to meet its business requirements," and that IFP was infringing copyrights not only where it did not have a license at all, but also where the license it had (if any) did not cover the particular uses in which it was engaging, such as both broadcast and AOD programs.  *Id.* ¶¶ 45-46, 48.  In addition, Isherwood told IFP it had no U.S. licenses at all and was "exposed" to legal action and legal claims, including lawsuits for copyright infringement in which the amount of damages was uncertain and hard to predict.  *Id.* ¶ 50.

In June 2008, Jeff Borgeson ("Borgeson"), IFP USA's Vice President of Music

Programming and director of the U.S. Audio Department, told Taverner: "I suspect we will eventually need to sort agreements with the other major label groups such as Universal & Warner Bros. . . . LA has produced programming under the radar and this [United Airlines] project brought our efforts to the forefront"; Borgeson testified that by "under the radar," he meant "undetected," "not widely known" and "[n]ot accounted for" – which he recognized was "a problem, a potential problem." *Id.* ¶¶ 13, 38. On June 27, 2008, Taverner wrote an e-mail to Gething, Borgeson, and Gerard Shadrick ("Shadrick"), who became CEO of IFP USA in March 2007, stating in part: "Interestingly after your conversation with Mark [Isherwood] last week he has done some investigation and is concerned that we are quite exposed in the USA." *Id.* ¶¶ 8, 53.

In a third report in July 2008, Isherwood reminded IFP of the "urgent need" to resolve its licensing issues. *Id.* ¶ 77. In August 2008, Isherwood reported that "[i]t ha[d] been acknowledged by senior IFP staff that a lack of knowledge about the administration of copyright is a general problem within IFP's worldwide operations" and the "[f]ailure to address this situation could continue to leave IFP vulnerable to claims from rights owners on an ongoing basis." *Id.* ¶ 51. Around December 2008, Borgeson spoke to Ian Defibaugh ("Defibaugh"), who had joined IFP USA in November 2008 as Director of Operations, about IFP USA "not having licenses," telling Defibaugh "there wasn't anything formalized within the U.S. to address a production [of music] that was being done in the L.A. office" and that there was "nothing was in place to address the issue." *Id.* ¶¶ 7, 37.

*e. Isherwood Attempts, But Ultimately Fails, to Secure Licenses from Plaintiffs*

IFP asked Isherwood to seek and obtain licenses from U.S. record companies and music publishers. Pls.' RSGD ¶ 81. For the U.K. territory, Isherwood negotiated written licenses with PPL and MCPS on IFP's behalf.[10] *Id.* ¶¶ 82, 160. Isherwood told IFP that, in the United States, music licensing was more complicated and "no guarantees could be given that this would be achieved." *Id.* ¶ 83. For U.S. musical compositions, Isherwood understood that the Harry Fox

---

[10] Isherwood testified that, in 2008, the "crux" of IFP's problem in the U.S. was that "the U.S. office had been operating . . . under the wrong information that the agreements with [U.K. music rights societies] PPL and MCPS would cover the reproductions they were making in the U.S. office." Pls.' RSGD ¶ 78. Isherwood called this problematic because "the jurisdiction of MCPS and PPL would not go to reproductions that take place in the U.S." Pls.' RSGD ¶ 78.

Agency ("HFA") sometimes acted as an agent for some music publishers, but "some publishers would choose, for certain types of exploitation of their rights, to license directly with the licensee, rather than through [HFA]."  *Id.* ¶¶ 86, 87.  On April 20, 2009, Isherwood wrote to Defibaugh, Borgeson, Taverner and Nadine Currimjee at IFP, stating, in part, that "HFA is not always able to grant a license for all the publishers in the US. . . . For IFP this means that there is no guarantee that the individual publishers will be prepared to license at the HFA royalty rate."[11] *Id.* ¶ 88.  On April 23, 2009, Isherwood told Taverner and Borgeson in part: "From an IFP perspective, no licenses are in place in the US that we have been able to identify. . . . All that can be done is that this issue will need to be covered when we get round to negotiating licenses in the US."[12]  *Id.* ¶¶ 85, 109.  Isherwood also sent IFP an "[u]pdate on Inflight licensing activities," which stated regarding the United States: "I am going to talk to Barry Knittel about this when I am in LA next month on a confidential basis."  *Id.* ¶ 91.  On April 29, 2009, Isherwood explained to Defibaugh, Borgeson, and Taverner:

> IFP will need a license agreement in place with HFA to cover the musical works. However, HFA is not always able to grant a license for all the publishers in the US because many of them, particularly the bigger like EMI Music Publishing and Warner/Chappell, prefer to grant licenses directly to users like IFP. . . . For IFP this means that there is no guarantee that the individual publishers will be prepared to license at the HFA royalty rate. The record companies in the US do not have a collective organization that manages mechanical/reproduction licensing on their behalf.  Therefore, in theory, IFP will need to go to every record company and negotiate the license agreements it needs.

*Id.* ¶ 110.

On May 7, 2009, Isherwood met with Defibaugh and Borgeson at IFP USA's Los

---

[11] In 2009, IFP proceeded with a pitch to United Airlines.  Pls.' RSGD ¶ 140.  In February 2009, when United asked if IFP was licensed by HFA for AOD uses in the United States, Borgeson told United that it was.  Pls.' RSGD ¶ 141.  On February 12, 2009, Borgeson emailed Taverner and Defibaugh and told them that he was worried he had provided United with incorrect information regarding HFA licensing and stated, in part, "I suppose this could open a can of worms should they inquire directly with Harry Fox[.]"  Pls.' RSGD ¶ 142.  Isherwood responded the next day and told Borgeson: "I suspect that you have provided Jason with the wrong information so I would recommend that you try to stop him making contact with the Harry Fox Agency. . . . It would be best if I follow this up as Jason [from United] may accidentally set hares running that we cannot then contain."  Pls.' RSGD ¶ 143.  Borgeson responded: "I will ask that United wait for further information from you regarding their AOD licensing."  Pls.' RSGD ¶ 144.  Isherwood never contacted United to correct the information Borgeson provided regarding HFA licensing.  Pls.' RSGD ¶ 145.

[12] In addition, Defibaugh testified that the risk of continuing with the status quo in the U.S. without licenses in 2009 "was an unknown factor" because "there was no agreement in place[.]"  Pls.' RSGD ¶ 96.

Angeles office for an "intro into licensing" to give them an "understanding as to how licensing happens."  *Id.* ¶ 112; Goldman Decl. Ex. 567, Docket No. 373-3.  At the meeting, Isherwood reiterated that IFP needed license agreements that would cover all of IFP's uses, that IFP appeared to have no licenses in place, and that all of the record companies would need to be approached separately.  Pls.' RSGD ¶ 114.  He also told IFP that it was "quite exposed" in the United States even when using promotional copies of works.  *Id.* ¶ 115.  After the meeting, Isherwood told Defibaugh and Borgeson he would "contact the different labels, and talk to them to try and fashion agreements similar or some sort of . . . understanding as to what . . . should be paid" in order to "tak[e] a proactive action . . . to work with them to . . . rectify the situation."  *Id.* ¶ 113.

On May 19, 2009, Borgeson wrote to Isherwood and stated, in part, "we are concerned about [HFA] and how they diminish our abilities to duplicate and encode here in Los Angeles." *Id.* ¶ 100; *see also id.* ¶ 101.  On May 20, 2009, Isherwood told Borgeson, Defibaugh, and Taverner: "I met with my LA contact regarding US licensing for Inflight. I am expecting something from him this week. Even then it will take a while to conclude any arrangements with him."  *Id.* ¶ 92.  The same day, Defibaugh wrote to Taverner asking, in part, "Should we continue 'as is' for now and assume all existing and possibly new IFP USA audio work . . . will remain within the LA office under further direction?"[13]  *Id.* ¶¶ 102, 116.  Taverner responded that IFP USA should "[c]ontinue on. You know, we're making efforts to rectify the situation." *Id.* ¶ 117.  After the May 2009 meeting, Defibaugh was comfortable proceeding even though there were no licenses in place because IFP was "working proactively to put something in place." Goldman Decl. Ex. J at 181:4-11, Docket No. 379-2 at 58.  On May 22, 2009, Shadrick told Borgeson, "I know you share my feelings that we do not wish to see the LA office precluded from providing services purely due onerous licensing costs.  This will impact the growth of the audio department in LA which should not be. . . . Ian [Defibaugh] tells me that for now (right or wrong) we are maintaining the current status quo."  Pls.' RSGD ¶ 118.

In a September 2009, IFP pitched its services to American.  *Id.* ¶ 123.  In an internal email, under the heading "Risks," Defibaugh noted that "IFP doesn't have all record label

---

[13] Defibaugh later testified that moving audio production to the U.K. to service U.S. airlines would have been costly and inconvenient for IFP.  Pls.' RSGD ¶ 104.  Similarly, Shadrick testified that he and Borgeson wanted "to grow the business" in the L.A. office and it made more sense to service U.S. airlines out of the L.A. office.  Pls.' RSGD ¶ 106.

agreements in place" and "IFP doesn't have a solution for the Digital Streaming royalties," by which he meant "[w]e don't necessarily have the right to use it."  *Id.* ¶ 123.

In October 2009, Isherwood sent his first e-mail to UMG regarding IFP's licensing situation.  *Id.* ¶ 129; Goldman Decl. Ex. 2, Docket No. 370-4.  In that e-mail, Isherwood stated: "the licensing situation as a result of these relationships [by which IFP provided music to various airlines] is not clear and my role is to seek to regularise the situation. . . . [I]t is going to be necessary for [IFP] to contact the labels individually to put the necessary licenses in place and I am contacting you to do so with UMG."  Pls.' RSGD ¶ 129; Goldman Decl. Ex. 2, Docket No. 370-4.  The e-mail further stated that "the revenue in question has been limited to that earned for programme production, duplication, and encoding although all duplication and encoding takes place in the UK."  Pls.' RSGD ¶ 129; Goldman Decl. Ex. 2, Docket No. 370-4.  Isherwood sent e-mails with the same language to EMI, Sony, and Warner around the same time.  Pls.' RSGD ¶ 130.  Isherwood testified that because "[t]his was the first letter to a rights owner. And therefore in writing, I didn't want to come out as black and white, as I had done to the client . . . . I just felt as an opening salvo, I needed to be a little bit more cautious with the wording."  *Id.* ¶ 129.  He also testified that the statement that "all duplication and encoding takes place in the U.K." was incorrect and misleading and "could have been" misinterpreted to mean "this was really a U.K. issue and not an issue where there were unlicensed reproductions already occurring in the U.S."[14]  *Id.* ¶¶ 132, 135.

On October 15, 2009, EMI's Kevin Carson ("Carson") sent Isherwood an e-mail stating, in part, " . . . do you have a boilerplate license or standard deal terms that you've used for such a project before?  I certainly have no objection to licensing content for use on planes . . . but I haven't entered into such a deal before[.]"  *Id.* ¶ 276.  On October 27, 2009, Isherwood sent EMI a "boilerplate contract," as a "starting point," telling Carson "any contract between us would have to be checked by Inflight's US lawyers."  *Id.* ¶¶ 277-78.

In October 2009, Isherwood met with four people at UMG for about 45 minutes.  *Id.* ¶ 312.  Isherwood has no notes from the meeting and does not recall what was said at the meeting.  *Id.* ¶¶ 313-14.  Isherwood could not recall anyone from UMG affirmatively accepting anything he said at the meeting.  *Id.* ¶ 315.  Isherwood did recall, however, that "there was no

---

[14] Isherwood repeated the statement in subsequent e-mails to UMG as late as September 14, 2011.  Pls.' RSGD ¶ 136; Goldman Decl. Ex. I, Docket No. 379-1 at 263.

dissent on behalf of the four people in front of me from 15 percent being the norm for this type of exploitation." *Id.* ¶¶ 315, 404; *see also* Goldman Decl. Ex. J at 181:12-14, Docket No. 379-2 at 58 (indicating that by October or November 2009 IFP was aware that "15 percent which is basically what they were charging in the U.K., that's what Universal was happy with"). Isherwood never testified that anyone told him they would send him a contract at the meeting, only that he "was expecting" one. Pls.' SSSUF ¶ 405. Isherwood never communicated to IFP that UMG promised him a "contract," IFP had the right to use UMG's recordings, or UMG had excused any past unauthorized uses. *Id.* ¶ 317.

In February 2010, Isherwood told Taverner: "I have, very slowly (!), been working on getting agreements for the LA office. It is proving something of a struggle to get people's attention." *Id.* ¶ 158. On March 23, 2010, Isherwood told IFP regarding the status of U.S. licenses: "I am afraid at the moment there is nothing more to report. I have been chasing the main licensors over the past few months without managing to move the discussions forward." *Id.* ¶ 161.

Isherwood's second meeting with UMG was in May 2010. *Id.* ¶ 320. After this meeting with UMG, Isherwood told IFP that they needed "to talk through the consequences of" UMG's request that any license "break out" U.S. air carriers from one of IFP's U.K. licenses. *Id.* ¶ 322. Isherwood further stated: "I need information about the legal entity in L.A. in order to provide the information [UMG] need[s]." *Id.* ¶ 322. Isherwood never got back to UMG on the U.S. air carrier issue and never provided the information UMG requested. *Id.* ¶¶ 323-24.

Isherwood's first meeting with EMI was also in May 2010. *Id.* ¶ 279. His notes from that meeting state that EMI asked for IFP's "old playlists back to 2008," expressed concern about "touchscreen availability," asked for a delivery fee, demanded at least a $10,000 per year advance, and stated that "there are certain catalogs within [EMI's] repertoire that they are not in a position to license for this type of service." *Id.* ¶¶ 280-85.

IFP collected money from airlines for mechanical copyright licenses for programs made in IFP's U.S. office, but has not paid any of those sums to UMG. *Id.* ¶¶ 153, 194. On June 2, 2010, Isherwood suggested to IFP, in relation to HFA, that "offering some form of back-payment may help sweeten the deal" for rights holders. *Id.* ¶ 156. On May 4, 2011, Isherwood sent an email to Borgeson and others at IFP that stated, in part: "one of the sweeteners I have said to [EMI, UMG, and WMG] is that we will pay back royalties . . . . Being prepared to do that avoids

them trying to get heavy handed for not having a license in the first place." *Id.* ¶ 157.

In June 2010, Isherwood told IFP that EMI was "offering 15% of revenue pro rata" but that any agreement would "not cover the entire catalogue," such as The Beatles repertoire, and that EMI was "also looking for an advance." *Id.* ¶ 286. Isherwood further stated: "I now need to follow up on these but I am reasonably comfortable that these will get sorted. I have proposed that we go back to 01.01.08 by way of back payments for which I believe accruals are available." *Id.* ¶ 286. IFP did not send EMI the requested playlists back to 2008, did not disclose to EMI the number of reproductions of EMI's content that had taken place in IFP's U.S. office, and did not tell EMI about any particular EMI recording that had been copied or how many times any such work was copied. *Id.* ¶¶ 287-88, 290. In addition, IFP continued to use The Beatles, along with other EMI content, on its playlists. *Id.* ¶ 292.

On September 21, 2010, Isherwood sent e-mails to Christopher Curley at HFA, Bill Waddell at UMG, and Carson at EMI to follow up regarding conversations about licenses for IFP that had taken place in May. *Id.* ¶¶ 162-64. Isherwood proposed to HFA that IFP would "make retrospective payment of royalties on the same basis for the period back to 1st January 2008 as an attempt in part to rectify this situation." *Id.* ¶ 162. With respect to UMG and EMI, Isherwood indicated that IFP would not want to pay an advance in excess of $7,200 as to UMG or $2,400 as to EMI. *Id.* ¶¶ 163-64. Thereafter, Bill Waddell of UMG had a conversation with Isherwood in which he relayed that "it didn't seem like [they] were going to be able to get the deal done" because "the kind of money that [IFP] was willing to pay as an advance didn't make sense to the Universal Music Group." *Id.* ¶ 326.

By October 2010, Borgeson was frustrated that no written contract with UMG was forthcoming because he was concerned that IFP "would get jerked around by a label for three, four, five years, and then get sued by them." *Id.* ¶ 177. At some point, Defibaugh replaced Shadrick as head of IFP USA. *Id.* ¶ 172. In 2011, Defibaugh understood that, with regard to licenses from labels, still "nothing had been signed," and UMG wasn't responding to Isherwood's communications. *Id.* ¶¶ 179-80. On February 16, 2011, Sony accused United of infringing its music, and Defibaugh wrote to Borgeson: "This was bound to happen sometime. Hopefully Mark [Isherwood] has been continuing his work. Otherwise we could have a problem." *Id.* ¶ 181.

In May 2011, Isherwood arranged a meeting with Lisa Rogell ("Rogell"), the in-house

14

attorney at UMG who replaced Waddell. *Id.* ¶ 328.   On May 2, 2011, in advance of their meeting, Isherwood sent an e-mail to Rogell similar to the e-mail he sent to UMG back in October 2009 because he was "starting again." *Id.* ¶ 330.   Isherwood has no notes from his May 2011 meeting with Rogell and has no recollection of Rogell saying anything affirmative to him in that meeting. *Id.* ¶¶ 331-32.   Isherwood never testified that Rogell told him she would send him a draft contract at the meeting, only that he was "expecting" one. *Id.* ¶ 407.   Rogell described the meeting as a "hi, I want to come in and meet with you kind of meeting" that she barely recalled. *Id.* ¶ 333.   On June 8, 2011, Rogell sent Isherwood an email asking for the name of his client, which indicated to him that she "didn't even remember the name of the company" he represented. *Id.* ¶ 334.   On September 14, 2011, Isherwood responded with IFP's name and reiterated that "all duplication and encoding takes places in the UK." *Id.* ¶¶ 335-36.   Isherwood testified that following his September 14, 2011 e-mail to Rogell, he had no further communications with UMG until late 2013." *Id.* ¶ 337.

Also in May 2011, Isherwood met with Jarrett McGehee ("McGehee") of EMI. *Id.* ¶ 302.   On October 5, 2011, McGehee sent Isherwood what McGehee described as a "general template to get the ball rolling" and stated: "I know we'll need to tweak it a bit to match the specific services of your client and past accruals." *Id.* ¶ 303.   Isherwood felt that the template agreement "did not give [him] what [he] needed in terms of the principal elements of the contract." *Id.* ¶ 305.   Isherwood "never got back to [McGehee] on that agreement." *Id.* ¶ 307.   McGehee's October 5, 2011 e-mail was the end of Isherwood's communications with EMI; UMG announced that it was acquiring EMI the following month and the acquisition was completed the following year. *Id.* ¶ 308.   McGehee testified that he had no discretion to allow the use of EMI's works without a written license and no authority to grant a retroactive license for in-flight entertainment. *Id.* ¶ 311.

In December 2011, Borgeson, who was frustrated because "things were moving at a slow pace," even proposed to Defibaugh that they contact HFA and music labels directly. *Id.* ¶¶ 188, 191.   With respect to whether it ever occurred to him that IFP might never get U.S. licenses, Borgeson stated: "[D]id it occur to me? Well, of course it did. I told you I was upset about it. I mean, what do you think? . . . [Y]ou're telling me that after three, four years did it ever occur to you like I'm a dumbass?" *Id.* ¶ 193.

By 2012, Isherwood was receiving some inquiries from IFP about the status of his

licensing negotiations.  *Id.* ¶ 202; Goldman Decl. Ex. I at 425:7-10, Docket No. 379-1 at 247.  In May 2012, Isherwood told IFP regarding the "status of US record label licensing rights" that "[a]t the moment things have not moved any further forward.  I am now trying to chase everyone and when I have any further input I will let you know."  Pls.' RSGD ¶ 203.  On June 24, 2012, Isherwood told IFP, "I am still not able to get a clear answer in relation to the HFA fees.  They have still not provided me with a proposal for a license[.]"  *Id.* ¶ 267.  HFA did not provide Isherwood with any proposal after June 24, 2012.  *Id.* ¶ 268.

With Isherwood's knowledge, IFP proceeded with a pitch to American in 2012.  *Id.* ¶ 215.  Borgeson "didn't think that was wise" to disclose IFP's lack of licenses to American, but "it was up to Roger [Grange] who was doing the communication with American."  *Id.* ¶ 216.  In October 2012, Isherwood told Grange: "I have been slammed on another project most of the summer so most of the IFP stuff has not moved forward much."  *Id.* ¶ 217.   On November 7, 2012, IFP told Isherwood "we have gained the audio business for American Airlines and would like to make sure that we have the audio rights covered."  *Id.* ¶ 218.  On December 12, 2012, Borgeson wrote that Grange "has corresponded with Mark Isherwood regarding securing music licensing however that is an area that is still not resolved.  I may need you and Roger to put more pressure on Mark . . . or we will have to go in a different direction to get this resolved."  *Id.* ¶ 220.

On December 20, 2012, Grange told Isherwood: "Can I catch up with you on progress regarding AA Music licenses? . . . we are just over a month from our first onboard cycle and I want to make sure we have everything in order."  *Id.* ¶ 222.  Isherwood responded to Grange's December 20, 2012 email, in part: "I am afraid there hasn't been . . . However, I have been in 'discussions' with the labels and HFA on this for at least three years.  Whilst all of them want to give a license all of them have failed to provide documentation to support that.  So, should anyone get itchy about the AA launch, we would point to all the emails and meetings that I have had during that time."  *Id.* ¶ 223.

By January 2013, Robert Haxton ("Haxton") who became Managing Director of IFP Ltd. and IFP USA in 2012, was aware that Isherwood had not "progressed any further with concluding negotiations with U.S. record labels," that in the United States "enforcement of the IP rights is down to the individual rights owners," and that without a documented license agreement, any party could demand rates that the other party found "unrealistic," resulting in no

16

deal being reached; nonetheless, IFP continued its conduct based on its belief that "good faith discussions" were taking place. *Id.* ¶¶ 11, 212. On February 8, 2013, Isherwood wrote a letter to Phil Bauckham ("Bauckham"), who served as a financial executive at IFP Ltd. since 2003, stating, in part:

> [O]ver the last four or five years, I have been in on-going discussions with music publishing companies and record companies in the US to put the requisite licences in place. However, the level of royalty revenue involved in granting IFP these licenses is quite low and therefore getting the requisite paperwork put in place has consistently proved difficult. However, most importantly, this failure for the rights owners to fulfill these formalities does not in any way reduce IFP's obligations to seek and pay for appropriate licences. ***As things currently stand, IFP has no licences, which leaves it open to legal proceedings.*** In such an, albeit unlikely, event that proceedings are taken, having royalties accrued would mitigate IFPs position before a court. So for this reason, at the very least, IFP should make accruals going forward.
>
> . . . [W]hen going to rights owners in the US for a license, an explanation has to be given as to why licenses have not been put in place for preceding periods. . . . The reason for the rate of 25% of relevant revenue being the figure at which those accruals take place is because this represents an amount that is common as an upper limit of royalties across a number of territories where IFP has licenses. There may be variations on the specific royalty level on an agreement by agreement basis but this figure has proved over a long period of time to be appropriate for calculating overall liability. In my experience it is highly unlikely that in the US market, IFP will achieve a total royalty obligation of less than 25% of their relevant revenue. Indeed in the conversations I have had so far with music publishers and record companies, the respective royalty rates of 10% and 15% have been those discussed, ***even though the license agreements have not been finalised.***

*Id.* ¶¶ 12, 227-28 (emphases added).

IFP is not aware of any communications about licensing with UMG or UMPG other than those that Isherwood had with them. *Id.* ¶ 169. Isherwood testified that he communicated honestly and accurately to IFP, primarily by email, and that the core of what he told IFP was the same orally as in writing. *Id.* ¶¶ 170-71.

> *f.  Plaintiffs Send IFP a Cease-and-Desist Letter and IFP Replaces Isherwood*

Haxton testified that, after receipt of Plaintiffs' November 2013 cease-and-desist letter,

IFP decided to relocate its duplication operation to London and Singapore, where IFP "had the appropriate licenses." *Id.* ¶ 344. In other words, the only difference in IFP's operations was that after Borgeson curated a playlist in the Los Angeles office, he would "advise someone in a non-US office what he had devised, they would physically make the copies in a non-US office, and then they would ship those copies to the various airlines," "including airlines based in the US." Goldman Decl. Ex. H at 164:8-20, Docket No. 378-8 at 71.

In 2014, IFP replaced Isherwood with Iain Kemplay ("Kemplay"), another U.K.-based licensing consultant. Pls.' RSGD ¶¶ 239-40. Borgeson was asked to bring Kemplay up to speed when he started work for IFP and, on June 30, 2014, Borgeson wrote an internal email listing Kemplay's assignments. *Id.* ¶ 241. Under the headings "Audio On Demand" and "Licensing issue," Borgeson wrote, "Negotiate individual major label licensing. Secure Major Record Label CD Agreements." *Id.* ¶ 241.

### 2. IFP's Motion and Plaintiffs' Cross-Motion

With respect to IFP's Motion and Plaintiffs' Cross-Motion, the parties discuss some facts already set forth *supra* and also set forth some additional undisputed "facts," citing to evidence submitted in support of both Plaintiffs' Motion and IFP's Motion. In addition, Plaintiffs have incorporated, in its entirety, the summary of uncontroverted facts set forth in their Motion. *See* Opp'n to IFP's Mot. at 4:21-23. The following is a summary of the facts that are supported by the record and which IFP contends are relevant to IFP's estoppel and statute of limitations counterclaims. This summary repeats some facts set forth *supra*, which IFP separately proffers in the context of its Motion:

Plaintiffs and IFP Ltd. entered into a tolling agreement effective as of November 14, 2013. IFP's Resp. to Pls.' Supp'l Facts ("IFP's RPSF") ¶ 1, Docket No. 416-2. Plaintiffs entered into a tolling agreement with IFP USA and Global Eagle effective as of November 26, 2013. *Id.*

#### a. UMG

Waddell and Bruce Resnikoff ("Resnikoff") of UMG testified that they were aware of the existence of in-flight audio entertainment and the existence of non-exclusive licenses between UMG and certain companies, but not that they were somehow aware of IFP's use of UMG music for in-flight entertainment based on their observations of in-flight entertainment, as IFP suggests. *See id.* ¶ 2(a)(i); Waddell Depo. Tr. at 68:1-70:17, Docket No. 432-2 at 17-19; Resnikoff Depo.

Tr. at 93:11-94:15, Docket No. 374-8 at 3-4.  In addition, UMG was aware that certain other content service providers ("CSP") at times used UMG's content without a license to do so; UMG took action to contact the CSPs and stop such infringement.  IFP's RPSF ¶ 2(a)(ii)-(iv).

As set forth *supra*, Isherwood reached out to UMG in October 2009, describing in general (and somewhat inaccurate) terms the nature of IFP's business and its licensing needs.  *See id.* ¶ 2(b)(iv).  Isherwood stated that "the bulk of the audio programmes are made and duplicated" in London, that IFP had "an office in Los Angeles which makes programmes for a dozen or so airlines," and that his role was to "regularize" the licensing situation, which was "not clear."  *See id.*; Ex. 2 at Docket No. 370-4.  Isherwood made similar statements to UMG in the months and years that followed.  *See, e.g.*, *id.* ¶ 2(b)(v),(viii).  At the October 23, 2009 meeting with UMG representatives, there was no dissent from UMG that "15% [was] the norm for this type of exploitation.  *See id.* ¶ 2(b)(vi).

Isherwood sent several e-mails to Waddell between October 2010 and April 2011 seeking to "pick up this issue again" and to "move the licensing of [IFP] forward."  *See id.* ¶ 5(b)(i).  Waddell left UMG in December 2010 and was replaced by Rogell, which Isherwood learned in May 2011.  *See id.* ¶ 5(b)(i)-(ii).  Isherwood then contacted Rogell to continue licensing discussions, using the same language as he used in his initial introductory e-mail to UMG.  *See id.* ¶ 5(b)(ii).  Isherwood had a meeting with Rogell in May 2011.  *See id.* ¶ 5(b)(iii).  Isherwood testified that he had no recollection of Rogell saying anything affirmative to him at the meeting, but that there was "no objection" to a 15% license fee.  *See id.*  Following the meeting, Rogell asked Isherwood the name of the company he was representing and stated that UMG was "trying to move forward since our meeting."  *See id.* ¶¶ 5(b)(iv), 8(a).  In September 2011, Isherwood e-mailed Rogell to reintroduce himself, repeating the same statements he previously made regarding IFP.  *See id.* ¶ 5(b)(v).

### b. EMI

EMI is not aware of any licenses it entered into content service providers between 2000 and 2008.  *See id.* ¶ 3(a)(i).  On October 12, 2009, Isherwood e-mailed EMI a similar message as it sent to UMG, which described in general (and somewhat inaccurate) terms the nature of IFP's business and its licensing needs.  *See id.* ¶ 3(b)(i).  Isherwood stated that IFP had a Los Angeles office that "makes programmes," which were duplicated and encoded primarily in London pursuant to IFP's U.K. licenses, and that "some encoding" took place in the United States

"mainly with regard to audio-visual programmes." *See id.* On October 27, 2009, Isherwood e-mailed EMI's Kevin Carson ("Carson") a "boilerplate contract," per Carson's request, and stated: "I am a little surprised that you have not come across a deal like this before. There are other inflight companies operating in the US, one of which is called Spafax." *See id.* ¶ 3(a)(ii), (b)(ii).

Between November 2009 and April 2010, Carson asked Isherwood several questions, which went unanswered, and discussed possible advances for IFP's use of EMI's works. *See id.* ¶ 3(b)(iii)-(iv). On May 5, 2010, Isherwood and Carson met to again discuss possible license terms, and Carson expressed that EMI had some concerns with any potential license. *See id.* ¶ 3(b)(v). On September 21, 2010, Isherwood wrote to Carson, reiterating prior statements regarding the nature of IFP's business practices and discussing possible license terms. *See id.* ¶ 3(b)(vi). Isherwood again e-mailed Carson on April 14, 2011 to "move the licensing of [IFP] forward." *See id.* ¶ 6(b)(i). Carson directed Isherwood to communicate with McGehee moving forward. *See id.* Between May 2011 and October 2011, Isherwood and McGehee engaged in communications regarding potential licenses. *See id.* ¶¶ 6(b)(ii), 9(a). During this time, McGehee sent a "general template" to Isherwood as "a start"; he also and made several requests and voiced some concerns, all of which went unanswered and unaddressed. *See id.*

### c. UMPG

HFA did not have authority to enter into a license agreement on behalf of UMPG or any other member, but would negotiate with content service providers and share the results with its members, who would decide whether to opt in or opt out. *See id.* ¶ 4(a)(i). In 2008 and 2009, HFA had discussions with other content service providers (including Spafax) regarding licenses, but those communications did not mention the use of UMPG content or that the providers were already operating in the United States without a license. *See id.* ¶ 4(a)(ii)-(iv). An internal HFA e-mail from December 19, 2009 discussed HFA's analysis of the inflight audio entertainment industry and stated that "it isn't totally clear exactly who does what in this transaction." *See id.* ¶ 4(a)(v).

In October 2008, an e-mail conversation took place between Spafax, a foreign rights society in the Middle East, and Senior Vice President of Copyright for UMPG Ed Arrow ("Arrow"), in which Arrow was asked whether Spafax had some kind of valid worldwide license for the use of UMPG's works on certain Middle East-based airlines. *See* ¶ 4(b)(i). Arrow

forwarded the e-mail chain to HFA's Eric Scott ("Scott"), later noting to Scott that Spafax's website indicated it provided services to certain U.S.-based airlines.  *See id.*

Between November 2008 and September 2011, Isherwood communicated with various individuals at HFA about obtaining licenses for the use of musical works in in-flight entertainment; Isherwood stated that IFP "does programming" in the United States and that "most programme production and all duplication" took place in the U.K., but never indicated that IFP was using UMPG's works.  *See id.* ¶¶ 4(c)(i)-(iv), 7(b)(ii)-(iii).  During this time, HFA was internally working on creating a "standard contract" for inflight entertainment.  *See id.* ¶ 7(b)(ii)-(iii).

Isherwood never communicated with UMPG about musical composition licenses for IFP, and has no idea whether HFA even communicated to UMPG about IFP.  *See id.* ¶ 4(a)(i) (citing Pls.' RSGD ¶¶ 248-50).

### C. Discussion

#### 1. Plaintiffs' Motion

##### a. IFP Is Liable for Copyright and State Law Infringement

The current Copyright Act protects, *inter alia*, sound recordings created on or after February 15, 1972.  *See* 17 U.S.C. §§ 102, 114, 301(c); *U.S. v. Moghadam*, 175 F.3d 1269, 1271 (11th Cir. 1999).  Sound recordings created prior to February 15, 1972 ("pre-1972 works") receive equivalent protection under state law.  *See, e.g.,* Cal. Civ. Code § 980(a)(2); *A&M Records, Inc. v. Heilman* ("*Heilman*"), 75 Cal.App.3d 554, 560-61, 564, n.6 (1977).

To establish a prima facie case of copyright infringement, a plaintiff "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012) (quoting *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) and *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  "The word 'copying' is shorthand for the infringing of any of the copyright owner's [six] exclusive rights."  *Id.* at 1153-54 (quoting *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n. 3 (9th Cir. 1989).  Among the exclusive rights granted to a copyright owner under the Copyright Act are the exclusive rights to reproduce, prepare derivate works based upon, distribute, and perform copyrighted works.  *See* 17 U.S.C. § 106(1)-(3), (6).  State law is analogous for pre-1972 works.  *Heilman*, 75 Cal.App.3d at 560-61, n.6; *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725 (9th

Cir. 1984); *Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693 PSG RZX, 2014 WL 4725382, at *4-9 (C.D. Cal. Sept. 22, 2014).

i.  Ownership and "Copying"

IFP does not contest Plaintiffs' ownership of the works that are the subject of the parties' stipulation regarding ownership.  *See* Opp'n to Pls.' MSJ at 26:3-4; *see also* Goldman Decl. Ex. W, Docket No. 379-1; Ramsey Decl. Ex. HH, Docket No. 400-7 at 144-49.  In addition, IFP does not contest Plaintiffs' claim that IFP made a copy of Plaintiffs' works, except as to works identified in Exhibit X to the Goldman Declaration as appearing on US Airways playlists.  *See* Opp'n to Pls.' MSJ at 26:4-9.  IFP contends that because it only began servicing US Airways in April 2014 (once US Airways was acquired by American Airlines), and the works that IFP then copied are also reflected on the American playlists, "works appearing only on US Airways playlists should not be part of this case."  *See id.*; *see also* Decl. of Kevin Bolt ("Bolt Decl") ¶ 2, Docket No. 400-3 (indicating that IFP USA began servicing US Airways in April 2014, the content IFP supplied to US Airways since that time is reflected on American's playlists, and the content reflected on US Airways playlists prior to April 2014 was not supplied by IFP).

Plaintiffs note, however, that IFP has produced documents indicating that it serviced US Airways prior to 2014.  *See* Reply ISO Pls.' MSJ at 10 n. 13, Docket No. 419.  For instance, IFP produced US Airways playlists dating back to 2010 in response to a request for production requesting, among other documents, playlists that reflect the identities of works IFP "provided to any air carrier."  *See* Pls.' SSSUF ¶ 409, Docket No. 419-2.  IFP also produced an agreement with US Airways from 2011, *see id.* ¶ 410, and there is no evidence that IFP has ever contended that this agreement was not serviced by at least one of the defendants in this case.  In any event, this issue involves at most 234 works, of which 141 were used for a US Airways playlist from March to April 2014.  *See id.* ¶ 413.

Given the factual dispute presented by the evidence on this issue, the Court cannot conclude that the works reflected on US Airways playlists prior to April 2014 were supplied by IFP.  Accordingly, Plaintiffs would not be entitled to summary judgment with respect to their infringement claims to the extent those claims are based works that appeared on US Airways playlist prior to April 2014.  However, it is not clear to the Court why, as IFP argues, "[w]orks appearing only on US Airways playlists should not be part of this case."  It seems that if a work is reflected on a US Airways playlist in or after April 2014, but not on an American playlist, it

22

seems IFP has not and would not dispute that it made a copy of that work.  IFP's contention is particularly perplexing in light of its statement that the works it copied in servicing US Airways in or after April 2014 (*i.e.*, once American acquired US Airways) "are reflected on the American playlists," which appears to not always be the case.  The parties should address this issue at the hearing.

> ## ii.  Infringement

Although IFP has conceded ownership and "copying," IFP argues that it has not infringed Plaintiffs' exclusive rights as copyright owners as to most works.  *See* Opp'n to Pls.' MSJ at 26:23-30:21.  IFP concedes that it would be liable for infringement as to those works where both the .wav file and the encoded deliverable were created in the United States, assuming that Plaintiffs defeat all of IFP's affirmative defenses.  *Id.* at 29:16-21.

Here, IFP's actions directly infringed Plaintiffs' rights as to those works where (1) a .wav file was created in the United States, (2) an encoded deliverable was created in the United States, *or* (3) an encoded deliverable was made outside of the United States and then delivered to a party inside the United States.  IFP infringed Plaintiffs' exclusive reproduction rights by copying Plaintiffs' music onto CDs, DVDs, and computer hard drives.[15]  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (defendant's "loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act"); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F.Supp.2d 349, 350 (S.D.N.Y.  2000) (indicating that the defendant's unauthorized copying of the plaintiffs' copyrighted CDs onto computers, so that it could replay the recordings for subscribers, "ma[de] out a presumptive case of infringement").  In addition, IFP infringed Plaintiffs' exclusive distribution rights (where the distribution originated in the United States) or importation rights[16] (where the distribution originated

---

[15] IFP contends that Plaintiffs' claims fail to the extent Plaintiffs assert infringement from the internal creation of a .wav file because (1) Plaintiffs' FAC did not put IFP on notice of such a claim, and (2) IFP's .wav copies are "intermediate" or "shape shifting" copies that do not constitute infringement because Plaintiffs have not "demonstrated a substantial harm to the value of their copyrights" from IFP's internal copying.  *See* Opp'n to Pls.' MSJ at 27:3-16 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 916, 921 (2d Cir. 1994).  However, not only does Plaintiffs' FAC adequately encompasses these claims, *see, e.g.*, FAC ¶¶ 31-32, Docket No. 108, but IFP's "shape shifting" argument is an inappropriate attempt to assert a fair use affirmative defense at this late stage.  *See Am. Geophysical Union*, 60 F.3d at 916 (analyzing whether institutional, systematic photocopying of scientific articles constituted fair use).

[16] The unauthorized importation of copies into the United States constitutes an infringement of the exclusive right to distribute copyrighted works.  17 U.S.C. § 602(a)(1).  A plaintiff must satisfy three requirements to state an infringement claim under Section 602: "(1) plaintiff must be the 'owner of copyright' in the work in question; (2)

overseas) by sending copies of Plaintiffs' music to airlines for use as in-flight entertainment.[17] The Court does not reach the question of whether IFP infringed Plaintiffs' exclusive performance rights because any works implicated in performance-related infringement are covered by IFP's other infringement.

### iii.  Willfulness

"In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000" for all infringements of any one work. *See* 17 U.S.C. § 504(c)(1)-(2).   Enhanced statutory damages for willfulness are intended to "'sanction and vindicate the statutory policy' of discouraging [copyright] infringement," *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990) (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952)), and "may be necessary in a particular case to prove that it 'costs less to obey the copyright laws than to violate them,'" *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 514 (7th Cir. 1994) (citation omitted).

A plaintiff sustains its burden of proving willfulness "by showing [the] defendant knew

---

copies of the work must have been imported into the United States 'without the authority of the owner of copyright'; and (3) the imported copies must have been 'acquired outside the United States.'" *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1384 (C.D. Cal. 1993) (quoting 17 U.S.C. § 602(a)(1)).  All three elements are satisfied here.

[17] IFP contends that it is not liable for infringement where it imported works reproduced outside of the United States because it "had the right to distribute the works copied abroad throughout the world." *See* Opp'n to Pls.' MSJ at 28:16-20 (citing Pls.' RSGD ¶ 354, Docket No. 424).  For musical compositions, IFP identifies only a U.K. license from "MCPS," the Mechanical-Copyright Protection Society Ltd., which limits distribution to "means only of rental" to customers within the "European Economic Area." *See* Ex. 87 at § 2.1(d), Docket No. 432-2 at 116.  For sound recordings, IFP identifies only a U.K. license from "PPL," Phonographic Performance Ltd., which authorizes IFP to "Encode Masters and to authorize the Loading of Encoded Masters in the form of Programmes and/or Sound Recordings on to Aircraft Databases throughout the world," "[s]ubject to the terms and conditions of this Licence and for the sole purpose of providing the Service." *See* Ex. 517 at § 3.1(d), Docket No. 440-1 at 23.  With respect to the PPL license, however, IFP has provided no evidence that Plaintiffs authorized PPL to grant such rights for the U.S. territory, and Plaintiffs' evidence indicates that Plaintiffs have not authorized PPL to grant rights for the U.S. territory in the Plaintiffs' works. *See* Pls.' SSSUF ¶ 414, Docket No. 419-2 (citing Decl. of Sheryl Gold ¶¶ 3-4, Docket No. 419-4).

In addition, IFP witnesses testified that much of IFP's overseas copying – all AOD encoding and, at least after December 2013, a significant amount of broadcast encoding – took place in Singapore, not in the U.K. *See id.* ¶ 402; *see also, e.g.*, Grange Dep. Tr. at 228:19-230:4 ("majority of encoding . . . was done in either the UK or in our Singapore office") Docket No. 419-3 at 13-15; Borgeson Dep. Tr. at 98:5-108:17 (all of IFP's AOD encoding and digital broadcast encoding was done in Singapore, but analog broadcast encoding was done in Singapore), Docket No. 419-3 at 65-75; Bolt Dep. Tr. at 138:18-139:3 (stating that all or most of the copying work was transferred to Singapore after December 2013, although he "assumed that the UK was helping out"), Docket No. 419-3 at 41-42.  Neither party has proffered evidence that any particular work was encoded in any particular location.

or should have known it infringed [the plaintiff's] copyrights. . . . Willful does not mean malicious, rather, it means with knowledge, whether actual or constructive." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F.Supp.2d 1164, 1173 (E.D. Cal. 2006) (quoting *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1543 (S.D.N.Y. 1991)); *accord Peer Int'l*, 909 F.2d at 1335. "Alternatively, willfulness is shown where 'the defendant recklessly disregarded the possibility that its conduct represented infringement.'" *Id.* (citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001); *Sega Enters. Ltd. v. MAPHIA*, 948 F.Supp. 923, 936 (N.D.Cal. 1996)). Although the determination of willfulness generally requires an assessment of a party's state of mind and is ordinarily a question of fact reserved for the jury, "where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment." *See id.* (citing, among others, *Peer Int'l*, 909 F.2d at 1335-36; *Sega Enters.*, 948 F.Supp. at 936).

Here, even drawing all reasonable inferences in IFP's favor, Plaintiffs have proffered ample evidence, as set forth *supra*, demonstrating that IFP knowingly infringed thousands of Plaintiffs' copyrighted works over a period of several years, consciously and repeatedly making the business decision to continue its unauthorized use of Plaintiffs' works. *See, e.g.*, Pls.' RSGD ¶¶ 17-21, 25-27, 29, 37-38, 44-46, 48, 50-51, 53, 77, 100-01, 114-15, 117-18, 153, 156-57, 159, 161, 179-81, 193-94, 203, 212-14, 223, 227-28, 267-68, 292, 317, 344. "To refute evidence of willful infringement, [a defendant] must not only establish its good faith belief in the innocence of its conduct, it must also show that it was reasonable in holding such a belief." *Peer Int'l*, 909 F.2d at 1336. IFP contends that "[t]he extensive record of Isherwood's communications with [Plaintiffs], his reportings to IFP, and IFP's internal understanding demonstrate that IFP had a good faith, reasonable belief that its use of [Plaintiffs'] works was authorized." *See* Opp'n to Pls.' MSJ at 39:19-21. The record before this Court simply does not demonstrate that IFP believed its use of Plaintiffs' works was authorized, let alone that any such belief could have been reasonable under the circumstances. To the contrary, IFP collected money from airlines for copyright licenses in anticipation that it would one day need to make amends for its unauthorized use of Plaintiffs' works, continued to attempt to negotiate licenses with Plaintiffs, and failed to successfully put any licenses in place for their use of Plaintiffs' works. As Plaintiffs aptly state, "[i]f IFP's infringements were not willful, no infringements could ever be." *See* Pls.' MSJ at 1:19-20

       *b.   Plaintiffs Are Entitled to Summary Judgment on IFP's Affirmative Defenses of License, Implied License, Waiver, and Preemption by the Airline Deregulation Act*

As indicated *supra*, IFP has withdrawn its defense of consent and does not challenge Plaintiffs' Motion with respect to its defenses of failure to state a claim, laches, unclean hands, and abandonment.  *See* Opp'n to Pls.' MSJ at 2 n.2, Docket No. 400.  Beyond those affirmative defenses, Plaintiffs have also moved for summary judgment with respect to IFP's affirmative defenses of oral license or authorization, implied license, waiver, and preemption by the Airline Deregulation Act, 49 U.S.C. § 41713.  *See* Pls.' MSJ at 24:20-27:5, Docket No. 441.  Plaintiffs are entitled to summary judgment with respect to each.

### i.   Oral License and Implied License

"While [a] copyright owner can sell or license his rights to someone else, section 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 556 (9th Cir. 1990) (citing 17 U.S.C. § 204(a)).   Section 101 of the Copyright Act carves out a narrow exception to that rule for nonexclusive licenses. *See id.* at 558, n.2 (citing 17 U.S.C. § 101).  "[A] nonexclusive license may be granted orally, or may even be implied from conduct." *Id.* at 558.  "A copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for copyright infringement, and it may sue only for breach of contract."  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999)).

"[A]n implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (quotations and citations omitted).   Courts typically find implied licenses "only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000)) (alterations in original).

IFP contends that a reasonable trier of fact could conclude that a Plaintiffs orally granted

IFP nonexclusive licenses because "[t]he parties agreed on the license fee (or method of calculation), the scope of the license (to cover IFP's U.S. operations) and retroactivity to January 1, 2008." *See* Opp'n to Pls.' MSJ at 37:2-6.   IFP further contends that, in determining whether "the totality of the evidence" supports IFP's position, a trier of fact could look to the terms of UMG's agreement with another content service provider, the draft agreement exchanged between EMI and IFP, HFA's licenses with other service providers, and international rates and terms for content service providers (*i.e.*, IFP's PPL and MCPS agreements). *See id.* at 37:6-16. In other words, IFP apparently contends that it would be proper for a trier of fact to create licenses (licenses which, as the record demonstrates, IFP was never able to secure) by piecing together (1) IFP's negotiations with Plaintiffs and (2) the terms of other license agreements. Simply put, based on the evidence before the Court, a reasonable factfinder could not conclude that Plaintiffs granted IFP either an oral or implied license.   At best, there is evidence that the parties discussed various terms, but never reached any final agreements.   As such, the Court would grant Plaintiffs' Motion with respect to IFP's affirmative defenses of license and implied license.

ii.  Waiver

"In copyright, waiver or abandonment of copyright occurs only if there is an intent by the copyright proprietor to surrender rights in his work." *A&M Records, Inc.*, 239 F.3d at 1026. Generally, "an overt act evidencing such an intent is necessary to establish abandonment." *See Wyatt Tech. Corp. v. Malvern Instruments Inc.*, No. CV 07-08298DDP(MANX), 2009 WL 2365647, at *11 (C.D. Cal. July 29, 2009), aff'd, 526 F.App'x 761 (9th Cir. 2013) (citing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960)).   "Under the view requiring an overt act, mere inaction would not constitute a manifestation of an intent to abandon."   Nimmer on Copyright (2009) § 13.06 (citing *Hampton*, 279 F.2d at 103-04 (finding that copyright was not abandoned where copyright holder did not attempt to enforce its copyright for over twenty-five years)).

IFP contends a trier of fact could reasonably conclude that Plaintiffs relinquished their rights by (1) "knowingly permitt[ing] IFP to continue using [their] works in the U.S. while the parties were negotiating and documenting the licenses that [Plaintiffs] said [they] would issue," (2) "fail[ing] to issue a cease and desist to IFP," (3) failing to "object to (or reserve rights regarding) IFP's ongoing use of its works," and (4) discussing with IFP its use of Plaintiffs'

27

works and possible license terms.  *See* Opp'n to Pls.' MSJ at 35:5-36:5.  As an initial matter, there is no evidence that Plaintiffs ever affirmatively indicated that they would issue licenses; rather, the parties merely discussed possible license terms.  Moreover, there is no evidence that Plaintiffs ever engaged in an overt act evidencing their intent to waive their rights.  As such, the Court would grant Plaintiffs' Motion with respect to IFP's affirmative defense of waiver.

iii.  Preemption by the Airline Deregulation Act

IFP contends that Plaintiffs' state law infringement claims are preempted by the Airline Deregulation Act.  *See* Opp'n to Pls.' MSJ at 37:18-38:1.  The Court previously considered, in determining whether the Deregulation Act preempts Plaintiffs' § 980(a)(2) claim, whether the provision of in-flight entertainment is a "service" under the Deregulation Act and, if so, whether § 980(a)(2) relates to the provision of such a service.  *See* Order Denying Defs.' Mot. to Dismiss at 14-17, Docket No. 106.  The Court concluded as a matter of law that "even if in-flight entertainment qualifies as a service as that term is used in the Airline Deregulation Act, any connection between the service and § 980(a)(2) is too tenuous and remote to justify preemption."  *Id.* at 17.

Nonetheless, IFP contends that "there is now an abundance of evidence demonstrating that the connection between [in-flight entertainment] (and, specifically, the use of pre-1972 works for [in-flight entertainment]) and the state law claims at issue is substantial."  *See* Opp'n to Pls.' MSJ at 38:17-19.  This purported "abundance of evidence" evidence is that Plaintiffs' pre-1972 sound recordings account for 20% of the sound recording that Plaintiffs claim IFP infringed, *see id.* at 38:21-39:2, which does not impact the Court's legal determination that the Deregulation Act did not preempt Plaintiffs' § 980(a)(2) claim.  As such, the Court would grant Plaintiffs' Motion with respect to IFP's affirmative defense of preemption.

c.  *Plaintiffs Are Entitled to Summary Judgment on IFP's Counterclaims*

IFP has asserted four counterclaims against Plaintiffs: (1) intentional misrepresentation, (2) fraudulent concealment, (3) negligent misrepresentation, and (4) intentional interference with contractual relations.  *See* SACC, Docket No. 363.  Plaintiffs are entitled to summary judgment with respect to each.

i.  Fraud-Based Claims: Intentional Misrepresentation, Fraudulent Concealment, and Negligent Misrepresentation

*Intentional Misrepresentation*:  To establish fraud, a party must proffer evidence of (1) a

28

knowingly false representation or fraudulent omission by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages.  *See, e.g.*, *Small v. Fritz Cos., Inc.*, 30 Cal.4th 167, 173 (2003).

*Negligent Misrepresentation*:   The elements required for fraud and for negligent misrepresentation are very similar, but "the state of mind requirements are different" in that "[n]egligent misrepresentation lacks the element of intent to deceive."  *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Intrieri v. Superior Court*, 117 Cal.App.4th 72, 85 (2004)).  Also unlike fraud, "negligent misrepresentation does not require knowledge of falsity," *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 243 (2007), but does require "a positive assertion to show a misrepresentation of material fact; an omission or an implied assertion will not suffice," *Cutler v. Rancher Energy Corp.*, No. CV 13-00906 DOC, 2014 WL 1153054, at *7 (C.D. Cal. Mar. 11, 2014).  Importantly, California law does not recognize a claim for negligent misrepresentation on the basis of a false promise; a negligent misrepresentation claim can be based only on a false statement concerning a past or existing fact.  *See Tarmann v. State Farm Mut. Auto Ins. Co.*, 2 Cal.App.4th 153, 158 (1991) ("To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts.  Predictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.").

*Fraudulent Concealment*:   "There are four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."  *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997) (quoting *Heliotis v. Schuman*, 181 Cal.App.3d 646, 651 (1997) (internal quotation marks omitted)).

Plaintiffs contend that IFP's three fraud-based counterclaims "are deficient for numerous reasons, including because there is no evidence of any misrepresentation, actual reliance (let alone *justifiable* reliance), or of any legally cognizable damages proximately caused by Plaintiffs' alleged actions."  *See* Pls.' MSJ at 31:11-14 (emphasis in original).  Plaintiffs further contend that IFP's "intentional misrepresentation and concealment claims also fail because there is no evidence Plaintiffs acted with fraudulent intent."  *See id.* at 31:14-16.  The Court agrees.

29

As set forth herein, there is ample evidence that IFP knew it had no licenses from Plaintiffs and that it could be sued for copyright infringement, and no evidence that Plaintiffs ever indicated to IFP that any such licenses were forthcoming or misrepresented any existing fact.  Given this record, no reasonable factfinder could find that IFP's "expectation" that it would receive licenses from Plaintiffs was justifiable.  In addition, although the parties were engaged in discussions regarding potential licenses at various times, there is no evidence that Plaintiffs ever agreed to permit IFP to continue its reproduction and distribution of the sound recordings and compositions while secretly intending to sue IFP for damages in excess of any agreed-upon royalty.  Finally, IFP fails entirely to address Plaintiffs' argument that, with respect to these claims, IFP has suffered no legally cognizable damages that were proximately caused by Plaintiffs' alleged actions.  For these reasons, the Court would grant Plaintiffs summary judgment on IFP's three fraud-based counterclaims.

#### iv.  Intentional Interference with Contractual Relations

"In order to prove the tort of intentional interference with contractual relations, the California Supreme Court has made clear the basic elements that plaintiff must establish: (1) it has a valid and existing contract with a third party; (2) defendants had knowledge of the contract; (3) defendants committed an intentional act designed to induce a breach or disrupt the contractual relationship; (4) actual breach or disruption of the contract relationship occurred; and (5) damages were suffered as a result."  *Sebastian Int'l, Inc. v. Russolillo*, 162 F.Supp.2d 1198, (C.D. Cal. 2001) (citing *Quelimane Co. Inc. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1998); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990)).  "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself."  *Quelimane Co.*, 19 Cal.4th  at 55 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 344 (1997)).

Plaintiffs contend that IFP's "counterclaim for interference with contract is baseless for multiple reasons, including the same reasons this Court already twice dismissed it."  *See* Pls.' MSJ at 31:16-17.  More specifically, Plaintiffs argue that their "actions did not cause a breach or disruption of IFP's airline contracts, or any cognizable, nonspeculative harm to IFP," and that "this claim is predicated on 'cease and desist' communications and litigation activity that are absolutely protected by the *Noerr-Pennington* doctrine and the California litigation privilege."

30

*See id.* at 31:18-21.

IFP counters that the *Noerr-Pennington* doctrine does not apply because Plaintiffs' November 20, 2013 cease-and-desist communication was objectively baseless.  *See* Opp'n to Pls.' MSJ at 44:8-17.  IFP also contends that Plaintiffs "upped the *ante*" by informing IFP's airline customers (specifically, American and United) that IFP's use of Plaintiffs' works was not authorized, and that "part and parcel" of these communications was Plaintiffs' claims against American and United based on their use Plaintiffs' works, which triggered indemnity claims against IFP.  *See id.* at 44:18-45:4.

Here, IFP's counterclaim is barred by the *Noerr-Pennington* doctrine and the California litigation privilege.  Contrary to IFP's assertion, the record amply supports that Plaintiffs' cease-and-desist letter was not objectively baseless and is therefore privileged.  The other actions on which IFP bases this claim were, at least, "incidental to a lawsuit" and are therefore privileged as well.  In addition, IFP has not pointed to any action by Plaintiffs that caused an "actual breach or disruption" of IFP's contracts with American or United.  As such, the Court would grant Plaintiffs summary judgment on IFP's counterclaim for intentional interference with contractual relations.

### 2.   IFP's Motion and Plaintiffs' Cross-Motion

The parties have each moved for summary judgment with respect to IFP's affirmative defenses of statute of limitations and estoppel.  *See* IFP's MSJ, Docket No. 432; Opp'n to IFP's MSJ, Docket No. 397-4.  Plaintiffs are entitled to summary judgment on both defenses.

#### a.   *Plaintiffs Are Entitled to Summary Judgment on IFP's Statute of Limitations Defense*

Here, Plaintiffs' claims are subject to three-year limitations periods.  *See* 17 U.S.C. § 507(b); Cal. Civ. Code § 338(a); *Bridge Publications, Inc. v. Vien*, 827 F.Supp. 629, 634 (S.D. Cal. 1993) (applying three-year statute per § 338(a) to "copyright claims based on Cal. Civ. Code § 980(a)(2)"); *Garcia v. Coleman*, 2008 WL 4166854, at *9 n.4 (N.D. Cal. Sept. 8, 2008).

A copyright claim accrues when "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for his claim."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1969, n.4 (2014).  This is an "actual or constructive knowledge" standard.  *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 615 (7th Cir. 2014).  Under the "separate accrual" rule, "each infringing act starts a new limitations period"

31

for each distinct work, with its own statute of limitations.  *Petrella*, 134 S.Ct. at 1969); *accord* Docket No. 334, at 18 n.77.

IFP contends that Plaintiffs infringement claims are time-barred where the alleged infringement occurred prior to November 14, 2010 as to IFP Ltd. and prior to November 26, 2010 as to IFP USA and Global Eagle, three years prior to the dates on which the parties' tolling agreements took effect.  *See* IFP's MSJ at 16:27-17:3, 19:19-20.  IFP argues that "no trier of fact could reasonably conclude that by November 14, 2010, Plaintiffs did not know and could not have discovered facts sufficient to assert the copyright claims they are now asserting (insofar as pre-November 14, 2010 claimed infringements are concerned)."  *See id.* at 18:23-26.

The evidence before the Court does not support IFP's position.  To the contrary, the evidence illustrates that Isherwood's intentionally vague communications with UMG and EMI prior to November 2010 did not include accurate descriptions of IFP's business practices and did not indicate that IFP was already using Plaintiffs' works.  As to UMPG, there is no evidence that Isherwood ever communicated with UMPG or that his attempts to secure licenses through HFA were ever relayed to UMPG.  And, in any event, Isherwood's communications with HFA did not include accurate descriptions of IFP's business practices and did not indicate that IFP was already using UMPG's works.

IFP argues that its "open and notorious" use of Plaintiffs' works on airlines "was itself sufficient to put Plaintiffs on inquiry notice for purposes of triggering the statute of limitations," a contention that appears to be premised on the fact that certain of UMG's executives occasionally traveled by plane and observed that in-flight entertainment existed.  *See* IFP's MSJ at 18:26-28; IFP's RPSF ¶ 2(a)(1).  IFP also attempts to argue that Plaintiffs "actually knew" of IFP's infringements in light of evidence involving the activities of *other* content service providers.  *See* IFP's MSJ at 19:3-9.  These arguments are unavailing.  The Court would grant summary judgment to Plaintiffs on IFP's statute of limitations defense.

> *b.*   *Plaintiffs Are Entitled to Summary Judgment on IFP's Estoppel Defense*

Estoppel is an equitable affirmative defense for the Court, not a jury, *Granite State Ins. Co. v. Smart Modular Technologies, Inc.*, 676 F.3d 1023, 1027 (9th Cir. 1996), on which IFP bears the burden of proof, *Cent. Arizona Water Cons. Dist. v. United States*, 32 F.Supp.2d 1117,

1138 (D. Az. 1998).  It "is disfavored and should only be applied as needed to avoid injustice." *Taita Chemical Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 389 (5th Cir. 2001).   In general, "[f]our elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.), *cert. denied*, 364 U.S. 882 (1960).

In copyright law, "when a copyright owner engages in intentionally misleading representations *concerning his abstention from suit*, and the alleged infringer detrimentally relies on the copyright owner's deception, the doctrine of estoppel may bar the copyright owner's claims[.]"  *Petrella*, 134 S.Ct. at 1977 (emphasis added); *accord* Docket No. 334 at 14 (same); *see also Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993) (defendant must have "reasonable and justified" belief that "the plaintiff would not pursue his claims against the defendant") (emphasis added), *rev'd on other grounds*, 92 F.3d 51 (2d Cir. 1996).

Here – try as IFP might to contort the record – there is no evidence that Plaintiffs ever engaged in any intentionally misleading representations concerning their abstention from suit for IFP's infringement of their works, or that they even discussed the issue with Isherwood at any point.  Accordingly, Plaintiffs are entitled to summary judgment on IFP's estoppel defense.

## IV.  Conclusion

For the above stated reasons, the Court would GRANT Plaintiffs' Motion, except as to their infringement claims with respect to works appearing on US Airways playlists prior to April 2014.  The Court would DENY IFP's Motion and GRANT Plaintiffs' Cross-Motion.